1    Seth L. Goldstein, S.B.N. 176882
     slglawoffice@gmail.com
2    2100 Garden Road, Suite H-8
     Monterey, California, 93940
3    Telephone (831) 372 9511
     Fax (831) 372 9611
4    Lead-Counsel for Plaintiffs

     Merit Bennett, *Pro Hac Vice*
     mb@thebennettlawgroup.com
     460 St. Michael's Drive, Suite 703
     Santa Fe, New Mexico 87505
     Telephone: (505) 983-9834
     Fax: (505) 983-9836
     Co-Counsel for Plaintiffs

5

6    Mike Bomberger, S.B.N. 169866
     Estey and Bomberger
7    2869 India Street
     San Diego, California 92103
8    Telephone: (619) 295-0035
     Counsel for Plaintiff David Benson

9

10                    UNITED STATES DISTRICT COURT

11                   EASTERN DISTRICT OF CALIFORNIA

12

13   **STACIA  LANGLEY; ESTATE OF MAX**
     **BENSON; DAVID BENSON; M.S., BY AND**
14   **THROUGH HIS NEXT FRIEND, MELANIE**
     **STARK; MELANIE STARK; E.D., BY AND**
15   **THROUGH HIS NEXT FRIENDS, ROBERT**
     **DARROUGH AND KRISTIN COUGHLIN;**
16   **ROBERT DARROUGH; KRISTIN**
     **COUGHLIN; D.Z., THROUGH HIS**
17   **GUARDIAN AD LITEM, REBECCA**
     **ESPINOZA ; LAURA KINSER; S.D., BY AND**
18   **THROUGH HIS NEXT FRIEND,**
     **CHRISTOPHER DAVIS; CHRISTOPHER**
19   **DAVIS; J.P., BY AND THROUGH HIS NEXT**
     **FRIEND, CHERILYN CALER; CHERILYN**
20   **CALER; H.K., BY AND THROUGH HIS**
     **NEXT FRIEND, SUZANNE MULLER;**
21   **SUZANNE MULLER; AUSTIN PETERSEN,**
     **THROUGH HIS GUARDIAN AD LITEM,**
22   **TIMOTHY PETERSEN;**

23           Plaintiffs,

24   v.

25   **GUIDING HANDS SCHOOL, INC.;**
     **CALIFORNIA DEPARTMENT OF**
26   **EDUCATION; DAVIS JOINT UNIFIED**
     **SCHOOL DISTRICT; YOLO COUNTY**
27   **SCHOOL DISTRICT; YOLO COUNTY**
     **SPECIAL EDUCATION LOCAL PLAN**

28

| | |
|---|---|
| 1    **AREA; YOLO COUNTY OFFICE OF** | **Case No. 2:20-cv-00635-TLN-KJN** |
| 2    **EDUCATION; JENNIFER GALAS;** | |
|      **PATRICK MCGREW; RILEY CHESSMAN;** | **PLAINTIFFS' THIRD AMENDED** |
| 3    **SHARON HOLSTEGE; CAROLYNNE BENO;** | **COMPLAINT** |
|      **ELK GROVE UNIFIED SCHOOL DISTRICT;** | |
| 4    **ELK GROVE SELPA; DOUG PHILLIPS;** | **JURY TRIAL REQUESTED** |
|      **MARILYN DELGADO; FOLSOM CORDOVA** | |
| 5    **UNIFIED SCHOOL DISTRICT; FOLSOM** | **DATE: N/A** |
|      **CORDOVA SELPA; BETTY JO WESSINGER;** | |
| 6    **KIM TRIGUERO; MEGHAN MAGEE;** | **TIME: N/A** |
| 7    **AMADOR COUNTY UNIFIED SCHOOL** | |
|      **DISTRICT; AMY SLAVENSKY; MITZI** | **Judge: Hon. Troy L. Nunley** |
| 8    **FAULKNER; ROCKLIN UNIFIED SCHOOL** | |
|      **DISTRICT; POLLOCK PINES** | **SAC Filed:  05.30.20** |
| 9    **ELEMENTARY SCHOOL DISTRICT; PAT** | |
|      **ATKINS; LICIA MCDONALD; STARANNE S.** | **Trial Date:  Not Set** |
| 10   **MEYERS; CINDY KELLER; JENNIFER** | |
| 11   **CHRISTENSON; NIMA  NARAN;** | |
|     **KIMBERLY WOHLWEND; BETTY** | |
| 12   **MORGAN; JILL WATSON; LINDA STEARN;** | |
|     **MICHAEL SMITH; MELANIE ALLEN;** | |
| 13   **LE'MON THOMAS; DAVID CHAMBERS;** | |
|     **ANDRE GATEWOOD; KIM DILLON; KRIS** | |
| 14   **LAYMON; AMANDA HINDS; ROBIN** | |
| 15   **SCHUMANN; ZACK MATLOCK; KYLE** | |
|     **MCCOY; SANDRA ROMANO; JENNIFER** | |
| 16   **JONES; MERILEE GODBOUT** | |
| 17         Defendants. | |

18

19

20

21                **PLAINTIFFS' THIRD AMENDED COMPLAINT**

22

23

24

25

26

27

28

1.     Plaintiffs—former students of Guiding Hands School, Inc. ("GHS") and their parents—bring this action for damages against Guiding Hands School, its administrators and staff, the local educational agencies in which the former students resided and their responsible employees, the California Department of Education, and Handle With Care Behavior Management System, Inc.

2.     There exists an ongoing criminal case in El Dorado County regarding the events described in this Complaint against three of the defendants named herein.  As part of the criminal investigation, a large amount of documentation (approximately 41 banker's boxes) and other physical and electronic evidence were seized from GHS and other defendants.  Because the criminal case pending against three of the defendants has yet to be concluded, discovery has been delayed.  The El Dorado County Superior Court has issued a protective order covering all 41 bankers boxes and all other physical and electronic data evidence seized from GHS pursuant to a District Attorney search warrant, thus preventing Plaintiffs from accessing these documents and information.  Plaintiffs reserve their right to seek leave to amend their complaint to name additional defendants and to bring additional claims against current defendants.

3.     For more than a decade, the California Department of Education ("CDE") and local educational agencies ("LEAs")—such as school districts, county offices of education and Special Education Local Plan Areas ("SELPAs")—have known that using restraints on students carries serious risks for the students' physical and emotional health, including death.   They have similarly known of the disproportionate use of such restraints on children with disabilities.

4.     For over a decade, the U.S. Department of Education ("DOE") has repeatedly notified the CDE and LEAs of the dangers of using restraints on school children and the unequal impact of such restraints on children with disabilities.  The DOE has urged the CDE and LEAs to develop policies and practices limiting and monitoring the use of restraints.

5.     The CDE and Defendant LEAs have also been alerted to the physical and emotional damages restraints have caused children with disabilities via lawsuits, parent and student complaints, media reporting, behavior investigation reports, and investigations by and communications from advocates.  Defendants have long been aware of the particular dangers of restraint use in nonpublic schools, which receive federal and state funding to educate students with disabilities but continue to utilize these restraints with minimal to no oversight, despite state and federal laws and regulations requiring such monitoring by state and local agencies.

6.      The significant harm caused to children subjected to the aggressive disciplinary controls and restraints employed by "behavioral intervention" systems such as those developed by Handle With Care Behavior Management System, Inc. ("HWC") have also been well publicized in the media, nationally and in California, often as a result of lawsuits filed after a child has been seriously injured or killed by the use of such methods.

7.      Despite these well-known dangers and discrimination against disabled children, nonpublic schools like Defendant GHS had a policy and practice of using such restraints as a substitute for the interventions described in students' positive behavior intervention plans ("BIPs"). GHS restrained students frequently, with excessive force, in response to predictable behaviors that did not constitute an immediate or serious threat to the student or others, for extended periods of time, and on students whose disabilities elevated the risk of harm from using restraints.

8.      GHS could do so because the CDE and the LEA Defendants abdicated their responsibilities to monitor and supervise restraint use in nonpublic schools and to ensure compliance with state and federal laws prohibiting discrimination and illegal restraint use. Unable and unwilling to provide services to children whose disabilities often manifest in behavioral problems, the LEA Defendants tried to shift their responsibility for the Plaintiff Students to GHS. And because the LEA Defendants did not want these students back, the LEA Defendants had a policy and practice of ignoring the abuse regularly committed by nonpublic schools against children with disabilities to whom the LEA Defendants had a legal responsibility to provide a free public education. The CDE and the LEA Defendants justified and continue to justify their failure to perform their statutory and regulatory duties to monitor, supervise, train and ensure compliance with laws prohibiting discrimination and child abuse by claiming that such responsibilities fall not upon them, but upon other public agencies or solely upon the nonpublic schools. This shifting of accountability has created an environment wherein no public agency is willing to acknowledge its responsibility to ensure that students with disabilities are educated in a safe and non-discriminatory environment, free of physical and emotional abuse. Thus, the CDE continued to certify GHS, and the LEA Defendants continued to absolve themselves of the responsibility to educate and ensure the safety of students with disabilities by handing them off to GHS and never looking back.

9.      As a result, the eight Plaintiff Students in this case were subjected to abusive restraints that caused them significant physical and emotional injuries. It took the murder of one of those students by GHS staff members, who placed him in a prone restraint for almost two hours

on November 28, 2018, to force the CDE to conduct a real investigation and take action against GHS.

10.    The CDE suspended GHS's nonpublic school certification on December 5, 2018, and permanently revoked its certification on January 11, 2019.  The CDE boasts of its "prompt action," but this action came too late for Plaintiffs, who suffered significant physical and emotional injuries and, in one case, death due to the brutal methods of GHS and the indifference of the CDE and the LEA Defendants.

## JURISDICTION AND PROCEDURAL HISTORY

11.    Plaintiffs filed their complaint on November 7, 2019, in the El Dorado County Superior Court.  Defendants removed the case to the U.S. District Court for the Eastern District of California on March 23, 2020, pursuant to 28 U.S.C. §§ 1331 and 1441(a).  On May 3, 2020, Plaintiffs filed the operative Second Amended Complaint pursuant to a stipulation by the parties. Defendants subsequently brought 12 separate motions to dismiss and HWC also brought a motion to strike. On March 31, 2021, the Court ruled on Defendants' motions, granting them in part and denying them in part.  ECF No. 123.  The Court gave Plaintiffs leave to amend their complaint.

12.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims under 42 U.S.C. § 1983, 42 U.S.C. §§ 12131, *et. seq.*, and 29 U.S.C. § 794.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

13.    This Court has subject matter jurisdiction over Plaintiffs' claims against Defendant Handle With Care Behavior Management System, Inc., under 28 U.S.C. § 1332.  All but two of the Plaintiffs are residents of the State of California.  Two Plaintiffs are residents of New Hampshire. Handle With Care Behavioral Systems, Inc. is a corporation formed under the laws of the state of New York with its principal place of business in Gardiner, NY.

14.    This Court has personal jurisdiction against Handle With Care Behavioral Systems, Inc., ("HWC") pursuant to FRCP 4 and California CCP 410.10, as it was doing business in California and had an effect here as a result of its training and product use.  Defendant HWC designed, manufactured, produced and sold implements and devices to assist in the restraining of children at GHS.  Defendant HWC provided training and consultation to, among others, mental health facilities and providers, social workers, juvenile facilities, residential facilities, k-12 schools (including private, public and special education schools/classrooms) and educational professionals/staff on the subject of non-violent, non-crisis interventions including, self -defense

and restraint techniques. By its own admission in its motion to dismiss, "HWC was hired by co-defendant GHS to provide self-defense and restraint technique training to its staff." Doc. 40, 2:19-28.

15.    This Court has personal jurisdiction over the remaining Defendants as they are residents of California.

## VENUE

16.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b), because the acts and omissions upon which this action is based occurred in part in this District within the counties of El Dorado, Amador, Placer, Sacramento and Yolo.

## THE PARTIES

### Plaintiffs

*Students*

17.    **Max Benson ("MAX")** was a thirteen-year-old student living in the Davis Joint Unified School District, part of the Yolo County Special Education Local Plan Area ("SELPA"). He had a number of physical and developmental disabilities, including but not limited to autism spectrum disorder, Ehler-Danlos syndrome, fine and gross motor skill deficits, overall low muscle tone and a fused cervical spine.  Max was a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1.  He was enrolled at Guiding Hands School, Inc., ("GHS") at a Yolo SELPA Individual Educational Placement ("IEP") meeting on June 13, 2018, and remained at GHS until November 28, 2018.  Max Benson was killed on November 30, 2018.

18.    The claims brought herein survive Max's death and are brought on behalf of the **ESTATE OF MAX BENSON** by Michael Turelli, who was appointed as the personal representative and administrator of the Estate of Max Benson by the Yolo County Superior Court on June 19, 2019.  **Attachment A** contains true and correct copies of Yolo County Superior Court's order appointing Michael Turelli as the Administrator of the Estate of Max Langley Benson and the Letters of Administration issued by that court.

19.    On December 27, 2018, a tort claim was filed with DJUSD on MAX BENSON's behalf by his attorney, Seth Goldstein.  *See* **Attachment B**.  DJUSD did not respond to the claim. MAX BENSON filed a government tort claim against YOLO SELPA on April 11, 2019.  It was rejected on May 28, 2019.  *See* **Attachment C**.  At the time, YOLO SELPA did not inform MAX BENSON that it believed YCOE was the correct defendant, rather than YOLO SELPA, a claim

that it has subsequently brought during this litigation. MAX BENSON filed a government tort claim against the CDE on December 27, 2018. It was rejected on January 28, 2019. *See* **Attachment D**.

20.    **Plaintiff M.S.** is a minor with autism spectrum disorder, Tourette syndrome and ADHD. He was placed at GHS by Elk Grove Unified School District ("EGUSD") and Elk Grove Unified SELPA ("EG SELPA") on September 8, 2018, when he was nine years old, and remained there until December 6, 2018. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. M.S. is a resident of Elk Grove, California. M.S.'s mother, Melanie Stark, is M.S.'s *de facto* legal guardian pending formal appointment of a *guardian ad litem* for the purposes of prosecuting this case. M.S. filed a government tort claim against EGSELPA on May 9, 2019. It was rejected on July 14, 2019. *See* **Attachment E** (which has been redacted to remove the name and images of the minor). M.S. filed a government tort claim against EGUSD on April 17, 2019. It was rejected on June 5, 2019. *See* **Attachment F** (in which minor's name has been redacted). M.S. filed a government tort claim against the CDE on April 17, 2019. It was rejected on June 7, 2019. *See* **Attachment G** (in which minor's name has been redacted).

21.    **Plaintiff E.D.** is a minor with autism spectrum disorder, anxiety disorder and other mental health and developmental disabilities. At all times relevant to this complaint, E.D. was a student in the Folsom-Cordova Unified School District ("FCUSD") and Folsom-Cordova SELPA ("FC SELPA"). E.D. was placed at GHS via his IEP by FCUSD and FC SELPA. E.D. was a student at GHS for one day, January 10, 2017. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. He is currently a resident of New Hampshire. E.D.'s parents, Robert Darrough and Kristin Coughlin, are E.D.'s *de facto* legal guardians pending formal appointment of a guardian ad litems for the purposes of prosecuting this case.

22.    **Plaintiff D.Z.** is a minor with autism spectrum disorder living in the Folsom Cordova Unified School District ("FCUSD"), part of the Folsom Cordova SELPA ("FC SELPA"), at all times relevant to this complaint. He was placed at GHS by FCUSD and FC SELPA in or about April 2017 and remained there until October 2018. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. Rebecca Espinoza is D.Z.'s court-appointed guardian ad litem for the purposes of prosecuting this case. On May 17, 2019, D.Z. filed an Application for Leave to Present a Late

Claim with FCUSD and FC SELPA. On June 16, 2019, it was denied and granted in part. *See* **Attachments H** and **I**.

23.    **Plaintiff S.D.** is a minor living in the Pollock Pines Elementary School District ("PPESD") at all times relevant to this complaint. He was placed at GHS by PPESD from 2016 to 2018. He has been diagnosed with depressive disorder, oppositional defiant disorder and developmental coordination disorder and is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. Christopher Davis is S.D.'s *de facto* legal guardian pending formal appointment of a guardian ad litem for the purposes of prosecuting this case.

24.    **Plaintiff J.P.** is a minor with autism spectrum disorder who was living in the Amador County Unified School District ("ACUSD") at all times relevant to this complaint. He was placed at GHS via his IEP by ACUSD, Amador County Office of Education ("ACOE") and the Amador County Office of Education SELPA ("ACOE SELPA") from approximately 2013 to 2018. J.P. is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. Cherilyn Caler is J.P.'s *de facto* legal guardian pending formal appointment of a guardian ad litem for the purposes of prosecuting this case.

25.    **Plaintiff H.K.** is a minor with A.D.H.D., Generalized Anxiety Disorder, Disruptive Mood Dysregulation Disorder, Depression, and other neurodevelopmental disabilities, who was living in the Mother Lode Unified School District ("MLUSD") and the Placerville Union School District during the years 2017 through 2019. H.K. was placed at GHS in 2017 by MLUSD and remained there until January 2019. H.K. is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. Suzanne Muller is H.K.'s *de facto* legal guardian pending formal appointment of a guardian ad litem for the purposes of prosecuting this case.

26.    **Plaintiff Austin Petersen ("AUSTIN")** has autism spectrum disorder and was living in the Rocklin Unified School District and Placer County SELPA at all times relevant to this complaint. He was placed at GHS by RUSD in September 2013 and remained there until November 2014. AUSTIN is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. Plaintiffs have filed a petition with the Court seeking the appointment of his father, Timothy Petersen, as AUSTIN's guardian ad litem. ECF Nos. 124 and 125.

- 8 -

27.     The plaintiffs who were formerly students at GHS will be referred to collectively as "Plaintiff Students."

*Parents*

28.     **Plaintiff Stacia Langley ("LANGLEY")** is Max Benson's mother.  She is a resident of Davis, California.  LANGLEY filed a government tort claim against DJUSD on April 11, 2019.  DJUSD did not respond.  *See* **Attachment J**.  LANGLEY filed a government tort claim against the CDE on April 11, 2019.  It was rejected on May 7, 2019.  *See* **Attachment K**. LANGLEY filed a government tort claim against YOLO SELPA on April 11, 2019.  It was rejected on May 28, 2019.  *See* **Attachment L.**

29.     **Plaintiff David Benson ("BENSON")** is Max Benson's father.  He is a resident of California.

30.     **Plaintiff Melanie Stark ("STARK")** is the mother.  She is a resident of Elk Grove, California.

31.     **Plaintiff Robert Darrough ("DARROUGH")** is E.D.'s father. He is a resident of California.

32.     **Plaintiff Kristin Coughlin ("COUGHLIN")** is E.D.'s mother.  She is a resident of New Hampshire.

33.     **Plaintiff Laura Kinser ("KINSER")** is D.Z.'s mother.  She is a resident of Folsom, California.

34.     **Plaintiff Christopher Davis ("DAVIS")** is S.D.'s father.  He is a resident of Pollock Pines, California.

35.     **Plaintiff Cherilyn Caler ("CALER")** is J.P.'s mother. She is a resident of Jackson, California.

36.     **Plaintiff Suzanne Muller ("Muller")** is H.K.'s mother. She is a resident of Ione, California.

37.     Plaintiffs who are parents of the Plaintiff Students shall be referred to collectively in this complaint as "Plaintiff Parents."

**Defendants**

*CDE*

38.     **Defendant California Department of Education ("CDE")** is the State of California's department responsible for administering and enforcing laws related to education. California's State Superintendent of Public Instruction ("SSPI") is an agent/employee of the CDE

PLAINTIFFS' THIRD AMENDED COMPLAINT

and is responsible for certifying, re-certifying, monitoring, investigating, and supervising nonpublic schools. Cal. Ed. Code §§ 56366.1, 56366.4.  The SSPI and the CDE are also responsible for supervising the implementation of laws restricting the use of emergency interventions that involve the use of physical force on children "with exceptional needs," including those placed in nonpublic schools.  Cal. Ed. Code § 56520, et. seq.; Cal. Ed. Code § 56521(a) and (b).

*LEA Defendants*

39.     **Defendant Davis Joint Unified School District ("DJUSD")** is a part of **Defendant Yolo County Special Education Local Plan Area ("YOLO SELPA")**.  Yolo SELPA was formed pursuant to Cal. Ed. Code § 56195.1, and is comprised of **Defendant YOLO County Office of Education ("YCOE")**, Defendant DJUSD and four other school districts within the county.  These entities "join[ed] together to assure access to special education and services for all eligible individuals who reside in the geographic area served by these agencies."  MAX BENSON was a special education student within and served by Defendants DJUSD, YCOE and YOLO SELPA at all times relevant to the complaint.

40.     **Defendant Jennifer Galas ("GALAS")** was at all times relevant to this complaint a Program Specialist for DJUSD.  She was MAX BENSON's program specialist until approximately late October 2018.  Plaintiffs are informed and believe and thereon allege that GALAS is a resident of California.

41.     **Defendant Patrick McGrew ("MCGREW")** was at all times relevant to this complaint the Director of Special Education for DJUSD.  Plaintiffs are informed and believe and thereon allege that MCGREW is a resident of California.

42.     **Defendant Riley Chessman ("CHESSMAN")** was at all times relevant to this complaint a Program Specialist for DJUSD and replaced GALAS as MAX BENSON's program specialist in approximately October 2018.  Plaintiffs are informed and believe and thereon allege that CHESSMAN is a resident of California.

43.     **Defendant Sharon Holstege ("HOLSTEGE")** was at all times relevant to this complaint the Director of Special Education for YCOE/YOLO SELPA.  Plaintiffs are informed and believe and thereon allege that HOLSTEGE is a resident of California.

44.     **Defendant Carolynne Beno ("BENO")** was at all times relevant to this complaint the Assistant Superintendent of YCOE and the Director of Yolo SELPA.  Plaintiffs are informed and believe and thereon allege that BENO is a resident of California.

- 10 -

45.     **Defendant Elk Grove Unified School District ("EGUSD")** is a part of **Defendant Elk Grove SELPA ("EG SELPA")**, a single-district SELPA pursuant to Cal. Ed. Code § 56195.1(a).  EGUSD is its only member.  Plaintiff M.S. was at all times relevant to the complaint a special education student within and served by Defendants EGUSD and EG SELPA.

46.     **Defendant Doug Phillips ("PHILLIPS")** was at all times relevant to the complaint the Director of Special Education for EGUSD and the EG SELPA.  Plaintiffs are informed and believe and thereon allege that PHILLIPS is a resident of California.

47.     **Defendant Marilyn Delgado ("DELGADO")** was at all times relevant to the complaint a Program Specialist for EGUSD.  Plaintiffs are informed and believe and thereon allege that DELGADO is a resident of California.

48.     **Defendant Folsom Cordova Unified School District ("FCUSD")** belongs to **Defendant Folsom Cordova SELPA ("FC SELPA")**, a single-district SELPA pursuant to Cal. Ed. Code § 56195.1(a).  FCUSD is its only member.  Plaintiff D.Z. was at all times relevant to the complaint a special education student within and served by Defendants FCUSD and FC SELPA.

49.     **Defendant Betty Jo Wessinger ("WESSINGER")** has been the Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA since at least 2018.  WESSINGER was also the Director of Special Education at RUSD from 2011 to 2013.  Plaintiffs are informed and believe and thereon allege that WESSINGER is a resident of California.

50.     **Defendant Kim Triguero ("TRIGUERO")** was at all times relevant to the complaint a program specialist for FCUSD and FC SELPA.  Plaintiffs are informed and believe and thereon allege that TRIGUERO is a resident of California.

51.     **Defendant Meghan Magee ("MAGEE")** was at all times relevant to the complaint an special education program coordinator for FCUSD and FC SELPA.  Plaintiffs are informed and believe and thereon allege that MAGEE is a resident of California.

52.     **Defendant Amador County Unified School District ("ACUSD")** is a member of the Amador County Office of Education SELPA ("ACOE SELPA").  Amador County Office of Education ("ACOE") is also a member of the ACOE SELPA and was the designated administrator of the ACOE SELPA.  At all times relevant to this complaint, ACUSD received state and federal funds to provide special education services to students within its District.  Plaintiffs are informed and believe and thereon allege that pursuant to the ACOE SELPA, ACUSD provided its special education funds to ACOE to administer and deliver special education services to ACUSD students.

53.    At all times relevant to the complaint, **Defendant Amy Slavensky ("SLAVENSKY")** was the Superintendent of ACUSD and was responsible for special education programs operated by the SELPA and for implementing all requirements of the ACOE SELPA with regard to ACUSD students, including but not limited to the following LEA assurances made by ACUSD as a member of the ACOE SELPA: insuring that ACUSD students with disabilities have access to the programs and services available to students without disabilities; insuring that ACUSD students with disabilities are educated in the least restrictive environment possible; regular evaluations of the programs in which ACUSD students are placed; insuring that the programs in which ACUSD students are placed comply with state and federal laws prohibiting disability discrimination and limiting the use of behavioral interventions; and ensuring that the staff serving ACUSD students with disabilities have sufficient training, supervision and knowledge to comply with such state and federal laws.

54.    **Defendant Mitzi Faulkner ("FAULKNER")** was the Special Education Coordinator for ACOE from August 2012 through June 2016 and then the Assistant Superintendent, SELPA/Special Education for ACOE. Pursuant to the ACOE SELPA agreement, FAULKNER was responsible for coordination of special education services and programs for ACUSD students. FAULKNER's responsibilities included, but were not limited to: planning, organizing and administering special education services and programs in compliance with applicable laws and regulations—including those prohibiting excessive force and disability discrimination; supervision and evaluation of staff providing special education services to ACUSD students; development, implementation and evaluation of special education policies and procedures; negotiation and implementation of contracts with nonpublic schools; and continuous evaluation of the programs and services provided to special education students in ACUSD. Plaintiffs are informed and believe and thereon allege that FAULKNER is a resident of California.

55.    **Defendant Rocklin Unified School District ("RUSD")** is a part of the Placer County SELPA. Plaintiff Austin Petersen was at all times relevant to the complaint a special education student within and served by Defendants RUSD and Placer County SELPA.

56.    **Defendant Pollock Pines Elementary School District ("PPESD")** is a member of the El Dorado County SELPA. Plaintiff S.D. was at all times relevant to the complaint a special education student within and served by PPESD.

PLAINTIFFS' THIRD AMENDED COMPLAINT

57.    **Defendant Pat Atkins ("ATKINS")** was at all times relevant to this complaint the Superintendent of PPESD.  Plaintiffs are informed and believe and thereon allege that ATKINS is a resident of California.

58.    **Defendant Licia McDonald ("MCDONALD")** was at all times relevant to this complaint a school psychologist and a special needs coordinator at PPESD.  Plaintiffs are informed and belief and thereon allege that MCDONALD is a resident of California.

59.    At all times relevant to the complaint, Defendants GALAS, MCGREW, CHESSMAN, HOLSTEGE, BENO, PHILLIPS, DELGADO, WESSINGER, TRIGUERO, MAGEE, SLAVENSKY, FAULKNER, ATKINS, and MCDONALD were the employees and/or the agents of the LEAs above-listed and were acting within the scope of their employment and/or agency.

60.    Defendants YCOE, YOLO SELPA, DJUSD, EGUSD, EG SELPA, FCUSD, FC SELPA, ACUSD, and RUSD, shall be referred to collectively in this complaint as the local educational agencies, "LEAs" or "LEA Defendants".

*GHS Defendants*

61.    **Defendant Guiding Hands School, Inc. ("GHS")** was a nonpublic school as defined in Cal. Ed. Code § 56034.  Pursuant to Cal. Ed. Code §§ 56365(a) and 56366, GHS had Master Contracts and Independent Service Agreements with the LEA Defendants to provide special education services to the Plaintiff Students.

62.    **Defendant Staranne S. Meyers ("MEYERS")** was at all times relevant to the complaint the principal and a member of the board of GHS.  MEYERS had authority and control over GHS's staff, programs, policies, practices, and training.  She had direct responsibility for ensuring the safety of students and GHS's compliance with state and federal education and anti-discrimination laws and regulations.  Plaintiffs are informed and believe and thereon allege that MEYERS is a resident of California.

63.    **Defendant Cindy Keller ("KELLER")** was at all times relevant to the complaint the executive director and school site administrator of GHS.  KELLER had authority and control over GHS's staff, programs, policies, practices, and training.  She had direct responsibility for ensuring the safety of students and GHS's compliance with state and federal education and anti-discrimination laws and regulations.  Plaintiffs are informed and believe and thereon allege that KELLER is a resident of California.

- 13 -

64. **Defendant Jennifer Christenson ("CHRISTENSON")** was at all times relevant to the complaint an administrator at GHS. CHRISTENSON had authority and control over GHS's staff, programs, policies, practices, and training. She had direct responsibility for ensuring the safety of students and GHS's compliance with state and federal education and anti-discrimination laws and regulations. Plaintiffs are informed and believe and thereon allege that CHRISTENSON is a resident of California.

65. **Defendant Nima Naran ("NARAN")** was at all times relevant to the complaint first a supervisor and then an administrator of designated instructional services at GHS. NARAN had authority and control over GHS's staff, programs, policies, practices, and training. She had direct responsibility for ensuring the safety of students and GHS's compliance with state and federal education and anti-discrimination laws and regulations. Plaintiffs are informed and believe and thereon allege that NARAN is a resident of California.

66. **Defendant Kimberly Wohlwend ("WOHLWEND")** was at all times relevant to the complaint a classroom teacher at GHS. Plaintiffs are informed and believe and thereon allege that WOHLWEND is a resident of California.

67. **Defendant Betty Morgan ("MORGAN")** was at all times relevant to the complaint a teachers' aide at GHS. Plaintiffs are informed and believe and thereon allege that MORGAN is a resident of California.

68. **Defendant Jill Watson ("WATSON")** was at all times relevant to the complaint at teacher's aide at GHS and was responsible for training GHS staff in Handle With Care behavioral interventions. Plaintiffs are informed and believe and thereon allege that WATSON is a resident of California.

69. **Defendant Linda Stearn ("STEARN")** was at all times relevant to the complaint a special education teacher at GHS. Plaintiffs are informed and believe and thereon allege that STEARN is a resident of California.

70. **Defendant Michael Smith ("SMITH")** was at all times relevant to the complaint a teacher and/or teacher's aide at GHS. Plaintiffs are informed and believe and thereon allege that SMITH is a resident of California.

71. **Defendant Melanie Allen ("ALLEN")** was at all times relevant to the complaint a teacher and/or teacher's aide at GHS. Plaintiffs are informed and believe and thereon allege that ALLAN is a resident of California.

72.     **Defendant Le'Mon Thomas ("THOMAS")** was at all times relevant to the complaint the transportation coordinator at GHS.  Plaintiffs are informed and believe and thereon allege that THOMAS is a resident of California.

73.     **Defendant David Chambers ("CHAMBERS")** was at all times relevant to the complaint the "school nurse" at GHS.  Plaintiffs are informed and believe and thereon allege that CHAMBERS is a resident of California.

74.     **Defendant Andre Gatewood ("GATEWOOD")** was at all times relevant to the complaint a teacher and/or teacher's aide at GHS.  Plaintiffs are informed and believe and thereon allege that GATEWOOD is a resident of California.

75.     **Defendant Kim Dillon ("DILLON")** was at all times relevant to the complaint a staff member at GHS. Plaintiffs are informed and believe and thereon allege that DILLON is a resident of California.

76.     **Defendant Kris Laymon ("LAYMON")** was at all times relevant to the complaint a staff member at GHS.  Plaintiffs are informed and believe and thereon allege that LAYMON is a resident of California.

77.     **Defendant Amanda Hinds ("HINDS")** was at all times relevant to the complaint a staff member at GHS.  Plaintiffs are informed and believe and thereon allege that HINDS is a resident of California.

78.     **Defendant Robin Schumann ("SCHUMANN")** was at all times relevant to the complaint a staff member at GHS.  Plaintiffs are informed and believe and thereon allege that SCHUMANN is a resident of California.

79.     **Defendant Zack Matlock ("MATLOCK")** was at all times relevant to the complaint a teachers' aide at GHS.  Plaintiffs are informed and believe and thereon allege that MATLOCK is a resident of California.

80.     **Defendant Kyle McCoy ("MCCOY")** was at all times relevant to the complaint a teachers' aide at GHS.  Plaintiffs are informed and believe and thereon allege that MCCOY is a resident of California.

81.     **Defendant Sandra Romano ("ROMANO")** was at all times relevant to the complaint a behaviorist at GHS.  Plaintiffs are informed and believe and thereon allege that ROMANO is a resident of California.

1    82.    **Defendant Jennifer Jones ("JONES")** was at all times relevant to the complaint a
2    staff member at GHS. Plaintiffs are informed and believe and thereon allege that JONES is a
3    resident of California.

4    83.    **Defendant Merilee Godbout ("GODBOUT")** was at all times relevant to the
5    complaint a staff member at GHS. Plaintiffs are informed and believe and thereon allege that
     GODBOUT is a resident of California.

6    84.    **Defendant Danielle Oehring ("OEHRING")** was at all times relevant to the
7    complaint a staff member at GHS.  Plaintiffs are informed and believe and thereon allege that
8    OEHRING is a resident of California.

9    85.    At all times relevant to the complaint, MEYERS, KELLER, CHRISTENSON,
10   NARAN, WOHLWEND, MORGAN, WATSON, STEARN, SMITH, ALLEN, THOMAS,
11   CHAMBERS, GATEWOOD, DILLON, LAYMON, HINDS, SCHUMANN, MATLOCK,
12   MCCOY, ROMANO, JONES, GODBOUT and OEHRING were the employees and/or the agents
     of GHS and were acting within the scope of their employment and/or agency.

13                                 *Handle With Care*

14   86.    Defendant Handle With Care Behavior Management System, Inc., ("HWC") by its
15   own admission, stated above, HWC provided training to GHS staff on use of restraints, "take-
16   downs" and, on information and belief, products consisting of mats, restraining devices of unknown
17   configuration, and directions on how to use them.  Reports and email provided by the school
18   districts, the GHS staff, contain recitation of the use of "mats," "flex cuffs," cervical collars, and
19   other mechanical devices to restrain the students.  The plaintiff children and plaintiff parents
20   observed other children restrained in these devices.  On one occasion, Max Benson was threatened
21   by staff to use a straight jacket device to transport him home.  Max Benson's body, seen at the
22   mortuary, had marks on the inner upper arms, just above the elbow, towards the back of the body,
23   consisting of prolonged linear lines consistent with pressure exerted by a long solid/hard object on
24   each arm, which body marks were believed to have been inflicted by the negligent application of
25   the HWC restraint and/or the application of excessive force, perpetrated by the GHS defendants.
26   In other instances, children were restrained by devices with straps, flex cuffs and a "straight jacket"
     like device on the school's transportation vehicle and in the classroom that left bruises and marks
     on their skin.

27   **PUBLIC EDUCATION IN CALIFORNIA**

28

                                                                                    - 16 -

87.    The California Supreme Court has recognized that, unlike many other states, California has assumed under its constitution a specific duty to provide public education. *Butt v. State of California*, 4 Cal.4th 668, 680-81 (1992).  While the Education Code may provide autonomy to LEAs, they are nonetheless "the State's agents for local operation of the common school system . . . and the State's ultimate responsibility for public education cannot be delegated to any other entity." *Id*. at 681.

88.    State law also guarantees free special education instruction and services to all qualifying children.  Cal. Ed. Code § 56040(a).  This responsibility falls on the state and the local educational agency (LEA) in which the student resides.  Cal. Ed. Code § 56344(c); 20 U.S.C. § 1412(a)(11).

89.    The state receives federal funding to provide educational services to children with disabilities pursuant to 20 U.S.C. §§ 1411-1413 and distributes this money to the LEAs.

90.    The state's supervisory and monitoring duties are spelled out in state and federal law.  20 U.S.C. § 1412(a)(11) (although a state may allocate the development and implementation of plans to provide special education to LEAs, it nonetheless retains the ultimate responsibility for ensuring compliance with the IDEA); Cal. Ed. Code § 56125(b)("The [State Superintendent of Public Instruction] shall monitor the implementation of local plans by periodically conducting onsite program and fiscal reviews, in accordance with Sections 300.114 to 300.120, inclusive, of Title 34 of the Code of Federal Regulations."); § 56135(a)("The [SSPI] shall be responsible for assuring provision of, and supervising, education and related services to individuals with exceptional needs as specifically required pursuant to the Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.)"); § 56606 ("The Superintendent shall provide for onsite program and fiscal reviews of the implementation of [plans approved under this part]. . . . "); § 56521(b)("The Superintendent of Public Instruction shall monitor and supervise the implementation of" state laws regarding "emergency interventions"); § 56600.6 (The SSPI must monitor pupil and program performance results, and provide monitoring and technical assistance to assure compliance with the IDEA).  As the code was amended in 2019 and 2020, all references to the California Code reflect the statutes that were in effect through 2018.

91.    In California, every school district must belong to a special education local plan area ("SELPA") which administers a local plan for providing the special education services needed by all students in the defined area and for allocating special education funding.  Cal. Ed. Code §§

PLAINTIFFS' THIRD AMENDED COMPLAINT

56195 and 5195.1.  The district may belong to a single-district SELPA, a multi-district SELPA, or a SELPA coordinated by the county office of education.  Cal. Ed. Code § 56195.1.

92.      The SELPA must ensure that it has "policies, procedures, and programs that are consistent with state laws, regulations, and policies governing" special education and compliance with the IDEA, the ADA, and Section 504.  Cal. Ed. Code § 56205(a).  The SELPA's local plan must include a description of how it will "oversee and evaluate placements in nonpublic, nonsectarian schools and the method of ensuring that all requirements of each pupil's individualized education program are being met. ... "Cal. Ed. Code § 56205(c).

## VICARIOUS LIABILITY OF THE LEA DEFENDANTS

93.      As required under California law, nonpublic schools ("NPS") are part of the continuum of services local educational agencies must make available to students.  Cal. Ed. Code §§ 56360, 56361(e), 56365(a).  If the LEA does not have the appropriate services or setting for a child who qualifies for special education, the LEA may contract with and pay a nonpublic school to provide such services in exchange for state and federal education funds. Cal. Ed. Code §§ 56365(a)-(d), 56366; 20 U.S.C. §§ 1411-1413.

94.      An LEA may place a child in a nonpublic school (NPS) only after it has determined that the placement is appropriate and, after placement, must regularly evaluate the student's progress and continuing suitability of the NPS placement.  Cal. Ed. Code §§ 56342.1 and 56366(a)(2)(B).

95.      A student placed in an NPS pursuant to Cal. Ed. Code §§ 56365 "will be deemed to be enrolled in public schools" for the purpose of state and federal funding, and the LEA shall pay the NPS "the full amount of the tuition for individuals with exceptional needs that are enrolled in programs provided by the" nonpublic school.  Cal. Ed. Code § 56365(b) and (d).

96.      An LEA placing a student in a nonpublic school pursuant to the student's IEP must have a Master Contract with that NPS.  Cal. Ed. Code §§ 56365(a); 56366. The Master Contract must include an individual services agreement for each student placed at the NPS and "a description of the process being utilized by the local educational agency to oversee and evaluate placements in nonpublic, nonsectarian schools, as required by federal law. . . ." Cal. Ed. Code § 56366(a)(2).  An LEA may enter a master contract only with a NPS that the LEA has certified as "meeting those standards relating to the required special education and specified related services and facilities for individuals with exceptional needs." Cal. Ed. Code § 56366(d).

97.    Nonpublic schools are a program of the LEA, and as such, the LEA is responsible for ensuring their compliance with special education and anti-discrimination laws.  Cal. Ed. Code § 56366(d); 5 C.C.R. § 4902.  Under the California Code of Regulations:

Each school district and county office of education shall have primary responsibility to ensure that its programs and activities are available to all persons without regard to . . . mental or physical disability. Each local agency shall investigate complaints of unlawful discrimination in its programs or activities.  5 C.C.R. § 4960(a).

98.    Plaintiffs allege on information and belief that when the LEA Defendants placed the Plaintiff Students at GHS via their IEPs, each Plaintiff Student's SELPA and/or school district had a Master Contract with GHS to provide educational services in exchange for federal and state special education funds, as required by law.  The LEA Defendants and GHS also entered an Individual Services Agreement for each of the Plaintiff Students placed at GHS via their IEP.

99.    At the time MAX BENSON was placed at GHS by DJUSD, YOLO SELPA and YCOE, Defendant GHS had entered into a Master Contract with YOLO SELPA for the 2017-2018 school year.  **Attachment X** is a true and correct copy of the 2017-2018 Master Contract between YOLO SELPA and GHS ("Yolo Master Contract") and an Acknowledgment of Amendment of Master Contract signed by Defendant KELLER on July 17, 2017 and Defendant BENO on July 26, 2017.

100.    The Master Contract states that the NPS is an independent contractor.  It also states that the NPS shall provide "special education and/or related services to students with exceptional needs under the authorization of California Education Code sections 56157, 56361 and 56365 et seq. and Title 5 of the California Code of Regulations section 3000 et seq., AB490 (Chapter 862, Statutes of 2003) and AB1858 (Chapter 914, Statutes of 2004)."  Yolo Master Contract at ¶¶ 1, 17.

101.    At the time EGUSD and EG SELPA placed Plaintiff M.S. at GHS, EGUSD had a Master Contract with GHS as required by law.  Although Plaintiffs do not have a copy of the 2018-2019 Master Contract between EGUSD, EG SELPA and GHS, the CDE's investigation report noted that a Master Contract existed.  Plaintiffs allege on information and belief that the 2018-2019 Master Contract between EGUSD, EG SELPA and GHS was substantially similar to the District Master Contract General Agreement for Nonsectarian, Nonpublic School/Agency Services 2017-2018 Elk Grove Unified School District ("EG Master Contract").  The EG Master Contract states that the nonpublic school is an independent contractor and will perform "special education and/or related services to LEA students with exceptional needs under the authorization of California

- 19 -

Education Code sections 56157, 56361 and 56365 et seq. and Title 5 of the California Code of Regulations section 3000 et seq., AB490 (Chapter 862, Statutes of 2003) and AB1858 (Chapter 914, Statutes of 2004)."  EGUSD Master Contract at ¶¶ 1, 19.

102.    Although these Master Contracts attempted to disclaim responsibility via the "independent contractor" clauses, these disclaimers were ineffective given the joint, nondelegable duty of the LEA Defendants to provide a public education, free from discrimination and in compliance with state and local laws, to students within the Plan Area/District, including those special education services for which the LEA Defendants had received funding from the state and federal government.

103.    Plaintiffs allege on information and belief that the other LEA Defendants had Master Contracts with GHS at the time that the Plaintiff Students from their school districts/SELPA areas were placed at GHS.  Plaintiffs allege on information and belief that these Master Contracts had substantially similar language to that in the Yolo and EG Master Contracts.

104.    Thus, the LEA Defendants have vicarious liability for the actions of GHS and its employees.

105.    Additionally, the Defendant school districts each belonged to a SELPA plan, which constituted interagency agreements, and are therefore jointly and severally liable for one another's actions.  "Whenever any public entities enter into an agreement, they are jointly and severally liable upon any liability which is imposed by any law . . . upon any one of the entities or upon any entity created by the agreement for injury caused by a negligent or wrongful act or omission occurring in the performance of such agreement." Cal. Gov't Code § 895.2.

**CORPORAL PUNISHMENT AND BEHAVIORAL INTEVENTIONS**

106.    California prohibits corporal punishment in public schools.  Cal. Educ. Code § 49001(b). It defines "corporal punishment" as "the willful infliction of, or willfully causing the infliction of, physical pain on a pupil." Cal. Educ. Code § 49001(a).  Exempted from the definition is "[a]n amount of force that is reasonable and necessary for a person employed by or engaged in a public school to quell a disturbance threatening physical injury to persons or damage to property, for purposes of self–defense, or to obtain possession of weapons or other dangerous objects within the control of the pupil." *Id*.

107.    The California legislature has enacted laws encouraging positive behavioral interventions and placing restrictions on "behavioral interventions" that use physical force on

- 20 -

children "with exceptional needs," including those in nonpublic schools.  Cal. Ed. Code § 56520, et. seq." Cal. Ed. Code § 56521(a).

108.    Although the California legislature enacted additional restrictions on restraints and other emergency interventions in 2019 and 2020, those enactments do not apply to this case.  All references are to the California code in effect prior to January 2019.

109.    "Emergency interventions may only be used to control unpredictable, spontaneous behavior that poses clear and present danger of serious physical harm to the individual with exceptional needs, or others, and that cannot be immediately prevented by a response less restrictive . . . " Cal. Ed. Code § 56521.1(a).

110.    The education code prohibits using "emergency interventions:" a) as a substitute for the positive interventions outlined in a student's behavioral intervention plan; b) "for longer than is necessary to contain the behavior;" c) that employ the use of prone restraints by staff who have not been trained those procedures; d) that exert "[a]n amount of force that exceeds that which is reasonable and necessary under the circumstances." Cal. Ed. Code § 56521.1(b)-(d).

111.    The law requires that school officials notify the child's parents or guardians within one school day if an emergency intervention is used and complete a "behavioral emergency report" ("BER").  Cal. Ed. Code § 56521.1(e).  The purpose of BERs is "[t]o prevent emergency interventions from being used in lieu of planned, systematic behavioral interventions" and they must be "immediately be forwarded to, and reviewed by, a designated responsible administrator." Cal. Ed. Code § 56521.1(e) and (f).  When the child has a "positive behavioral intervention plan", the law requires an IEP team meeting within two days to determine whether the plan should be modified. Cal. Ed. Code § 56521.1(h).

112.    Under Cal. Ed. Code § 56521.2, neither LEAs nor nonpublic schools may "authorize, order, consent to, or pay for" interventions that, among other prohibitions: 1) are designed or likely to cause physical pain; 2) deny adequate "food, water, . . . physical comfort, or access to bathroom facilities;" 3) are designed, used or likely to subject the student to "verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma;" 4) preclude adequate supervision of the student; or 5) deprive the student of one or more of his senses. Cal. Ed. Code § 56521.2(a)(1)(3)(4)(7) and (8).

113.    Prone restraints are prohibited, except as a limited emergency intervention subject to the prohibitions outlined above in section 56521.1. Cal. Ed. Code § 56521.2(a)(5).

- 21 -

114.    Schools are instructed to consider the use of "positive behavioral interventions and supports, and other strategies, to address" behavior that impedes the child's learning or that of other students, consistent with federal law.  Cal. Ed. Code § 56521.2(b).

115.    Compliance with these laws is a condition of receiving federal funding for special education.  Cal. Ed. Code § 56523(d).

116.    As a condition of certification by the California Department of Education, an NPS must certify that it will not accept students whose IEP services it cannot provide and that its written policy for student discipline "is consistent with state and federal law and regulations."  Cal. Ed. Code § 56366.10(a) and (d).

**CALIFORNIA LAW PROHIBITS AND DEFINES CHILD ABUSE BY CODE**

117.    California Penal Code Section 273a(b) defines child abuse as "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

118.    California Penal Code Section 273d(a) defines child abuse as "Any person who willfully inflicts upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition is guilty of a felony."

119.    By and through these statutes, California bans the use of punishment of a child that would involve the unreasonable assault of a child by restraining him unnecessarily or in violation of a statute causing any psychological harm, or physical injury, including by leaving marks or bruises that would constitute a "traumatic condition".

120.    As will be shown below, in numbers of the situations described herein wherein the children were placed into restraints, they were left with physical marks and injuries and with long-lasting psychological harm and damages.

**GHS's SYSTEMIC ABUSE AND DISCRIMINATION**

121.    Despite the laws prohibiting corporal punishment of students, restricting the use of restraints and requiring that educators implement positive behavioral interventions, GHS had a lengthy, well-documented policy and practice of ignoring students' Behavior Improvement Plans (BIPs) and instead restrained students in response to predictable, disability-related behaviors that did not constitute a clear and present threat to the safety of the students or to others.

- 22 -

122.    The application of the restraints constituted corporal punishment, child abuse and excessive force.  GHS restrained students repeatedly, for excessive periods of time, with excessive force and without monitoring their conditions or providing them with periodic breaks, access to the restroom, food or water.  GHS restrained students in positions well-known among educators to carry significant risks to the health and safety of those restrained, especially persons with the disabilities and characteristics the Plaintiff Students were known to have.  More often than not, the restraints not only failed to solve the students' behavior issues, but aggravated them.  GHS nonetheless continued to use the violent and ineffective restraints, despite the legal requirements to use the positive and less-restrictive techniques outlined in the students' behavior improvement plans.  The restraints caused pain and physical injuries to the Plaintiff Students, some of which were long-term and/or permanent.  The restraints were dehumanizing and caused serious trauma and emotional distress and injuries to the Plaintiff Students.

123.    GHS's administrators were fully aware of the restraints administered by their staff and often witnessed or participated in them.  More important, GHS's administrators approved of and encouraged the use of restraints as a primary form of behavior control, in lieu of the behavior interventions outlined in students' BIPs.  In fact, it was GHS's policy and practice to use illegal, frequent and excessive restraints in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of the students or others.

124.    GHS did not sufficiently or effectively train its staff in non-physical or positive behavior interventions.  Nor did it have effective policies, practices or training in recognizing medical emergencies, providing first aid or CPR, or how and when to alert emergency personnel.  GHS did not provide sufficient or effective training on how to reduce danger and injury in the event that a restraint was truly warranted, including performing the restraint safely, for no longer than necessary, while providing continuous monitoring of the student.

125.    GHS misrepresented and/or failed to disclose material facts to the parents of students prior to enrollment and while the students were at the school.  They misrepresented that GHS staff had the proper experience and training for dealing with the disabilities and behavior issues of the students, that they were skilled in using positive behavior interventions, that they only used restraints when absolutely necessary for the safety of the student or others, and that they had sufficient staff to supervise the students and provide non-physical, positive behavior prevention and intervention techniques.

126.    GHS did not, as required by law, always complete a BER or notify parents when a student was restrained and/or injured.  Even when GHS notified the parents or the parents otherwise learned about the restraints, GHS and its staff falsely represented the length, severity of and reasons for the restraints.  It also falsely represented that the restraints were legal, appropriate and the only way to keep the students and others safe.  In the case of most of the parents, it was not until they learned that the CDE was investigating GHS following MAX BENSON's death that they realized that GHS and its staff were regularly and systematically substituting the behavior interventions in their students' BIPs with excessive and dangerous restraints in response to predictable, disability-related conduct that did not constitute a clear and present danger to the safety of the students or others.  It was not until the facts regarding rampant and systemic child abuse and discrimination came to light as a result of the media attention and investigations following MAX BENSON's death that Plaintiffs discovered that the CDE and the LEA Defendants knew or should have known of the rampant child abuse and discrimination occurring at GHS, yet ignored their legal responsibilities to monitor, investigate or stop GHS or to remove students from the school and transfer them to a safe, nondiscriminatory placement.

127.    Plaintiffs do not know the dates of all of the restraints to which GHS subjected their children, the complete factual circumstances, or the names of all individuals involved.  Plaintiff parents have attempted to obtain their children's educational records from GHS, but GHS has not responded.  Moreover, documents seized from GHS pursuant to a search warrant as part of a criminal prosecution of WOHLWEND, MEYERS and KELLER have been placed under a protective order by the criminal court and cannot currently be accessed by Plaintiffs. Plaintiffs have also requested their educational records from the LEA Defendants but have not been able to obtain all of the records to which they are legally entitled.  Plaintiffs reserve their right to amend their complaint to add Defendants and/or claims.

**DEFENDANT CDE**

128.    The CDE has oversight over nonpublic schools.  Nonpublic schools are certified by the CDE's head, the State Superintendent of Public Instruction ("SSPI"), who must conduct onsite reviews of the NPS facility and program prior to certification and every three years thereafter, unless the SSPI receives a formal complaint against the NPS, in which case the onsite review should be conducted once a year.  Cal. Ed. Code § 56366.1(a) and (e)(1).

129.    The NPS must certify to the SSPI that it will not accept students whose services it cannot provide and that its policy for student discipline "is consistent with state and federal law and regulations." Cal. Ed. Code § 56366.10(a) and (d).

130.    The SSPI "shall conduct an investigation of a nonpublic, nonsectarian school or agency onsite at any time without prior notice if there is substantial reason to believe that there is an immediate danger to the health, safety, or welfare of a child." Cal. Ed. Code § 56366.1(i)(1). The SSPI must also investigate the NPS if it "receives evidence of a significant deficiency in the quality of educational services provided". Cal. Ed. Code § 56366.1(i)(3).

131.    The SSPI must also "monitor the facilities, the educational environment, and the quality of the educational program, including the teaching staff, . . . of an existing certified nonpublic, nonsectarian school or agency," which includes onsite reviews every two out of three years. Cal. Ed. Code § 56366.1(j).

132.    The SSPI may revoke or suspend an NPS's certification for multiple reasons, including violation of state or federal laws, conduct that its harmful to a student's health, welfare or safety, failure to comply with the Master Contract, and failure to provide appropriate services or implement a student's IEP. Cal. Ed. Code § 56366.4(a).

133.    At all times relevant to the complaint, Tom Torlakson was the SSPI and an employee and/or agent of the CDE, acting within the scope of his employment and/or agency. At all times relevant to the complaint, the legal duties of the SSPI and the CDE included but were not limited to:

a.    Monitoring and supervision of the implementation of laws restricting the use of emergency interventions that involve the use of physical force on children "with exceptional needs," including those placed in nonpublic schools. Cal. Ed. Code § 56520, et. seq.; Cal. Ed. Code § 56521(a) and (b);

b.    Monitoring "the implementation of local plans by periodically conducting onsite program and fiscal reviews," including at nonpublic schools. Cal. Ed. Code § 56125(b);

c.    Assuring "provision of, and supervising, education and related services to individuals with exceptional needs as specifically required pursuant to the Individuals with Disabilities Education Act." Cal. Ed. Code § 56135(a);

d.    Providing onsite program reviews of the implementation of special education plans, Cal. Ed. Code § 56606;

PLAINTIFFS' THIRD AMENDED COMPLAINT

e.  Monitoring pupil and program performance results, and provide monitoring and technical assistance to assure compliance with the IDEA, Cal. Ed. Code § 56600.6.

f.  Post-certification onsite reviews of nonpublic schools every three years if there are no formal complaints, but once a year if there has been a formal complaint against the school.  Cal. Ed. Code § 56366.1(e)(1);

g.  Onsite, unannounced investigations of nonpublic schools "if there is substantial reason to believe that there is an immediate danger to the health, safety, or welfare of a child."  Cal. Ed. Code § 56366.1(i)(1);

h.  An investigation of the nonpublic school if the SSPI "receives evidence of a significant deficiency in the quality of educational services provided."  Cal. Ed. Code § 56366.1(i)(2); and

i.  Monitoring of "the facilities, the educational environment, and the quality of the educational program, including the teaching staff" of any certified nonpublic school, which includes onsite reviews every two out of three years.  Cal. Ed. Code § 56366.1(j); and

134.  The U.S. Department of Education ("DOE") has repeatedly informed educational agencies and officials, including the California Department of Education and the SSPI, that restraints were being used disproportionately against children with disabilities.

135.  On July 31, 2009, then U.S. Secretary of Education, Arne Duncan, sent a letter to the chief state school officers informing them of congressional testimony from the Government Accountability Office ("GAO") about "the abusive and potentially deadly misapplication of seclusion and restraint techniques in schools."  https://www2.ed.gov/policy/elsec/guid/secletter/090731.html, Arne Duncan, Letter to Chief State School Officers Regarding the Use of Seclusions and Restraints in Public and Private Schools, July 31, 2009.  Duncan urged "each State to review its current policies and guidelines regarding the use of restraints and seclusion in schools to ensure every student is safe and protected, and if appropriate, develop or revise its policies and guidelines." *Id.*

136.  The GAO congressional testimony referenced in Duncan's letter detailed an examination of ten restraint and seclusion cases across the U.S. involving a criminal conviction, a finding of civil or administrative liability, and/or a large financial settlement.  The cases shared the following elements: "(1) children with disabilities were sometimes restrained and secluded even

- 26 -

when they did not appear to be physically aggressive and their parents did not give consent; (2) facedown or other restraints that block air to the lungs can be deadly; (3) teachers and staff in these cases were often not trained in the use of restraints and techniques; and (4) teachers and staff from these cases continue to be employed as educators." https://www.gao.gov/assets/130/ 122526.pdf, U.S. GAO Testimony Before the Committee on Education and Labor, House of Representatives, "Seclusions and Restraints: Selected Cases of Death and Abuse at Public and Private School and Treatment Centers," May 19, 2009 ("GAO Report") at 7.

137.    The GAO warned that the restraint techniques used against children were dangerous and likely to cause physical injury "because they may involve physical struggling, pressure on the chest, or other interruptions in breathing" and that children "can be severely traumatized during restraint." GAO report at 1.  The GAO noted that in some cases, the restraints resulted in death.  *Id*. at 2.  "Of the 10 closed cases we examined, 4 involved children who died as a result of being restrained. In all 4 cases, staff members used restraint techniques that restricted the flow of air to the child's lungs. In one of these cases, an aide sat on top of a child to prevent him from being disruptive and ultimately smothered him. The other cases related to the use of different types of prone restraints, a technique that typically involves one or more staff members holding a child face down on the floor. Although some of the teachers and staff involved in these cases were trained on the use of prone restraints, the children in their care still died as a result of its use." *Id*. at 8-9.

138.    The GAO found that "[a]lmost all of the allegations we identified involved children with disabilities."  GAO report at 5.  "In addition, 9 of our 10 closed cases involve children with disabilities or a history of troubled behavior. The children in these cases were diagnosed with autism or other conditions, including post-traumatic stress disorder and attention deficit hyperactivity disorder. Although we did not evaluate whether the seclusion and restraint used by the staff in our cases was proper under applicable state laws, we did observe that the children in the cases were restrained or secluded as disciplinary measures, even when their behavior did not appear to be physically aggressive." *Id*. at 7-8.

139.    Plaintiffs are informed and believe and thereon allege that the GAO report and Arne Duncan's accompanying letter were provided to the CDE and the SSPI on or shortly after July 31, 2009.

140.    In 2012, the DOE issued a resource guide to state and local educators recommending fifteen recommended policies and practices that states and LEAs should implement to protect children from the dangers of restraints.  https://www2.ed.gov/ policy/seclusion/ restraints-and-

seclusion-resources.pdf, U.S. Department of Education, Restraint and Seclusion: Resource Document, May 15, 2012 ("Resource Doc."). The DOE warned that "the use of restraint and seclusion can, in some cases, have very serious consequences, including, most tragically, death. There is no evidence that using restraint or seclusion is effective in reducing the occurrence of the problem behaviors that frequently precipitate the use of such techniques." Resource Doc. at 2. "Physical restraint or seclusion should not be used except in situations where the child's behavior poses imminent danger of serious physical harm to self or others and restraint and seclusion should be avoided to the greatest extent possible without endangering the safety of students and staff." *Id*. Prone restraints were specifically condemned: "Prone (i.e., lying face down) restraints or other restraints that restrict breathing should never be used because they can cause serious injury or death." *Id*. at 16.

141.    Additionally, the U.S. Department of Justice, Office of Civil Rights issued a Dear Colleague Letter on Restraint and Seclusion of Students with Disabilities on December 28, 2016, notifying educational agencies that students with disabilities were being restrained at a much higher rate than other students. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf ("2016 OCR Letter"). In the letter, OCR noted that federal law, including the ADA and Section 504, significantly limits the use of restraints in public school districts.

142.    The letter stated:

> According to [OCR's Civil Rights Data Collection], during the 2013-14 school year, students with disabilities were subjected to mechanical and physical restraint and seclusion at rates that far exceeded those of other students. Specifically, students with disabilities served by the Individuals with Disabilities Education Act (IDEA) represented 12% of students enrolled in public schools nationally, but 67% of the students who were subjected to restraint or seclusion in school. Based on data reported to OCR, approximately 100,000 students were placed in seclusion or involuntary confinement or were physically restrained at school to immobilize them or reduce their ability to move freely, including more than 69,000 students with disabilities served by the IDEA. Data disparity alone does not prove discrimination. The existence of a disparity, however, does raise a question regarding whether school districts are imposing restraint or seclusion in discriminatory ways.

2016 OCR Letter at 2.

143.    Again on November 22, 2016, then U.S. Secretary of Education John B. King Jr. sent a letter to governors and chief state school officers calling for the elimination of corporal punishment in education.  "It is difficult for a school to be considered safe or supportive if its students are fearful of being physically punished by the adults who are charged with supporting their learning and their future," King wrote. The letter reiterated that corporal punishment is disproportionately applied to Black students and those with disabilities.  It cited studies demonstrating that corporal punishment is ineffective and has negative impacts on cognitive functioning and brain development.  King also pointed to research showing that children who have been subjected to physical punishment "are more likely to develop mental health issues, including alcohol and drug abuse or dependence, mood disorders, anxiety disorders, and other personality disorders."  https://www2.ed.gov/policy/gen/guid/school-discipline/files/corporal-punishment-dcl-11-22-2016.pdf.  Plaintiffs are informed and believe and accordingly allege that the CDE and SSPI Torlakson received a copy of this letter at or around the time it was published.

144.    The CDE and SSPI Torlakson were well aware of the warnings from the US DOE and OCR that restraints and physical punishment carried significant risks of physical injury, emotional trauma and death and that students with disabilities were being restrained at a much greater rate than non-disabled students.  On January 12, 2018, Torlakson sent a letter to SELPA directors, special education administrators for county offices of education, nonpublic school administrators and school district special education directors to "remind" them of state law regarding the use of restraints.  Torlakson referenced the 2012 Resource Document and the 2016 OCR Letter as resources.  https://www.cde.ca.gov/sp/se/ac/om011218.asp.

145.    Between 2005 and 2012, the numbers of "behavioral emergency reports" (which schools must complete whenever a student is subjected to a "behavioral emergency intervention" ("BER") or serious property damage has occurred) submitted to the CDE more than doubled.  These figures demonstrated that BERs occurred at double the rate in nonpublic schools (which almost exclusively serve children with disabilities) than they did in the general public school population.

146.    According to data submitted to the CDE for the 2011-12 school year, nonpublic schools educated only 2 percent of the special education students in California, yet they filed 66 percent of the behavioral emergency reports with the CDE that year. https://edsource.org/2015/little-oversight-of-restraint-practices-in-special-education/78040.

147.    A review of the restraint data submitted to the CDE between 2005 and 2012 by the nonprofit organization EdSource also revealed that school staff regularly responded to behavioral

emergencies by restraining the student (78 percent of the incidents reported) and that approximately 44 percent of the restraints applied were prone restraints, which the U.S. Department of Education in 2012 warned "should never be used" on special education students due to a risk of serious injury or death. https://edsource.org/2015/seven-charts-that-put-restraint-and-seclusion-in-context/66794.

148.    Despite repeated reports about the increasing use of restraints and their disproportionate use on students with disabilities and in nonpublic schools, the CDE did not review the BER data it received to look for trends.  When asked in 2015 about the fact that the number of BERs reported to the CDE between 2005 and 2012 had doubled and that nonpublic schools were reporting significantly greater numbers of BERs, then CDE director of special education Fred Balcom responded with indifference: "I wouldn't speculate on it – whether the number is appropriate or too much or too little. It is what it is."  He explained that CDE policy and practice did not include proactive monitoring of restraint use in California's schools, but that the CDE took action only in response to a complaint to the CDE. https://edsource.org/2015/little-oversight-of-restraint-practices-in-special-education/78040.

149.    The CDE and SSPI Tom Torlakson also resisted legislative efforts to limit the use of restraints in California.  Torlakson successfully opposed a bill introduced in the California Assembly in 2011 that would have significantly limited the ability of teachers to restrain students arguing that it "would establish overly prescriptive definitions of restraint in the EC (Education Code) accompanied with the restrictive conditions upon when they may be used in emergency situations. This would undermine the professional judgment teachers and administrators use when faced with a serious or imminent threat to the student, their peers or themselves."  Bill Analysis, AB-519, 2011-2012 at 8, found at http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201120120AB519.

150.    Instead of limiting restraints, the California legislature in 2013 repealed a then-existing requirement that SELPAs collect and report annual data on Behavioral Emergency Reports to the CDE.  Despite their knowledge that restraints were being disproportionately applied against children with disabilities and at nonpublic schools, the CDE and SSPI Torlakson did not respond by implementing proactive auditing of BERs within SELPAs or at nonpublic schools.  Indeed, the CDE and Torlakson sent out a letter in March 2014 to SELPAs, special education administrators of county offices of education, and nonpublic school administrators explaining the elimination of requirements to report BER data to the CDE.  The CDE categorized the elimination of the reporting

requirement as a way to "reduce unnecessary costs".   https://www.cde.ca.gov/sp/se/ac/ bipltr031414.asp.

151.   The CDE and Torlakson demonstrated their deliberate indifference to the discrimination children with disabilities are subjected to at nonpublic schools by repeatedly failing to monitor those schools or ensure compliance with laws prohibiting abuse—including improper restraint use—at nonpublic schools throughout California.  Not only did the CDE and Torlakson fail to proactively monitor and ensure compliance with the laws prohibiting abuse and improper restraint use against children with disabilities at nonpublic schools, they failed to react rapidly or effectively to specific complaints of restraint abuse.

152.   In 2014, the mother of a disabled student sued Tobinworld (which ran a chain of nonpublic schools in California) and the Antioch Unified School District, asserting that in 2013 Tobinworld staffers twice pinned her 7-year-old son to the ground, bloodying his nose and bruising him.

153.   In October 2014, the CDE received a complaint against Tobinworld II and Tobinworld III, notifying it that the husband of Tobinworld's owner's, Matthew Israel, had been working at the school without proper documentation, background checks or notification to the school districts.  Israel had previously been banned in 1986 by the California attorney general from running a similar school after findings that students had been severely abused, and one had died as a result of being restrained.  Israel moved to the East Coast and ran an institute that was investigated by New York, Massachusetts and the U.S. Department of Justice for using electronic skin shocks to control student behavior.

154.   In response to the citizen complaint against Tobinworld, the CDE did not conduct an onsite visit for almost 3 months.  It took almost 10 months to complete the investigation and take any action.  In addition to finding procedural violations regarding the hiring of Israel, the CDE found that the schools did not have sufficient numbers of certified staff and that its policies and procedures for behavioral interventions did not comply with legal requirements.   The CDE suspended the certification of both locations—preventing them from accepting new students, demanding the necessary documentation for Israel and other staff, and requiring them to work with a CDE consultant to bring the school into compliance.  *See* **Attachment M**.  The CDE reinstated the schools' certifications in less than four months in December 2015.  *See* **Attachment N**.

155.   Several weeks later, a video emerged showing Tobinworld II staff restraining and hitting a nine-year-old child with disabilities in the face by adult staff.  Shortly thereafter, on

January 15, 2016, a group of non-profits who advocate for the rights of students with disabilities—the American Civil Liberties Union ("ACLU"), Disability Rights California ("DRC"), and Disability Rights Education and Defense Fund ("DREDF")—sent a letter to SSPI Torlakson and the interim director of Special Education at the CDE, **Attachment O** to this complaint.  The letter outlined the ongoing use of violence and restraints against students with disabilities in California's public and "nonpublic" schools, abuse of which the CDE had long been aware and against which it had failed to take effective action.  "By failing to monitor, by issuing incomplete relief to address legitimate complaints of violence, and by continuing to certify and fund schools engaged in these practices, CDE is contributing to the continuance, rather than the elimination, of this abuse."  The advocates noted reports of repeated abuse and improper restraints at a group of nonpublic schools, and urged the CDE "to take immediate steps to protect children with disabilities in segregated school sites . . . ."

156.    The letter went on: "Despite formal complaints, media reports, and multiple lawsuits – costing our public schools millions of dollars – the California Department of Education has no proper system to monitor the treatment of students with disabilities, investigate and resolve complaints, or provide meaningful technical assistance – all steps that are mandated by federal and state law."  The non-profits urged the CDE to act immediately to protect students with disabilities in California schools from excessive force and abuse with a particular focus on "segregated"—or nonpublic—schools.   Among other recommendations, they urged CDE to take the following actions:

   a.  "Collect and analyze data from all other segregated school sites, and conduct unannounced site visits to monitor the use of force and isolation."

   b.  "Immediate review and remediation of the policies, procedures, and practices of all California school districts to eliminate the improper use of force on children with disabilities."

   c.  "Develop effective policies, procedures, and practices for school districts so that they may eliminate the improper use of force on children with disabilities.

   d.  "Ensure that school districts immediately implement these policies, procedures, and practices."

   e.  "Ensure that school districts are provided with the training and technical assistance to create the least restrictive environment for children with disabilities and to promote positive behavioral support."

f.  "Create an ombudsman program with a toll-free number to ensure that parents and students are informed of their rights regarding the use of force and isolation in schools."

157.    The CDE and Torlakson responded to the letter two months later on March 18, 2016. **Attachment P** is a copy of correspondence from Edmundo Aguilar, Assistant General Counsel for the CDE, to the ACLU, DREDF and DRC dated March 18, 2016.  The CDE acknowledged that it has "general supervisory powers and responsibilities for oversight of educational instruction in schools receiving state or federal funding", including nonpublic schools.  It acknowledged that it is "responsible for certification, monitoring, and complaint investigation regarding" nonpublic schools.  Yet despite overwhelming evidence that children with disabilities were being restrained and abused on a regular basis throughout nonpublic schools in California and despite evidence that the CDE's corrective actions against Tobinworld had not been effective, the CDE insisted it had performed and was performing its duties effectively.  It did not offer to undertake any of the actions urged in the January 2016 letter.

158.    Nor did the CDE suspend Tobinworld II's license in response to the video that emerged in January 2016.  Rather, the school closed on its own in July 2016 when local school districts      pulled      their      students      out,      and      the      school      lost      those      funds. https://edsource.org/2016/tobinworld-closing-its-antioch-school-for-special-education-students /566741.

159.    Despite knowledge of repeated abuse against students at Tobinworld schools, the CDE allowed Tobinworld to continue operating throughout the state, including at a site in Southern California where a CDE investigation in August 2018 revealed that staff used excessive force in restraining two students, causing contusions and requiring emergency room treatment. https://www.disabilityrightsca.org/system/files/file-attachments/Restraint_and_Seclusion_ Report.pdf at 3.

160.    In the face of repeated reports and warnings regarding excessive restraint use from multiple sources—child and disability advocates, the U.S. DOE, and private citizens—Torlakson and the CDE did not strengthen the CDE's policies and practices. They did not implement procedures or practices to actively and more effectively monitor a dangerous practice that they knew was disproportionately impacting students with disabilities, particularly those at nonpublic schools.  Nor did they implement effective compliance policies and practices. Rather, the CDE and SSPI Torlakson continued to certify nonpublic schools such as GHS, including those with known

- 33 -

records of restraint abuse, thereby sending a message to all nonpublic schools that restraint abuse did not concern the CDE or Torlakson.   The CDE and Torlakson were deliberately indifferent to the fact that children with disabilities were being disproportionately harmed by restraint use.

161.    In 2003, a mother of a former GHS student sued the school and Sacramento Unified School District after GHS staff restrained her ten to thirteen times throughout one day in June 2002. *See* **Attachment Q.**  The student was anxious about her mother's planned surgery that day and repeatedly asked to call her mother, but GHS staff refused.  When she became agitated, GHS performed "take down" maneuvers on the student and put her in multiple violent restraints.  When the student vomited, staff made her clean it up.  Plaintiffs allege on information and belief that the CDE knew of the facts alleged in the lawsuit.

162.    Plaintiffs allege on information and belief that the CDE had cited GHS and requested corrective actions for improper teacher credentialing in August 2018 and that the school had until December 2018 to resolve the issues.

163.    On November 6, 2018, Plaintiff STARK filed a compliance complaint with the CDE against Guiding Hands School, alerting it to the fact that her nine-year-old son, Plaintiff M.S., had been improperly restrained and injured at least twice during his first two months at the school.  In response, the CDE did not immediately conduct an onsite visit.  In fact, it did not visit GHS until more than three weeks later, on November 30, 2018, and only after another student, Max Benson, had been fatally restrained by GHS staff on November 28, 2018.  **Attachment R** is a copy of the CDE's Investigation Report of STARK's complaint regarding the non-compliance of EGUSD. **Attachment S** is a copy of the CDE's Nonpublic School Investigation Report of STARK's complaint with M.S.'s name and identifying information redacted.

164.    When the CDE finally conducted its investigation of STARK's complaint, it found that from September 10 through November 29, 2018, GHS staff placed M.S. in restraints or otherwise "physically intervened" with him 61 times. **Attachment R** at 5, 10.  After STARK filed her complaint with CDE, but before CDE conducted an on-site visit on November 30, 2018, GHS staff restrained M.S. at least two more times on November 29.  **Attachment S** at 10. And Max Benson was killed by GHS staff who put him in a prone restraint for over an hour and a half on November 28, 2018.

165.    Even after MAX BENSON's death, the CDE's investigation—while relatively quick for the CDE—moved slowly given the known risks to the students and the information disclosed to the CDE on November 30, 2018.  Plaintiffs are informed and believe and thereon allege

- 34 -

that during a November 30, 2018, meeting between the CDE investigator, the program coordinator from DJUSD (the school district in which MAX was enrolled) and GHS staff, the following facts were revealed:  1) GHS staff members regularly placed MAX in restraints that averaged an hour in length; 2) on November 28, 2018, MAX's classroom teacher, Defendant WOHLWEND, placed MAX in a prone restraint, and other staff members (Defendants Betty MORGAN, Le'Mon THOMAS, and Jill WATSON) took turns holding his legs down, because MAX had been spitting, a known, disability-related behavior listed in his Behavior Improvement Plan; 3) restraining MAX was WOHLWEND'S typical response to MAX's spitting, and WOHLWEND stated that restraining MAX was the only "proven" intervention; 4) WOHLWEND stated that MAX's behavior that day was nothing out of the ordinary; 5) GHS staff regularly put and held MAX in a prone restraint even though there was no "clear and present danger of serious physical harm" to MAX or others; 6) GHS staff restrained MAX for an hour and 30-45 minutes, during which he showed escalating signs of distress—including vomiting, biting his lip until it bled, kicking at the wall and urinating on himself, but staff did not release him or monitor his vital signs; 7) GHS staff admitted that they regularly restrained other students in response to undesirable behaviors; 8) GHS staff regularly restrained students for more than an hour; 9) GHS's training regarding restraint use did not meet the requirements of the Education Code; 10) Defendant Jill WATSON, the GHS staff member responsible for training staff in restraint use, did not know anything about Behavioral Improvement Plans, Behavior Emergency Reports, or IEPs, nor did she include information about them in her restraint trainings; 11) WATSON was not concerned about restraints that lasted 30 minutes; 12) WATSON witnessed and took no action to stop the prone restraint placed on Max on November 28, 2018, for over an hour and a half; 13) WATSON did not ask WOHLWEND or MORGAN why MAX was being restrained, but instead joined in by holding down MAX's hands; 14) WOHLWEND, WATSON and MORGAN failed to obtain immediate medical assistance for MAX when they saw that he was no longer responsive; 15) after WATSON determined that MAX had no pulse, neither WATSON, WOHLWEND, nor MORGAN performed CPR or called 911, but instead paged Defendant David CHAMBERS, the school "nurse," and 16) CHAMBERS had to be paged twice because he got "side-tracked" after the first call and did not arrive for at least 15 minutes, during which MAX received no medical assistance.

166.     During the November 30, 2018, on-site visit, the CDE learned that GHS staff regularly restrained students for lengthy periods of time in response to predictable, disability-related behavior that did not pose a clear and present danger to the physical health and safety of the

PLAINTIFFS' THIRD AMENDED COMPLAINT

students or others; that GHS staff had not been properly trained on how and when to use restraints legally and safely; and that GHS staff and administrators did not view their dangerous and abusive use of restraints as problematic or unsafe for GHS students. Yet the CDE and Torlakson did not take immediate action to prevent the GHS staff involved in the incident from having access to students at GHS. Nor did Torlakson or the CDE ensure that all GHS staff immediately receive competent training so that they would not continue to place students in dangerous and harmful restraints and would better understand their legal obligations.

167. Despite the serious risks involved, the CDE and Torlakson did not suspend GHS's license until December 5, 2018, an action that only prohibited GHS from admitting new students but did not prevent GHS or its staff from continuing to abuse current students. The CDE did not revoke GHS's certification until January 11, 2019. Between November 30, 2018, and January 11, 2019, GHS staff continued to restrain and physically discipline students as a matter of course, as evidenced by a letter sent to the CDE by the Western Placer Unified School District on December 6, 2018. **Attachment T** is a true and correct copy of a document produced to Plaintiffs by the CDE in response to a public records act request.

168. Despite the known risks and serious harm to children with disabilities, the CDE and Torlakson failed their duties to monitor, investigate, or ensure that nonpublic schools complied with anti-discrimination laws and those protecting students with disabilities from abusive restraint use. As a result, nonpublic schools like GHS continued to use such restraints frequently, for lengthy periods of time, on students whose disabilities elevated the risk of restraint use, and in response to predictable, disability-related behaviors that did not constitute an immediate or serious threat to the student or others. Many students, including the Plaintiff Students, consequently suffered physical and emotional injuries and, in the case of MAX BENSON, death.

**MAX BENSON**

169. Defendant YOLO SELPA was formed pursuant to Cal. Ed. Code § 56195.1(c), and consists of Defendant YCOE and five school districts within the county, including Defendant DJUSD. **Attachment U** is a copy of the 2015 Yolo County SELPA Local Plan ("Yolo Plan"). The Yolo Plan constitutes an interagency agreement between the participants and states that the districts and the YCOE "join[ed] together to assure access to special education and services for all eligible individuals who reside in the geographic area served by these agencies." Yolo Plan at 5.

170. The Yolo Plan delineates the duties and responsibilities of its participants, many of which are shared. However, the parties to the Plan designated the Superintendent of Schools for

- 36 -

YCOE as the local Administrative Unit ("AU") for the SELPA. Yolo Plan at 6, 13. Under the Plan, the AU is responsible for, among other things: 1) receiving and distributing all special education funding; 2) submitting for approval policies and procedures governing regional and District-operated programs and services; 3) coordination of the Plan's implementation; and 4) through its designee, the SELPA Administrator, coordinating services with school districts to ensure all special education students have equal access to all programs and services in the Plan area. *Id.* at 6, 13-14. Defendant BENO, as the Assistant Superintendent of Yolo COE and Yolo SELPA, and Defendant HOLSTEGE, as the Director of Special Education for Yolo COE, were the responsible officials.

171.    The Yolo Plan specifies that all federal and state special education funds of the Plan participants will go to YCOE, which must then distribute them to pay for special education services. Yolo Plan at 16-17.  As the Plan administrator, YCOE is also responsible for monitoring the expenditure of special education funds and coordinating services to ensure all special education students have equal access to all programs and services in the Plan area. *Id.* at 6, 13-14, 17.

172.    Under the Yolo Plan, "[t]he Superintendent of each LEA shall be responsible for special education programs operated by the LEA and for implementing all requirements of the Local Plan."  Thus, DJUSD was responsible for ensuring compliance with special education and anti-discrimination laws at schools and programs receiving money to educate special education students within DJUSD.  When it adopted the Yolo Plan, DJUSD represented that it would comply with state and federal laws, including the ADA, Section 504, the IDEA, and the California Education Code.  **Attachment V** is a copy of DJUSD's Special Education Local Plan Area Local Education Agency Assurances ("DJUSD Assurances") dated August 3, 2015.  DJUSD ensured that it would "administer the local implementation of procedures, in accordance with state and federal laws, rules, and regulations, which will ensure full compliance."  DJUSD Assurances at 7.

173.    Under the SELPA, DJUSD Director of Special Education MCGREW was responsible for the coordination of special education services and programs within the DJUSD and the implementation of the local plan.  This included assuring that the District's programs—including any nonpublic school in which the District has placed a special education student—did not discriminate against children on the basis of disability and followed state and federal education laws, including those on behavioral interventions.

174.    The Yolo Plan states its intention "to provide a full continuum of services to students with disabilities . . . throughout the geographic region of the SELPA."  Yolo Plan at 16.   The Program Administrator of each school district works with the SELPA Administrator to identify

- 37 -

unmet student needs and identify resources to meet those needs. *Id.* Under the Plan, special education funds shall be used for services to meet the needs of students with disabilities in the Plan area. *Id.* at 17. The AU (YCOE), the SELPA Administrator (BENO and HOLSTEGE), and DJUSD's Special Education Director MCGREW were responsible for monitoring the appropriate use of special education funds for students in the DJUSD. *Id.*

175. As required under California law, nonpublic schools ("NPS") are part of the continuum of services available to students with disabilities in the Yolo SELPA. Cal. Ed. Code §§ 56360, 56361(e). Nonpublic schools contract with LEAs to provide special education services in exchange for state and federal educational funding. Cal. Ed. Code §§ 56365(a)-(d), 56366; 20 U.S.C. §§ 1411-1413. A student placed in an NPS pursuant to Cal. Ed. Code §§ 56365 "will be deemed to be enrolled in public schools" for the purpose of state and federal funding, and the LEA shall pay the NPS "the full amount of the tuition for individuals with exceptional needs that are enrolled in programs provided by the" nonpublic school. Cal. Ed. Code § 56365(b) and (d).

176. SELPAs must ensure that they have "policies, procedures, and programs that are consistent with state laws, regulations, and policies governing" special education and compliance with the IDEA, the ADA, and Section 504. Cal. Ed. Code § 56205(a). The SELPA's local plan must include a description of how it will "oversee and evaluate placements in nonpublic, nonsectarian schools and the method of ensuring that all requirements of each pupil's individualized education program are being met. . . ." Cal. Ed. Code § 56205(c). Nonpublic schools are a program of the LEA, and as such, Defendants DJUSD, YCOE, YOLO SELPA, BENO, HOLSTEGE and MCGREW were responsible for ensuring that a NPS providing educational services to students within the Plan Area complied with special education and anti-discrimination laws. Cal. Ed. Code § 56365(b); 5 C.C.R. §§ 4902, 4960(a).

177. YOLO SELPA's written procedures regarding Master Contracts with nonpublic schools serving students in the YOLO SELPA area state that the SELPA contracts with the NPS, and that it must also: document its efforts to review and monitor the master contract with the NPS; evaluate the staffing qualifications and levels at the NPS; issue and monitor assurances for NPS contracts; and maintain updated NPS master contracts. Yolo County Special Education Local Plan Area (SELPA) Policy 3312: Non-Public Schools (NPS)/Non-Public Agencies (NPAs) Monitoring. **Attachment W**. The policy states that each school district must evaluate the provision of services by the NPS on an annual basis, as part of the students' IEP process. Both the district and the SELPA must document their efforts to review and monitor the master contract with the NPS. The SELPA

- 38 -

is responsible for evaluating the staffing qualifications and levels at the NPS, for issuing and monitoring the assurances for NPS contracts, and for maintaining updated NPS master contracts.

178.    As a nonpublic school, Defendant GHS had entered into a Master Contract with Yolo SELPA for the 2017-2018 school year. **Attachment X**. The Master Contract states that GHS is an independent contractor. The contract states that in the event of termination or non-renewal, the NPS "shall continue to be bound to all the terms and conditions of the most recent executed Master Contract between [GHS] and [Yolo SELPA] for so long as [GHS] is servicing authorized students at the discretion of [Yolo SELPA]." **Attachment X** at ¶ 5.

179.    In June 2018, MAX BENSON was a 12-year-old special education student in the DJUSD, part of the YOLO SELPA. He had been diagnosed with autism and emotional disturbance, in addition to numerous physical disabilities. His disabilities manifested in behaviors such as verbal and physical aggression and spitting. The DJUSD program specialist handling his case, Defendant GALAS, recommended to Max's mother, Stacia LANGLEY, that MAX be placed at GHS, a nonpublic school certified by the CDE. As required by Cal. Ed. Code § 56342.1, an IEP meeting was held on June 13, 2018 to determine the appropriateness of placing MAX BENSON at GHS. Before the IEP meeting, GALAS asked YOLO SELPA whether they had a Master Contract with GHS. She was told "yes" and was sent a copy of the contract.

180.    MAX BENSON was enrolled at GHS at a Yolo SELPA IEP Placement meeting on June 13, 2018, attended by Max's mother Stacia LANGLEY, GALAS, GHS teacher Kim WOHLWEND, and GHS Administrator Jennifer CHRISTENSON. During the meeting, LANGLEY repeatedly requested a one-to-one paraeducator to help MAX and keep him from acting out in an erratic or violent manner. LANGLEY stated that having an adult next to MAX might be the only way to keep him from acting out. LANGLEY said that one-to-one support was necessary because MAX did not know how to express his feelings or ask for help and could become anxious and overwhelmed. CHRISTENSON stated that the school did not use one-to-one paraeducators because it was "highly staffed." She stated that GHS provided "an intensive level of service."

181.    WOHLWEND told LANGLEY that they would place MAX next to another student in the classroom who needs more assistance. WOHLWEND stated that between her and two paraeducators in the classroom, MAX would frequently be next to a paraeducator or a teacher. WOHLWEND stated that the school would provide customized assistance, with staff talking about his triggers, taking data on his behaviors, reviewing coping skills, providing options and intervening appropriately. Although LANGLEY reiterated that MAX had difficulty expressing his feelings

- 39 -

1    and asking for help, CHRISTENSON told LANGLEY that one-to-one support was not available

2    (or needed) at GHS because their behavioral support system "provides support in other ways."

3        182.    Shortly after the June 13, 2018, IEP meeting, GHS provided enrollment documents

4    to LANGLEY via GALAS, which included the GHS Parent and Student Handbook 2018-2019

5    ("the Handbook"). **Attachment Y**.  The Handbook contains a section on Positive Behavior

6    Interventions and Supports.  Via the Handbook, GHS represented to LANGLEY and other parents

7    that the school was focused on positive behavior intervention and supports, as opposed to punitive,

     physical discipline.  It stated that the school used "proactive," "customized practices to support

8    student behavior," coaching, teaching and modeling positive interactions, "problem-solving,"

9    "positive language," and "direct teaching."  It stated that GHS staff's corrections of undesirable

10   behavior would be "Calm, Brief, Immediate, Respectful."

11       183.    The GHS Handbook stated that corrections would involve a sequence that includes

12   prompts, redirection, re-teaching, and providing a choice (which includes asking for help, moving

13   to a different location, or taking a break). Restraints are not mentioned.  Nor was LANGLEY told

     that GHS staff would use restraints frequently on MAX, as a regular, first-step intervention in

14   response to MAX's known behavioral problems, in lieu of positive behavior interventions, for

15   significant periods of time, with excessive force and in response to behaviors that did not constitute

16   a threat to the physical safety of MAX or other persons and which could have been prevented and/or

17   controlled by less restrictive measures.

18       184.    On July 6, 2018, GALAS signed an Individual Services Agreement specifying the

19   services GHS would be providing to Max and sent it to GHS on July 6, 2018, as required under

     Cal. Ed. Code § 56366(a)(2)(A).  **Attachment Z**.

20       185.    During Max's enrollment at GHS, the annual Master Contract with Yolo SELPA

21   expired on June 30, 2018, and a new contract was not entered, despite California law requiring such

22   a contract when an LEA places a student at an NPS.  Cal. Ed. Code § 56366.

23       186.    On September 7, 2018, in response to a request from an unknown person, Defendant

24   BENO's administrative assistant, Vinceena Irgens, sent out a list of the nonpublic schools with

     which Yolo SELPA had a 2018-2019 Master Contract.  Defendant GALAS noticed that GHS was

25   not on the list and emailed Irgens asking for clarification.  Irgens responded to GALAS and copied

26   Defendant McGREW, the Special Education Director of DJUSD, and Defendant CHESSMAN,

27   saying: "The SELPA is not entering into a contract with them this year.  I believe Carolynne

28

- 40 -

[BENO] discussed this with the directors.  If your district wants to enter into a contract, of course you are free to do so.  Patrick [McGREW] would need to make that decision."

187.    Plaintiffs allege on information and belief that YCOE, YOLO SELPA, BENO and HOLSTEGE participated in a decision to remove GHS from the YOLO SELPA list of approved nonpublic schools because they had information about GHS's discrimination, abuse of students and legal violations.  Yet none of these Defendants subsequently informed the family members of children who were presently attending GHS about the problems or the decision not to renew the contract.  Nor did they take any other steps to insure that students within the YOLO SELPA who had been placed at GHS were transferred to a safe, approved placement.  Defendants took no steps to monitor MAX's placement at GHS or to insure that he was not subjected to discrimination or abuse. Instead, the YOLO Defendants renounced their responsibilities under the Yolo SELPA Plan and Cal. Ed. Code § 56366 to assure that Max was in a safe, approved program paid for with the special education funding Yolo received, telling DJUSD that it could contract with GHS if it wished.

188.    Plaintiffs allege on information and belief that BENO informed MCGREW about YCOE and YOLO SELPA's decision not to renew its contract with GHS sometime before September 2018, but MCGREW took no steps to investigate GHS, to remove DJUSD students from GHS and place them in a safe, approved placement, to inform the parents of DJUSD students placed at GHS of the change or to ensure that DJUSD students placed at GHS were not subjected to discrimination or abuse.

189.    There is no record of a 2018-2019 Master Contract with GHS in the files DJUSD's provided in response to a record request from MAX BENSON, and although it appears YCOE paid GHS for services provided to MAX in June 2018, Plaintiffs have not seen any record of payment for services provided after that date.  LANGLEY and Max's father, David BENSON, were not informed by DJUSD, YCOE or YOLO SELPA that GHS no longer had a Master Contract and did not learn that the contract had expired until after MAX had been killed by GHS staff.

190.    YOLO SELPA and YCOE have tried to disclaim responsibility for MAX BENSON, noting among other items their nonrenewal of a Master Contract with GHS for the 2018-2019 school year.  However, the 2017-2018 Master Contract states that in the event of termination or non-renewal, the NPS "shall continue to be bound to all the terms and conditions of the most recent executed Master Contract between the [NPS] and the LEA for so long as [NPS] is servicing authorized students at the discretion of the LEA."  By the contract's terms, the LEA is Yolo SELPA.

- 41 -

**Attachment X** at ¶ 1. YOLO SELPA and YCOE took no action to remove MAX BENSON from GHS or insure his transfer to a safe, approved placement. Nor did they inform MAX's parents that GHS no longer had a Master Contract with YOLO SELPA.

191.    When DJUSD adopted the Yolo SELPA Plan, it represented that it would comply with state and federal laws, including the ADA, Section 504, the IDEA, and the California Education Code. It ensured that DJUSD's Superintendent would "administer the local implementation of procedures, in accordance with state and federal laws, rules, and regulations, which will ensure full compliance."

192.    Under the Yolo SELPA Plan, DJUSD's Special Education Director McGREW was responsible for the coordination of special education services and programs within the DJUSD and implementing the local plan. He was thus responsible for ensuring that GHS—an NPS at which DJUSD had placed a student via his IEP—complied with state and federal education and anti-discrimination laws. McGREW was the direct supervisor of Defendants GALAS and CHESSMAN, the DJUSD Program Specialists assigned to MAX BENSON. GALAS and CHESSMAN were responsible for monitoring his placement and ensuring that GHS was following state and federal law, including in its use of behavioral interventions. Although Defendants knew that YCOE and YOLO SELPA had decided not to renew its contract with GHS for the 2018-2019 school year, they did not conduct any investigation of GHS, remove MAX from GHS, transfer him to a safe, approved placement, or take any action to ensure that MAX was not subjected to discrimination or abuse.

193.    MAX had the following disabilities and medical conditions of which GHS, DJUSD, YCOE, YOLO SELPA and their employees were aware, via conversations with LANGLEY, MAX's medical and educational records, and/or their observations: autism, obesity, low muscle tone, poor postural control, difficultly with coordinated muscle activity, easily fatigued with use of gross motor skills, a fused cervical spine, Ehler-Danlos syndrome, chronic neck pain and medications of Clonodine and Motrin. Defendants knew that these conditions exacerbated the risks associated with placing a student in restraints.

194.    GHS, DJUSD, YCOE, YOLO SELPA and their employees were aware that MAX was unable to express his feelings or request what he needed directly. They were aware that MAX's disabilities led him to become easily frustrated and to seek attention by acting out with aggressive behaviors, such as spitting.

- 42 -

195.    Despite this knowledge and their promises, between June and November 2018, GHS staff regularly restrained MAX in response to the predictable behavior his BIP was designed to prevent and redirect, even though this behavior did not pose a clear and present danger to MAX or others and could have been controlled by a less restrictive response, such as positive attention, closer staff supervision or a one-to-one paraeducator.  GHS staff regularly isolated MAX and did not provide him with the necessary attention and assistance he needed, leading him to become aggressive and lash out with known, disability-related behaviors, such as spitting.  GHS staff left MAX alone for long periods of time, facing the classroom wall.  Within the first ten calendar days of MAX's enrollment at GHS, he was restrained three times.  Behavior Emergency Reports ("BERs") were sent to GALAS on June 22, 2018, but neither GALAS nor anyone else at DJUSD took any action.

196.    MAX's annual IEP was held on October 12, 2018, attended by GALAS and written up by Defendant CHESSMAN, MAX's new program specialist for DJUSD.  Despite knowledge that YOLO SELPA had decided not to renew its contract with GHS for the 2018-2019 school year, no one at YOLO SELPA, YCOE or DJUSD informed MAX's parents of that fact.  YOLO SELPA, YCOE, BENO and HOLSTEGE took no steps to inform parents or insure that students in the YOLO SELPA were placed only at an NPS that they had approved, with which the SELPA had a master contract, and which they could and would monitor to ensure compliance with educational and antidiscrimination laws.  Defendants were deliberately indifferent to the fact that a student within the DJUSD and YOLO SELPA had been placed at a non-approved NPS and tried to wash their hands of any responsibility to ensure that MAX was safe and free from discrimination and abuse in his educational placement.

197.    In MAX's October 12, 2018 IEP, DJUSD, GALAS and CHESSMAN approved MAX's continued placement at GHS.  The documentation for that IEP, including a behavior report prepared by GHS's behaviorist, indicated that MAX regularly acted out by spitting.  It contained no information about the positive behavior interventions that GHS staff had implemented in response to MAX's behavior.   Plaintiffs are informed and believe and thereon allege that from June through November 2018, GHS staff regularly restrained MAX in response to predictable behavior his Behavior Improvement Plan was designed to prevent and redirect, including spitting.  GHS staff frequently restrained MAX, often for extended periods of time, even though his behavior did not pose a clear and present danger and could have been controlled by a less restrictive response, such as closer supervision.

- 43 -

198.    MAX's October 12, 2018, IEP and supporting documentation—which was created jointly by Defendants—in particular GHS, GHS Staff, DJUSD, YCOE, YOLO SELPA, and their staff—contained numerous references to MAX's tendency to act out with negative behaviors, including spitting, when he perceived that staff was not paying attention to him, including but not limited to the following:

    a.  "Max seems to struggle most when he perceives staff is not watching/paying attention to him."

    b.  "Max is most successful when staff is readily available to provide a high level of support, especial when faced with locations or subjects perceived as difficult, or without staff attention."

    c.  "When Max feels staff isn't watching or providing one on one support, he can become non-compliant and sometimes physically aggressive, and have negative attention seeking behaviors (mouthing things, flipping off peers and staff, spitting, exposing himself to the classroom.)"

    d.  A Behavior Data Report recording many incidents of MAX's spitting in an attempt to get peer and/or staff attention between August and October 2018.

199.    A Behavior Intervention Plan was prepared in which the IEP team acknowledged that MAX needed to remain close to staff to control his spitting.  MAX's BIP called for the following strategies to prevent and respond to his behavioral problems: recognition and reward for using appropriate interactions—including a token economy system, and praise and recognition of positive interactions; modeling, practicing and prompting MAX in appropriate behaviors, including the use of verbal prompts; providing feedback and role playing with MAX to practice positive interactions; offering choices; and close proximity to staff.  MAX's BIP did not reference the use of restraints and referred only to taking breaks, removing MAX from activities, and "holding hands for safety."  The BIP stated that emergency interventions could only be used "to prevent unpredictable, spontaneous behavior which presents a clear and present danger of serious physical harm …."

200.    LANGLEY was made to sign a separate GHS "consent" form titled "Behavior Emergency Plan" to permit the use of Handle With Care "Emergency Interventions" "to control unpredictable spontaneous behavior which poses a clear and present danger of serious physical harm to the individual or others or serious property damage and cannot be immediately prevented by a response less restrictive than the temporary application of a technique used to control the

- 44 -

behavior."  The form did not call these "interventions" "restraints," but instead referenced them as "Therapeutic Physical Intervention Techniques."  Nor did the form describe the severity of the restraints, their inherent dangers, or the elevated risks associated with using restraints on a child with MAX's conditions.

201.    LANGLEY was not told that GHS staff had been and would continue to use restraints frequently on MAX, as a regular, first-step intervention in response to MAX's known behavioral problems, in lieu of positive behavior interventions, for significant periods of time, with excessive force and in response to behaviors that did not constitute a threat to the physical safety of MAX or other persons and which could have been prevented and/or controlled by less restrictive measures.

202.    During MAX's time at GHS, GHS staff regularly placed MAX in restraints as a primary intervention, without resort to less restrictive measures, in response to known, disability-related behaviors (such as spitting) for lengthy periods of time.  GHS staff regularly placed MAX in restraints in response to behavior that did not constitute a clear and present danger to the physical health and safety of MAX or others.

203.    In addition to the behavioral emergency reports sent to DJUSD for restraints imposed on MAX in June 2018, GHS sent additional BERs to DJUSD, GALAS and CHESSMAN for the following restraints:

    a.   On October 23, 2018, WOHLWEND placed MAX in a 5-minute standing restraint because he refused to finish cleaning his yoga mat.  GHS sent a corresponding BER to GALAS, whose only response was to ask that GHS forward future reports to CHESSMAN and another DJUSD employee who could put the reports in MAX's file.

    b.   On October 31, 2018, WOHLWEND put MAX into a 20-minute prone restraint (misleadingly referred to as "HWC Neutral") in response to MAX's "spitting all over the classroom".

    c.   On November 2, 2018, WOHLWEND and MORGAN put MAX into a 20-minute prone restraint in response to spitting at a peer.

    d.   On November 8, 2018, WOHLWEND and MORGAN put MAX into a 10-minute prone restraint after he hit another student on the way back from the restroom.

204. Defendants DJUSD, GALAS, and CHESSMAN received repeated reports that GHS staff were placing MAX in dangerous, excessive and unjustified restraints in violation of the educational code and in response to known, disability-related behavior documented in his IEP and BIP. Yet Defendants did nothing more than place the BERs in MAX's educational file.

205. Plaintiffs allege on information and belief that GHS staff placed MAX in additional restraints for which it did not fill out a BER or otherwise record in MAX's records. After MAX was killed, GHS staff told a CDE investigator that MAX had repeatedly been placed in prone restraints that lasted longer than 20 minutes. His classroom teacher, WOHLWEND, told the CDE investigator that placing MAX in a restraint was a "proven" intervention and the principal one she used in response to his frequent, disability-related behavior of spitting.

206. Yolo SELPA's written policy on Positive Behavioral Intervention favors positive behavioral interventions and discourages the use of "emergency interventions" such as restraints, except in limited circumstances. Yolo County Special Education Local Plan Area (SELPA) Policy 6159.4: Positive Behavioral Intervention, available at: http://ycoe-ca.schoolloop.com/file/ 1522740721782/ 1522740722003/9214046236039701322.pdf. It states that the SELPA and its member agencies "have approved two non-violent intervention formats: Crisis Prevention Institute (CPI) and Handle with Care to be used by trained personnel in an emergency intervention only." *Id.*

207. Despite repeated violations of this policy by GHS staff—including multiple instances documented and communicated to DJUSD, GALAS, and CHESSMAN, and placed in MAX's educational files and YOLO SELPA IEP documents—DJUSD, YCOE, YOLO SELPA and their employees failed to take any action to protect MAX.

208. As described in more detail below, MAX was not the only GHS student subjected to improper and excessive restraints. GHS's administrators and employees engaged in a policy and practice of using restraints as a substitute for the positive interventions detailed in the students' BIPs. GHS used restraints against its students frequently, for periods of time that were longer than necessary, and with excessive force. These restraints—including prone restraints, in which the child is placed face down on the floor with one or more adults applying force to keep the child's body immobile—frequently lasted over an hour. Some students were restrained weekly, sometimes multiple times a day. GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency

- 46 -

interventions and were physically abusing their students.  Yet DJUSD, YCOE, YOLO SELPA, and their employees ignored their legal duties to monitor the program and left vulnerable students in GHS's care.

209.    MAX's family learned from the GHS van driver that shortly before November 28, 2018, GHS staff threatened to send MAX home on the school van in a "straight jacket" if he did not comply with staff requests.

210.    On November 28, 2018, MAX spit at another student.  Although this was a known disability-related behavior of MAX's, noted throughout his educational records and in his BIP, WOHLWEND did not try other less restrictive interventions and immediately performed a "takedown" maneuver on MAX by holding his hands behind his back, dropping him to his knees and rolling him over into a prone, face-down restraint.  This takedown maneuver caused chin abrasions and bruising to MAX's left check, right ankle, both knees and left leg.  The fact that GHS staff applied deadly force was clear from the impressions of the objects in Max's pants pocket on his dead body.

211.    WOHLWEND restrained MAX face-down on the floor, holding his upper body, while MORGAN held his legs.  WOHLWEND and MORGAN maintained MAX in this restraint for approximately one hour and 45 minutes.  Even when MAX calmed down, Defendants maintained the hold.  At some point during the hold, Defendant THOMAS took over in holding MAX's legs for a brief period so that MORGAN could take a bathroom break.

212.    Defendant WATSON, the GHS employee responsible for training other staff in emergency interventions, passed by the classroom and witnessed MAX in the restraint.  She told MORGAN she was not properly restraining MAX's legs and instructed MORGAN to hold him by the ankles.  WATSON then joined them and held down MAX's hands while MORGAN held down his ankles and WOHLWEND immobilized his torso.

213.    Defendants were aware that MAX's disabilities made it difficult for him to request help or express his feelings.  They knew that his physical disabilities made him quick to fatigue and lacking in endurance.  They also knew that he had limited range of motion in his neck due to a fused cervical spine.  During the almost two-hour hold, no one offered MAX food, fluids, a bathroom break, range-of-motion exercises, or periodic release of his limbs for circulation. WOHLWEND, MORGAN, WATSON and THOMAS did not monitor MAX's physical condition or vital signs.

214.    During the almost two-hour-long restraint, MAX showed increasing and obvious signs of distress.  MAX's voice changed from its normal high pitch to a low mumble.  MAX struggled, kicking footprints into the wall.  MAX asked in vain to use the restroom and then urinated on himself.  MAX bit his lip, causing it to bleed.  MAX vomited.  Nonetheless, Defendants did not monitor his physical condition or release him.  At approximately 1:50 p.m., MAX aspirated, went into cardiac arrest and lost consciousness.  Defendants did not assess MAX's physical condition and continued to hold him in the restraint.  As it was the end of the day, WATSON left the room to find assistance transporting MAX to the school van.

215.    Several minutes after MAX lost consciousness, WOHLWEND realized that MAX was not moving and had a bloody lip.  WOHLWEND asked other staff to call for defendant CHAMBERS, the school "nurse" at GHS, purportedly to document the blood.  Plaintiffs allege on information and belief that CHAMBERS did not hold a registered nurse license and therefore did not meet the credentials to be a school nurse.

216.    Defendant CHAMBERS did not respond to WOHLWEND's classroom and had to be paged a second time.  While WOHLWEND was waiting for CHAMBERS, she checked MAX's pulse because he was not responding to her.  Although WOHLWEND could not find a pulse, she did not perform CPR or call 911, but merely waited for CHAMBERS to respond.  CHAMBERS took approximately 10 minutes to respond, during which time no one tried to perform CPR or call 911.

217.    When CHAMBERS finally arrived, he found that MAX had no carotid or radial pulse and began to perform CPR.  Although MAX had aspirated on his vomit, CHAMBERS did not clear his airway.  CHAMBERS performed CPR for approximately 7-10 minutes, during which time no one called for emergency personnel.  At approximately 2:03 p.m., almost 25 minutes after MAX had lost consciousness, CHAMBERS finally asked GHS staff to call an ambulance.

218.    When the paramedics arrived, they found that MAX had gone into cardiac arrest, had no pulse and was not breathing.  They performed CPR on MAX and took him to a local hospital.  MAX was subsequently transferred to UC Davis, where he died on November 30, 2018, from multiple organ system failure and profound irreversible neurologic injury secondary to aspiration and prolonged cardiac arrest.

219.    Defendants GHS, its administrators and its employees did not have sufficient training, policies or practices in positive behavior interventions; safe and legal restraint use—including under what conditions, how, on whom and for how long restraints should be applied to

- 48 -

students; how to monitor students while in a restraint; or how to respond to medical emergencies, including the provision of CPR and/or notifying emergency professionals. As a result, MAX BENSON was placed in an unsafe, illegal restraint for more than an hour and a half that caused him emotional distress, physical pain, and injuries, including but not limited to his going into cardiac arrest. Defendants did not monitor his medical condition or breathing and failed to provide him with necessary emergency assistance or summon emergency professionals in a timely manner. As a result of Defendants' policies, practices, actions and failures to act, MAX BENSON died on November 30, 2018.

220.    On November 28, 2018, Defendant CHRISTENSON, GHS's administrator, called Defendant GALAS at DJUSD to report that MAX had been taken to the hospital when he lost consciousness following a restraint. CHRISTENSON misrepresented what had happened, indicating that the restraint had lasted approximately 5-7 minutes and that MAX had been "responsive" after he was released from the restraint.

221.    In the information accompanying the BER sent by GHS to DJUSD, GHS misrepresented what had occurred, stating that Defendant THOMAS had assisted with the restraint because MAX was escalating—and not because WOHLWEND and MORGAN had held MAX in a restraint for so long that MORGAN needed someone to take her place while she used the bathroom. GHS also lied and told GALAS that WOHLWEND released MAX as soon as he stopped responding verbally to staff, and that CHAMBERS began to perform CPR immediately on MAX as soon as he passed out.

222.    Other communications from GHS to DJUSD either misrepresented what had occurred and/or demonstrated a frightening ignorance of the laws regarding behavioral interventions. In an email sent to GALAS and CHESSMAN on November 28, 2019, CHRISTENSON stated that "Max was in a Handle with Care intervention. He was released and talking, [sic] He then became unresponsive. CPR performed by our staff and 911 was called, paramedics came and took over. "In an attempt to excuse the abuse GHS had inflicted on MAX, CHRISTENSON sent another email to McGREW, GALAS, and CHESSMAN with a behavioral chart recording many instances in which MAX had spit in order to get staff attention. "I am sending you this copy of his behavioral data so that you can see that this was not an isolated incidence [sic] and that Kim generally is able to re-direct him." GHS administrator CHRISTENSON thereby demonstrated that she and her staff completely misunderstood the laws regarding emergency interventions, which should not be implemented in response to predictable, disability-related

- 49 -

behavior, particularly behavior which does not constitute a clear and present threat to the safety of the student or others.  Moreover, the chart did not contain any information about any less restrictive or positive behavioral interventions implemented by WOHLWEND or GHS staff in response to MAX's spitting.

223.    On November 30, 2018, in response to notification that a student had been hospitalized following a restraint, CDE sent an investigator to GHS.  The investigator interviewed a number of GHS staff and administrators, who told conflicting stories—some of which conflicted with statements made at other times.  Defendants made conflicting statements, some of which were deliberate misrepresentations, in order to exculpate themselves.   However, they made many admissions demonstrating that GHS and the individual Defendants had violated state and federal anti-discrimination laws and laws limiting the use of restraints.

224.    On November 30, 2018, GHS Administrator, Defendant CHRISTENSON, told the CDE investigator the following:

        a.    The average duration of a restraint for MAX was one hour;

        b.    The incident started with MAX's spitting "and escalated from there;" and

        c.    GHS was not sure that the restraint had caused the medical emergency.;

225.    On November 30, 2018, MAX's lead classroom teacher, Defendant WOHLWEND, told the CDE investigator the following:

        a.    On November 28, 2018, the behavior that led to her restraining MAX— spitting—was typical for MAX and the only difference was that it started earlier in the day;

        b.    "None of this was out of the ordinary" for MAX;

        c.    The typical duration of a restraint placed on MAX was 30-45 minutes;

        d.    On that day, WOHLWEND grabbed MAX's hands and held them behind his back, dropped him to his knees and then put him in the prone position, with her hip placing pressure on his hip to keep him down;

        e.    During the restraint, MAX swore at and scratched WOHLWEND and kicked holes in the wall;

        f.    Every time WOHLWEND counted down to a release, MAX would "escalate;"

        g.    MAX said he needed to urinate during the restraint and did indeed urinate on himself;

h.  The last thing MAX said was that he thought he was going to throw up, but he did not respond when WOHLWEND told him they had bags for him to vomit into;

i.  A couple of minutes after MAX last spoke, WOHLWEND became worried by MAX's non-response, and checked his condition;

j.  WOHLWEND thought that MAX was not responding because he was pretending to be asleep;

k.  WOHLWEND called for CHAMBERS to file a report because MAX had said earlier that he was going to bite his lip, and she saw blood on his lip;

l.  WATSON said MAX was still breathing but WOHLWEND checked him for a pulse;

m.  Only then did WOHLWEND realize it was an emergency, so she rolled MAX over and saw that he had turned blue;

n.  "They" began to perform CPR about 2-3 minutes after MAX said he was going to bite his lip;

o.  WOHLWEND was "absolutely" familiar with MAX's IEP and BIP;

p.  WOHLWEND felt that MAX's spitting was "attention-seeking behavior;"

q.  Placing MAX in a restraint when he spit was "a proven intervention;"

r.  Restraining MAX was "the only intervention that decreased the behavior. It was successful in the moment and in general--worked better than planned ignoring;"

s.  Restraining MAX was justified because spitting was "a danger to others" because there were other students who "might punch" MAX if he spit on them;

t.  WOHLWEND did not consider removing MAX from class in response to spitting because restraining him "seemed to be working;"

u.  Another GHS student who was "loud" was "constantly" in a restraint;

v.  WOHLWEND had restrained other students for longer periods of time than she had restrained MAX; and

w.  Restraining a student for more than an hour and a half was "routine" for WOHLWEND.

226.  On November 30, 2018, Defendant MORGAN, the teacher's aide in MAX's classroom, made the following statements to the CDE investigator:

- 51 -

a. MORGAN and WOHLWEND restrained MAX on November 28, 2018 in response to spitting because spitting was "dangerous" in that he might get spit on other children;

b. Toward the end of the restraint, MAX began to struggle more intensely than MORGAN had ever seen him struggle, so MORGAN held down his legs again;

c. Defendant WATSON, a GHS teacher's aide and trainer, had been in and out of the classroom during the restraint, and came in to hold down MAX's hands toward the end because MAX was pinching WOHLWEND;

d. At approximately 1:55 p.m., WATSON went to get the transportation coordinator, and WOHLWEND stood up, releasing MAX from the hold;

e. When MAX did not move or respond to WOHLWEND's prodding his shoulder, they became worried;

f. MORGAN rolled MAX over and heard him breathing;

g. Defendant WATSON returned and said she saw MAX breathing;

h. WOHLWEND was still concerned and called for CHAMBERS by intercom;

i. Only then did WATSON remove the other students from the classroom;

j. WATSON took the other students to the bus and when she returned, CHAMBERS was performing CPR on MAX;

k. WATSON had previously placed MAX in at least one prone restraint by herself;

l. GHS staff regularly placed MAX in a hold when he was moved about campus; and

m. The method of intervention that worked for MAX was a prone restraint;

227.    On November 30, 2018, Defendant WATSON, a teacher's aide and the lead trainer of GHS staff in Handle With Care interventions, made the following statements to the CDE investigator:

a. WATSON's "experience" and training from HWC staff were her only qualification to be a HWC trainer at GHS;

b. There is no annual or hourly requirement training requirement for GHS staff in HWC;

c. HWC training is based solely on WATSON's discretion, and she certifies staff if she "feels they have passed the training;"

d. WATSON did not know anything about student IEPs; she only trained staff in restraint techniques, not in the reasons behind the behavior;

e. WATSON did not discuss IEPs or Behavior Improvement Plans in her trainings as that was "the verbal part," which was handled by CHRISTENSON

f. WATSON did not "deal with" Behavior Emergency Reports or read incident reports, and she only debriefed with staff after an incident if she had time;

g. WATSON had not seen any data on the number of "hands-on" interventions at GHS;

h. Seeing a student in a restraint for 30 minutes would not concern WATSON, but she might be concerned about a restraint that lasted around "30-45 minutes;"

i. On November 28, 2018, WATSON observed MAX in a prone restraint on her way to get her lunch;

j. Thirty minutes later, WATSON saw that MAX was still in a restraint and struggling;

k. WATSON told MORGAN to reposition her hold on MAX's legs to his ankles;

l. WATSON held down MAX's hands "so he couldn't pinch" WOHLWEND;

m. WATSON did not ask WOHLWEND or MORGAN why MAX was in a restraint;

n. WATSON left to get another staff member to try to get MAX into a standing position, and when she returned MAX was no longer in the restraint but still lying on his stomach;

o. MAX did not move or respond when WATSON moved his hair, but she heard him breathing;

p. WATSON checked for but could not find a pulse on MAX's neck or wrist;

q. WOHLWEND called for CHAMBERS;

r. CHAMBERS arrived about 5-10 minutes after MAX became nonresponsive;

s. CHAMBERS said MAX's name but got no response, then rolled MAX over and checked for his pulse;

t. MAX had blood on his lip and a pale complexion

u. CHAMBERS then began to perform CPR and told staff to call 911;

v. CHAMBERS asked other staff to spell him; WOHLWEND tried but was unable to do it, so WATSON took over; and

w.  WATSON had seen MAX in other restraints before and had participated in restraining MAX on another occasion.

228.  On November 30, 2018, a CDE investigator interviewed Defendant CHAMBERS, GHS's school "nurse."  CHAMBERS made the following statements:

a.  On November 28, 2018, at approximately 1:50 p.m., CHAMBERS was called for a "skin assessment" after a student had been placed in a restraint;

b.  When CHAMBERS got to WOHLWEND's classroom, he rolled MAX over;

c.  MAX looked pale, and CHAMBERS checked for, but could not find, a pulse on MAX's wrist and neck;

d.  CHAMBERS asked staff to call 911 and administered CPR for 8-10 minutes, until paramedics arrived and took over;

e.  CHAMBERS believed MAX had gone into cardiac arrest based on his symptoms;

f.  CHAMBERS had been called to the classroom earlier—approximately 1:35 p.m.—but it did not seem like an emergency and he got side-tracked; and

g.  There may have been one or two students in the classroom when CHAMBERS was there.

229.  On November 30, 2018, a CDE investigator interviewed Defendant THOMAS, the transportation coordinator at GHS.  THOMAS made the following statements:

a.  THOMAS had received training from HWC;

b.  On November 28, 2018, MORGAN asked THOMAS to check in on WOHLWEND's classroom while she took a bathroom break;

c.  THOMAS checked in and everything was fine, but then a few minutes later, at approximately 1:20 p.m., a student came and asked THOMAS for help in the classroom;

d.  THOMAS assisted WOHLWEND in flipping MAX's lower body back into the prone position and held down his hands and ankles;

e.  After 2-3 minutes, things "calmed down" and THOMAS left;

f.  When THOMAS looked into the classroom later, WATSON was there;

g.  THOMAS led the students into the gym when the paramedics arrived;

h.  THOMAS had seen MAX in prone restraints previously—frequently and for long periods of time, upwards of 20 minutes;

- 54 -

i.   THOMAS had restrained MAX himself on one other occasion when MAX hit another student; and

j.   It was GHS policy and practice to place a student in a restraint if he or she hit another student, regardless of whether the situation escalated or the student was aggressive.

230.   MAX's death on November 30, 2018, caused the CDE finally to conduct a more comprehensive investigation of GHS, including a pre-existing complaint about restraint abuse made by Plaintiff Student M.S.'s mother on November 6, 2018.

231.   Despite the severe dangers involved, the CDE and Torlakson did not suspend GHS's license until December 5, 2018, an action that only prohibited GHS from admitting new students but did not prevent GHS or its staff from continuing to abuse current students.  The CDE did not revoke GHS's certification until January 11, 2019.  Between November 30, 2018 and January 11, 2019, GHS staff continued to restrain and physically discipline students as a matter of course.

232.   Defendant WOHLWEND and two GHS administrators, Defendants MEYERS and KELLER, were charged with felony manslaughter in connection with MAX's death.

233.   DJUSD, YOLO SELPA, YCOE and their employees failed to carry out their duties to supervise, train, investigate, report and ensure legal compliance in response to known and suspected uses of excessive force against students, including MAX BENSON, at GHS.

234.   GHS sent Behavior Emergency Reports to DJUSD, which demonstrated that Max was being illegally restrained in response to predictable, disability-related behaviors.  His October 12, 2018, IEP documents demonstrated that he was not getting the positive behavioral interventions he needed.  Given the record of MAX's continued spitting and other predictable behaviors noted in his IEP, Defendants violated Cal. Ed. Code § 56521.1 by failing to call an IEP meeting to review GHS's restraints and determine whether there was a need to modify MAX's BIP. Defendants also violated Cal. Ed. Code 56521.1 by failing to ensure that GHS and its staff used restraints on DJUSD/YOLO SELPA students only to control unpredictable, spontaneous behaviors, which posed a clear and present danger to the safety of the student or others and could not be addressed by less restrictive interventions.

235.   DJUSD also learned that YOLO SELPA had removed GHS from its list of approved schools and did not renew its Master Contract with the school.  Yet Defendants did nothing to investigate GHS, stop the restraints, or remove MAX to a safe, approved placement.  They were deliberately indifferent to the discrimination and abuse to which MAX was being subjected by GHS

- 55 -

and its staff.  As a result, MAX sustained significant physical and emotional injuries, including death.

236.    Defendants' conduct caused severe emotional distress and injuries to Plaintiff LANGLEY, including extreme grief and anguish over knowing how her son suffered and died, the loss of MAX's love and companionship, and profound sadness over all of the experiences Defendants robbed from her and her son.

237.    Defendants' conduct caused significant emotional distress and injuries to Plaintiff DAVID BENSON, including grief and anguish about his son's suffering and death, the loss of MAX's love and companionship, and the loss of future experiences he will never have with his son.

238.    At all times relevant to the complaint, the employees of DJUSD, YCOE, YOLO SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT M.S.**

239.    Plaintiff Student M.S. is a minor with autism spectrum disorder, Tourette syndrome and ADHD in the Elk Grove Unified School District and EG SELPA.

240.    Defendant Doug PHILLIPS was at all times relevant to the complaint the Director of Special Education for EGUSD and the EG SELPA and therefore responsible for ensuring that all EG SELPA programs—including nonpublic schools in which EG SELPA students are placed—comply with state and federal special education and anti-discrimination laws Cal. Ed. Code § 56205(a) and (c).

241.    Defendant Marilyn DELGADO was the EGUSD program specialist assigned to M.S.

242.    M.S. was placed at GHS by Defendants EGUSD and EG SELPA.  At the time, EG SELPA had a Master Contract with GHS to provide special education and related services to EG SELPA students.

243.    M.S. had an IEP on May 30, 2018, while he was attending Zehnder Ranch Elementary School.  Shortly thereafter that IEP, M.S.'s mother requested an emergency IEP meeting because a teacher at Zehnder Ranch dug her nails into M.S.'s arm and yanked his headphones off of his head.  STARK discussed options with DELGADO, and they decided to look into GHS.

244.    When STARK and DELGADO visited GHS, its Defendant MEYERS promoted the school's benefits, including their ability to work with STARK and M.S. on his behavioral issues.

MEYERS told STARK that GHS used positive reinforcements and occupational therapy methods to prevent problematic behavior. STARK was concerned about the use of restraints and asked about GHS's policy. MEYERS told STARK that restraints were used as a last resort, only after other interventions had been unsuccessful and to protect the safety of the student or others. At no time during did anyone from GHS disclose to STARK that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed through the less restrictive measures in the students' BIPs.

245.    M.S.'s IEP was amended on August 23, 2018, and he had a BIP dated August 27, 2018. The documents from the May 30, 2018 IEP stated that M.S. had "demonstrated possible sensory issues such as sensory seeking resulting from poor interpersonal boundaries and . . . requires earmuffs occasionally due to a sensitivity to sounds." The BIP stated that M.S. "is sensitive to physical touch and proximity, staff will refrain from utilizing physical gestures or prompting when communicating with the student."

246.    The BIP stated that M.S. could become physically aggressive when frustrated or doing something he did not like, resulting in his hitting or kicking peers or staff. The BIP required the use of an incentive system; routines; consistency and follow-through with expectations; model relaxation techniques (including deep breathing, taking space and squeezing M.S.'s fists); discussing events, consequences and restitution while practicing self-advocacy skills; offering choices; setting clear limits; counseling; and the utilization of verbal and visual prompting. It stated that M.S. should be allowed to access headphones when needed.

247.    The Discipline/Emergency Intervention section stated that a "Nonviolent Physical Crisis Intervention" team would "maintain a calm and neutral tone, utilize clear/direct/simple verbal communication" and that because M.S. was sensitive to proximity, he would be provided with space to calm down and given headphones when escalated to help with calming.

248.    The BIP also stated that because M.S. was sensitive to touch and proximity, GHS staff would use visual and verbal prompts and guidance and refrain from using physical prompts to communicate with M.S.

249.    M.S. started school on September 10, 2018, when he was 9 years old.

250.    STARK was given a GHS intervention statement form, which she signed on September 10, 2018. The form stated that "if children appear to be a physical danger to themselves

- 57 -

1   or others around them a HWC (Handle with Care Intervention) trained staff will initiate a restraint

2   in an attempt to de-escalate and enable appropriate re-entry into the classroom."

3       251.    Defendants also provided STARK with the GHS enrollment materials, which

4   included the GHS Parent and Student Handbook 2018-2019.  The Handbook contains a section on

5   Positive Behavior Interventions and Supports.  Via the Handbook, GHS represented to STARK that

6   the school was focused on positive behavior intervention and supports, as opposed to punitive,

    physical discipline.  It stated that the school used "proactive" and "customized practices to support

7   student behavior;" coaching, teaching and modeling positive interactions; "problem-solving;"

8   "positive language;" and "direct teaching."  It stated that GHS staff's corrections of undesirable

9   behavior would be "Calm, Brief, Immediate, Respectful."

10      252.    The GHS Handbook stated that corrections would involve a sequence that includes

11  prompts, redirection, re-teaching, and providing a choice (which includes asking for help, moving

12  to a different location, or taking a break). STARK was not told that, in lieu of the strategies outlined

13  in GHS enrollment materials and M.S.'s BIP, GHS staff would restrain M.S. almost daily in

    response to his predictable, disability-related behavior.

14      253.    GHS staff began to restrain M.S. on his first day of school.  A belated CDE

15  investigation found that between September 10, 2018 and November 6, 2018, GHS staff restrained

16  or physically intervened with M.S. 61 times. On many days, M.S. was restrained on multiple

17  occasions and for time periods in excess of 30 minutes.  He regularly came home complaining of

18  pain, with bruises, welts and abrasions on his face and body.  M.S. was frequently placed in

    restraints in response to "noncompliant" behavior.  Although she had not received training in HWC

19  restraints, M.S.'s classroom teacher, Defendant Linda STEARN, participated in the great majority

20  of the restraints on M.S.   Other GHS staff, including WOHLWEND, DILLON, LAYMON,

21  HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN, and JONES, also

22  participated in and/or witnessed some of the restraints and took no action to protect M.S.

23      254.    GHS staff did not regularly allow M.S. to use his noise-cancelling headphones when

24  agitated, as required by his BIP.  In at least one occasion on September 12, 2018, GHS removed

25  M.S.'s noise cancelling headphones, causing him to yell, hit, kick and pinch the aid. Staff placed

26  him in a standing restraint.  When STARK picked M.S. from school that day, he had bruises on his

    face and arm.  When asked, GHS staff told STARK that they had restrained M.S.  STARK then

27  spoke with principal MEYERS who represented that the staff was new and would be given

28

"additional training" so that it would not happen again.  MEYERS did not disclose that STEARN, M.S.'s teacher, had not received any training regarding restraints.

255.    On September 17, 2018, STARK requested an IEP team meeting based on her concerns about "the amount and intensity of physical restraints being used" on M.S., as well as the injuries he had suffered.

256.    At an IEP team meeting held on September 26, 2018, STARK told DELGADO and GHS staff that she was concerned about the facial abrasions on M.S. and how the emergency interventions were being implemented.  When STARK asked for more information about the restraints, GHS staff described them with soft language and did not provide information about prone restraints. STARK stressed that M.S. did not like to be touched and that he alone must remove his headphones.  Nonetheless, GHS staff continued to substitute the techniques outlined in M.S.'s BIP, instead restraining him and using other physical interventions.  Subsequent to the September 26, 2018, meeting, GHS completed 15 BERs for M.S. from October 2 to November 29, 2018. DELGADO, EGUSD and EG SELPA took no action to stop the illegal and excessive restraints or to ensure that GHS staff followed M.S.'s BIP.

257.    Concerned about the number and nature of these continuing restraints and other physical interventions, STARK filed a compliance complaint with the CDE on November 6, 2018, which she forwarded to DELGADO on November 9, 2018.  Her email stated that she was very concerned about the number of BERs that had been made since her son's start at GHS two months prior.  "I am very concerned that these restraints are being used as corporal punishment and not as a safety measure."

258.    DELGADO did not respond until November 16, 2018, the date of a meeting with the IEP team which had to be re-scheduled to December 5, 2018 because of forest fires in the area. DELGADO asked STARK to re-send the complaint attached to the email as she could not open it a second time.  On November 26, 2018, STARK re-sent the attachment.  DELGADO took no action.

259.    Pursuant to the Master Contract between EGUSD, EG SELPA and GHS, GHS was required to complete a detailed behavioral emergency report ("BER") every time an emergency intervention was used against an Elk Grove student, place the BER in the student's file, and submit the BER to EGUSD within 24 hours of the incident "for administrative action."  Under the Master Contract and Cal. Ed. Code § 56521.1(h), a BER demonstrating that "a previously designed intervention is ineffective" requires the review of the IEP team.  Although GHS did not always fill

- 59 -

out BERs completely or even at all for its physical interventions with M.S., the CDE's investigation of STARK's complaint included a review of 18 BERs filed for M.S. The CDE found that GHS had implemented restraints and other "physical interventions" on M.S. 61 times between September 10 and November 6, 2018.

260.    Despite receiving information that GHS was improperly restraining M.S. as a substitute for the techniques prescribed in his BIP, no one at EGUSD/EG SELPA took action. Nor did the CDE visit GHS or begin its investigation until after the incident in which GHS staff restrained and killed MAX BENSON on November 28, 2018.

261.    None of the GHS Defendants, the LEA Defendants or the CDE informed STARK about the November 28, 2018, incident involving MAX BENSON.

262.    M.S.'s IEP team held an approximately three-hour-long meeting on December 5, 2018, attended by DELGADO, STARK, GHS Administrators CHRISTENSON and RAMSEY, GHS behaviorist Sandra ROMANO, STEARN and others. STARK asked the team about "physical prompts" and restraints at GHS. STARK told the team that due to M.S.'s sensitivity to physical touch, she did not want them to use physical prompts with him. GHS team members told her that if they could not use "physical prompts," they would need to use more restraints on M.S. On this occasion as on others, GHS staff represented to STARK that the restraints they were performing on M.S. were legal and justified. DELGADO did not question or contradict these representations. STARK left the meeting unsettled and said she needed to speak with an attorney.

263.    On December 6, 2018, when STARK arrived at the school to pick up her son, she found a news crew. When asked by STARK, GHS administrator RAMSEY told her that a GHS student had died following a restraint but emphasized that GHS always followed the law. STARK removed her son from GHS that day and informed EGUSD that she would no longer send M.S. to the school.

264.    The CDE finally conducted an investigation into STARK's complaint after MAX BENSON died. In its investigation report, **Attachment S** to this complaint, the CDE made the following findings and conclusions regarding GHS:

> a.    GHS violated Cal. Ed. Code § 56521.1 by using emergency interventions for predictable behavior; using emergency interventions as a substitute for M.S.'s BIP; failing to implement M.S.'s IEP; and failing to request an IEP team meeting to address M.S.'s behavior and placement at GHS given the continuous use of restraints;

b.  M.S.'s classroom teacher, Defendant STEARN, was not included in a list of staff trained in HWC restraints, even though she had restrained M.S. on many occasions;

c.  GHS did not document M.S.'s injuries and failed to complete BERs as required;

d.  The conduct of GHS in its operation was "harmful to the health, welfare, and safety of the student with exceptional needs," in violation of Cal. Ed. Code § 56366.4(a)(3); and

e.  "GHS's routine and ongoing use of HWC restraints in response to the known behaviors in the student's BIP, such as hitting and kicking, rather than the implementation of the behavior strategies in the student's BIP violated [Cal. Ed. Code] Section 56521.1(a) and (b).  Such practice of excessive, prolong restraint by GHS is harmful to students because the practice is punitive, humiliating, can cause serious injury, does not provide an opportunity for de-escalation, can cause physical and mental stress, may cause difficulty breathing, may trigger underlying medical issues, and may create long-term trauma."

265.  The CDE revoked GHS's NPS certification on January 11, 2019.

266.  The CDE also investigated the actions and omissions of EGUSD, EG SELPA and their employees with respect to M.S.'s placement at GHS.  In its investigation report, **Attachment R** to the complaint, the CDE made the following findings and conclusions:

a.  "The District failed to meet the requirements of [Cal. Ed. Code §] 56521.1(a). The District did not ensure emergency interventions were only used to control unpredictable, spontaneous behaviors, with clear and present danger and failed to use the less restrictive interventions which could have resolved the student's behaviors.  The District physically intervened with the student 61 times from September 10 to November 6, 2018.  **The District is out of compliance**."

b.  "The District failed to meet the requirements of [Cal. Ed. Code §] 56521.1(h). The District's reports described a serious behavioral incident on October 24, 2018, for which the BIP was ineffective.  The District should have called an IEP meeting to review the incident and the BIP and determine whether there was a need to modify the BIP.  **The District is out of compliance**."

267.  As a result of the CDE's findings and conclusions, the CDE required that EGUSD make following corrective actions, among others:

a. Conduct a training for parents of EGUSD students attending GHS pursuant to their IEP.  The training was to include a discussion and demonstration of all physical interventions used by the school;

b. Submit evidence to the CDE that the District has reviewed the requirements of 34 C.F.R. § 300.325 and Cal. Ed. Code § 56383 regarding the District's role in relation to IEPs for students the District has placed at an NPS;

c. Hold IEPs for District students who attended GHS and implement a BIP or revise the BIPs of students where necessary, focusing on the use of positive behavioral supports and interventions;

d. Review the process for evaluating the placement and progress of each student placed at an NPS, focusing on whether the NPS appropriately implements the student's BIP and whether the NPS complies with the requirements of Cal. Ed. Code §§ 56520 through 56525 regarding emergency behavioral interventions, and then revise the District's Master Contract as necessary; and

e. Schedule onsite review of GHS to occur at least every other month for a year, focusing on whether District students' needs continue to be best met at the NPS.

268.    Defendants EGUSD, EG SELPA, PHILLIPS and DELGADO abdicated their responsibilities to monitor and supervise the NPS placements of District students and ensure the NPS's compliance with state and federal laws prohibiting discrimination and the improper use of restraints.  Defendants were deliberately indifferent in the face of knowledge that a District student was being repeatedly restrained in response to predictable, disability-related behavior that should have been addressed by his BIP and that did not constitute a clear and present danger to his or others' safety.  They took no action and permitted the abuse and discrimination to continue.

269.    The LEA and CDE Defendants failed to carry out their duties to supervise, train, investigate, report, and ensure legal compliance in response to known and suspected uses of excessive force against M.S. and other students at GHS.

270.    In addition to his physical injuries described above, Defendants' actions and failures to act have caused M.S. to suffer extreme emotional distress, including post-traumatic stress disorder.  He has difficulty sleeping and is plagued by night terrors.  M.S. startles easily and has become more reclusive.  He also has chronic wrist pain.

271.    Defendants' actions and failures to act caused emotional distress to M.S.'s mother, STARK.    STARK has difficulty sleeping and regularly agonizes over having agreed to his placement at GHS and not removing him sooner

272.    At all times relevant to the complaint, the employees of EGUSD, EG SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

## PLAINTIFF STUDENT E.D.

273.    E.D. is a minor with autism spectrum disorder and post-traumatic stress disorder. At all times relevant to the complaint, he was a student within the FCUSD and FC SELPA.  After E.D.'s family moved to Rancho Cordoba in late 2016, E.D. was placed at GHS by FCUSD via his IEP.

274.    Bethanee Hunnicut was a Program Specialist for the Special Education Department of FCUSD.    In December 2016, Hunnicut took E.D.'s mother COUGHLIN and father DARROUGH to tour three possible schools, including GHS.  COUGHLIN chose a different school for E.D. The Friday before E.D. was scheduled to start at the other school, COUGHLIN was told that there was no longer room for E.D. and pressured by Hunnicut to place E.D. at GHS or risk violating truancy laws. At no time during the tour or prior to E.D.'s enrollment did anyone from GHS disclose to COUGHLIN or DARROUGH that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed through the less restrictive measures in the students' BIPs.

275.    Prior to E.D.'s first day at GHS, the school had been informed that E.D. had lost most of his vocal abilities, had difficulty with transitions, and exhibited impulsive behavior. E.D. had never been restrained before his enrollment at GHS and did not require restraints to control his behavior.  E.D.'s parents never imagined nor would they have consented to E.D.'s being restrained. E.D.'s parents expected that his educational services would be provided by trained and compassionate staff.

276.    On January 10, 2017, E.D.'s first and only day at GHS, staff told E.D. to sit down. As it was his first day in a new school, E.D. was overwhelmed and experiencing anxiety due to the transition.  E.D. reacted by impulsively swiping everything off of his desk.  Rather than redirecting or prompting E.D., staff immediately placed E.D. in a prone restraint for approximately 40 minutes, injuring his face, shoulders, neck, back, and wrists. Layers of skin were scraped off of E.D.'s chin

1  leaving an open wound, and he had bruises, swelling and marks from broken blood vessels on his
2  eyes, face, neck, back, shoulder, torso, and wrists. Plaintiffs allege on information and belief that
3  E.D. suffered a blow to the head during the restraint.  When E.D. was dropped at home by the
4  school van that afternoon, he looked as if he had been in a car accident.

5       277.   COUGHLIN immediately contacted Hunnicut by email to tell her about the restraint
   and E.D.'s injuries.  Hunnicut told COUGHLIN she would handle the issue with GHS via FCUSD.

6       278.   COUGHLIN and E.D.'s father DARROUGH refused to send E.D. back to GHS, yet
7  they had to fight with FCUSD for two to three months before the District would place E.D. at a
8  different school.

9       279.   In addition to the physical injuries to E.D. caused by the restraint, E.D. suffered
10 significant emotional distress and injuries.  E.D. shows classic symptoms of Post-Traumatic Stress
   Disorder, as well as symptoms of traumatic brain injury, for which he takes prescription medication.
11 Since the restraint, E.D. has more difficulty accomplishing tasks that were previously easy for him,
12 resulting in frustration and angry outbursts.  E.D. now suffers from short-term memory loss and  an
13 inability to bridge information from his memory to the present time.  E.D. has lost previously
14 acquired skills, such as communication skills and recognizing and naming colors.  E.D. struggles
15 much more with academics than prior to the restraint.  He has trouble sleeping and often wakes
16 with startles, disrupting his sleep pattern and making his other physical and mental health issues
17 worse.

18      280.   As a result of what happened at GHS, COUGHLIN and DARROUGH suffered from
19 severe emotional distress and injuries.   DARROUGH now suffers from depression and
   COUGHLIN has difficulty trusting anyone.

20      281.   At all times relevant to the complaint, the employees of FCUSD, FC SELPA, and
21 GHS were agents and/or employees of their respective employers acting within the scope of their
22 employment/agency.

                          **PLAINTIFF STUDENT D.Z.**

23      282.   Plaintiff D.Z. is a student with autism, OCD and Bipolar Disorder.  D.S. was placed
24 at GHS by FCUSD and FC SELPA via an IEP conducted on April 25, 2017.  D.Z. started at GHS
25 on May 1, 2017 and remained there until moving to a different nonpublic school on October 22,
26 2018 at the request of his mother, KINSER.  TRIGUERO was D.Z.'s program specialist and her
27 supervisor, MAGEE, was a special education program coordinator for FCUSD and FC SELPA.

28

- 64 -

283.    At or around the time of D.Z.'s enrollment at GHS, GHS administrator CHRISTENSON represented to KINSER that D.Z. would benefit from attending GHS because they had a high staff-to-student ratio and offered small group and individual instruction, obviating the need for a one-to-one aide.  CHRISTENSON said D.Z. would be supervised during unstructured time and would receive visual and positive behavioral supports and self-regulation strategies. CHRISTENSON told KINSER that "Handle With Care" restraints were performed only by staff that had been trained and licensed to perform restraints and only as a last resort measure when all the strategies in the BIP had been exhausted and/or when the student or others were in danger. KINSER asked what the restraints looked like, and CHRISTENSON demonstrated only a standing restraint, but told KINSER nothing about prone restraints.  KINSER told GHS that she wanted it documented that restraints should only be performed on D.Z. in an emergency situation and Defendants promised her they would put a note in D.Z.'s file.  No one from GHS told KINSER that GHS had a policy and practice of regularly restraining students in lieu of using the positive behavioral interventions in the students' BIPs and in response to behavior that did not constitute a clear and present danger to the safety of the student or others.

284.    While D.Z. was at GHS, staff repeatedly placed him in restraints for predictable, disability-related behavior that was supposed to be addressed by the techniques in his BIP and which did not constitute a clear and present danger to the safety of D.Z. or others.  In many cases, staff caused D.Z. to become aggravated by ignoring him or reacting inappropriately to known symptoms of D.Z.'s disability—such as giving fist bumps—and then placed him in excessive and violent restraints.

285.    Because GHS did not always complete the required Behavioral Emergency Reports when staff restrained D.Z., Plaintiffs do not know the dates and circumstances for every restraint, but they began as early as October 4, 2017 and lasted until at least October 11, 2018.  The GHS staff involved in restraining D.Z. were his classroom teacher Defendant MCCOY and other staff, including CHRISTENSON, OEHRING, GODBOUT, MATLOCK, CHAMBERS, and ALLEN. D.Z. was regularly placed in prone restraints, often multiple times a day, frequently lasting in excess of 30 minutes.

286.    Beginning as early as October 4, 2017, FCUSD and FC SELPA received BERs for some but not all of the restraints (approximately 28 over a one-year period), most of which indicated that D.Z.'s behavior was predictable and did not constitute a clear and present threat to D.Z's or

others' safety and should have been addressed by the less restrictive methods in his BIP. Yet FCUSD and FC SELPA employees allowed the illegal restraints to continue.

287.    KINSER witnessed several of the restraints and was shocked by the excessive force used by staff, who would hold her son face down on the floor with either an elbow or knee pressing down on D.Z.'s upper back and pushing his chest into the cement or floor. The restraints reminded KINSER of how police restrain criminals. On multiple occasions, KINSER could see that D.Z. was struggling to breathe. KINSER was told by GHS staff and administrators that these restraints were legal, justified, and the only way to control D.Z.'s behavior and keep him safe. However, KINSER became increasingly worried when D.Z. started coming home with injuries to his back and chest and began to demand that GHS provide her with copies of legally required BERs.

288.    D.Z. suffered superficial soft tissue injuries such as red, weeping marks on his back and wrists, and reported that his ribs and arms hurt often. He often came home with abrasions, bruises, and red welts across his back, shoulders, and wrists. In addition, GHS staff regularly put D.Z. in a mechanical restraint during transportation from school which involved tying his hands behind his back and using a harness that was several sizes too small. On several occasions, these mechanical restraints left welts and bruises on D.Z.

289.    On or around April 28, 2018, GHS staff placed D.Z. in a mechanical restraint and tied his hands behind his back for his hour-long bus ride home. KINSER was so concerned that she took photos of the red welts all over D.Z.'s torso and the bluish tint of his hands. Shortly thereafter, KINSER requested an IEP team meeting because she was concerned about GHS's use of restraints. An IEP meeting was held on May 17, 2018, and attended by GHS administrator Phyllis Ramsey, GHS behaviorist ROMANO, and an FCUSD Program Specialist. Despite clear evidence in D.Z.'s educational records that he was being restrained illegally in response to predictable, disability-related behavior that did not constitute a threat to D.Z. or others, Defendants decided to make no changes to D.Z.'s IEP, and FCUSD's program specialist took no action.

290.    During the month of September 2018, GHS staff placed D.Z. in at least six prone restraints, including one on September 17, 2018, that lasted over an hour; one on September 18, 2018, that lasted for two and a quarter hours and involved five staff members (McCOY, GODBOUT, MATLOCK, CHAMBERS and OEHRING) and another student; and one on September 19, 2018 that lasted an hour and a half.

291.    On September 18, 2018, KINSER received a call from GHS telling her that they could not manage D.Z. and that she needed to pick him up. When KINSER arrived, CHAMBERs

and another staff member spent ten minutes speaking with her about D.Z.'s "mental health issues" before CHAMBERS asked KINSER whether she wanted to see D.Z. so she could calm him down. KINSER was shocked and asked why CHAMBERS had delayed her with conversation while her son was upset. CHAMBERS took KINSER down the hall, where she saw D.Z. being held in a prone restraint with one person at each arm and one person at each leg, including another student. KINSER could see and hear that D.Z.'s breathing was labored and yelled at Defendants to get off of D.Z.

292. On or around September 25, 2018, D.Z. accidentally spilled the contents of a mug at his desk. CHAMBERS responded by placing his hand on D.Z.'s neck, pushing D.Z.'s face down into the desk, and pulling both of D.Z.'s arms behind him aggressively. CHAMBERS told D.Z. to "shut the fuck up" and "clean this shit up."

293. On September 30, 2018, KINSER sent an email to CHRISTENSON in which she expressed concern that the school appeared to be "grossly understaffed". She requested that no more restraints be performed on D.Z. "These are improper restraints, and I am still pretty shocked that a peer was told to restrain him. If there is a situation where he is becoming physically aggressive I want to be called and I will remove him myself," she wrote.

294. On October 1, 2018, KINSER wrote to Betty Jo WESSINGER, Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA, about D.Z.'s placement at GHS:

> The placement is at this point not working. He is having increasing spells of violence and being held in restraints, which I believe are him reacting to certain elements in his environment. I am not in agreement with their behavioral tactics, the meeting of his IEP, transportation needs and physical environment. Both my sons teacher and the teacher's aide, quit recently. I don't think their staffing is appropriate. I believe this school met his needs at one time, but no longer meets his needs now. Due to changes in my son, but also changes to their staff and methods.

295. KINSER asked that the appropriateness of D.Z.'s placement be discussed at his upcoming IEP meeting on October 18, 2018. WESSINGER responded to KINSER's email on October 2, 2018, including Defendants TRIGUERO and MAGEE to confirm their attendance at the IEP. WESSINGER added, "In the meantime, I will follow up with Guiding Hands on their staffing of the program."

PLAINTIFFS' THIRD AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

296.    As Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA, WESSINGER was responsible for administering the local plan and assuring that the SELPA was in compliance with all laws and regulations.  Cal. Ed. Code § 56205(a) and (c); Folsom Cordova Unified School District Special Education Local Plan Area Local Education Agency (LEA) Assurances ("FC Assurances"), **Attachment AA**, at 5.

297.    She was also responsible for: coordinating review of the SELPA Plan's programs, evaluating the Plan's effectiveness, and evaluating the effectiveness of the Plan's accountability methods; ensuring a coordinated system of data collection and management; assuring full educational opportunity; and administering the allocation of state and federal funds.  As the SELPA Director, WESSINGER was also responsible for compliance with Cal. Ed. Code § 56195.7(c)(6), requiring LEAs to provide ongoing review of the SELPA's programs and procedures, as well as a method for correcting identified problems.

298.    FCUSD and FC SELPA attested in their LEA Assurances:

The state has in place a system for review of the special education programs in districts. It is the responsibility of Folsom Cordova Unified SELPA to support the delivery of effective programs and services in FCUSD, to support a continuum of appropriate service options, to improve the quality of the programs offered, and to participate in review processes, including the Quality Assurance Process, Self Reviews, Verification Reviews, and Focused Monitoring, as well as Complaints processes and mediation and due process procedures. Folsom Cordova Unified SELPA shall ensure that any non-compliant items identified have been and continue to be rectified.  **Attachment AA** at 9.

299.    As FC SELPA's Director, WESSINGER had a duty to monitor and insure that its programs—including a nonpublic school in which FCUSD had placed a District student—were complying with state and federal education and anti-discrimination laws, including those restricting behavioral interventions.  WESSINGER knew both from her position as the director of FC SELPA (see section regarding E.D. above) and her previous experience as the director of special education at Rocklin Unified School District (see section regarding AUSTIN PETERSEN below) that GHS regularly restrained students in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of the students or others and that could have been handled with less restrictive measures.  Yet WESSINGER approved the use of GHS as a nonpublic school at which FCUSD could place its students with disabilities.

- 68 -

300.    TRIGUERO was a Program Specialist and her supervisor, Defendant MAGEE, was a Special Education Program Coordinator.  Both were directly involved in and responsible for monitoring D.Z.'s placement and ensuring that GHS was following state and federal law, including in its use of behavioral interventions.  Both learned during D.Z.'s placement at GHS that he was being subjected to illegal restraints, yet neither took any action to stop the restraints or transfer D.Z. to a safe placement until KINSER insisted that D.Z. be removed from the school.

301.    Prior to placing D.Z. at GHS, FCUSD and FC SELPA already knew that GHS had improperly and aggressively restrained at least one student (Plaintiff Student E.D.), causing him serious physical and emotional injuries and prompting the parents to pull him out of the school.  Additionally, FCUSD, FC SELPA and their employees received approximately twenty-eight BERs for the restraints GHS had placed on D.Z. Those BERs demonstrated that GHS was restraining D.Z. in response to predictable, disability-related behavior, in lieu of using the techniques specified in D.Z.'s BIP.  Despite this information, FCUSD, FC SELPA, WESSINGER, TRIGUERO and MAGEE took no action to investigate GHS or to ensure that D.Z. and other students were in a safe placement where they were not subject to abuse and discrimination.

302.    Despite widespread knowledge among educators about the disproportionate use of restraints on students with disabilities and in nonpublic schools, FCUSD, FC SELPA WESSINGER, TRIGUERO and MAGEE failed to carry out their duties to supervise, train, investigate, report and ensure legal compliance in response to known and suspected uses of excessive force against E.D., D.Z. and other students at GHS.  Defendants were deliberately indifferent to Plaintiffs' rights.

303.    Plaintiffs allege on information and belief that even after receiving KINSER's email regarding the restraints and understaffing, WESSINGER did not "follow up" with GHS.  Despite repeated complaints about the use of excessive and illegal restraints at GHS, Defendants took no action to monitor GHS, investigate complaints, stop the restraints, inform the CDE, or remove its students from an unsafe placement.

304.    KINSER removed D.Z. from GHS immediately following his IEP meeting on October 18, 2018.

305.    In addition to the physical injuries described above, D.Z. also suffered emotional distress and injuries as a result of the restraints and other abuse to which Defendants subjected him. He suffers from depression and classic symptoms of Post-Traumatic Stress Disorder, including: retreating or assuming a defensive position if an adult reaches out toward him; toileting regression;

disassociation; problems with sleeping, including night terrors and startles; and becoming triggered by loud noises.

306.    Defendants' actions and failures to act caused KINSER severe emotional distress and injuries.  She became depressed as a result of watching her son suffer, knowing that he had been abused, feeling helpless to do anything about it, and witnessing the indifference of GHS staff and administrators, as well as officials from FC SELPA and FCUSD.  KINSER also suffered economic damages in the form of lost wages, as Defendants' actions caused her to miss work often in order to retrieve D.Z. from the school and then later due to the PTSD that D.Z. suffered as a result of Defendants' actions.  As a result, KINSER's employer transitioned her from full-time to part-time work.  When D.Z.'s PTSD prevented him from attending school, KINSER had to stay home so that she could care for D.Z. and could no longer perform her job as required.

307.    At all times relevant to the complaint, the employees of FCUSD, FC SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT S.D.**

308.    S.D. is a minor student with depressive disorder, oppositional defiant disorder, developmental coordination disorder and post-traumatic stress disorder.  On or about October 26, 2016, S.D. was placed at GHS via his IEP by Pollock Pines Elementary School District (PPESD) and the El Dorado County SELPA, of which PPESD is a member.

309.    Defendant LICIA MCDONALD, was a school psychologist and the special needs coordinator at PPESD and recommended GHS to S.D.'s father, Christopher DAVIS.  She highlighted strong supervision, staff specifically trained to deal with behavioral issues, and a philosophy that valued inclusion and non-discrimination.

310.    Prior to S.D.'s enrollment at GHS, DAVIS visited the school and spoke with administrators by phone.  GHS staff told DAVIS that the school's policy was to attempt to de-escalate students engaged in problematic behaviors with non-physical interventions, such as losing recess privileges or token economy points.  GHS staff told DAVIS that students were restrained only if they were a danger to themselves or others.  The restraints were described as standing restraints, and prone restraints were not described to DAVIS.

311.    DAVIS also received a copy of the GHS Parent and Student Handbook, which misrepresented that the school was focused on positive behavior intervention and supports, as opposed to punitive, physical discipline.

312.    At no time prior to S.D.'s enrollment did GHS inform S.D.'s father, Christopher DAVIS, that it had a policy and practice of disregarding the behavioral interventions outlined in students' IEPs and BIPs and instead restraining students in response to predictable, disability-related behavior which did not constitute a clear and present danger to the safety of students or others and which could have been handled by less restrictive means.

313.    GHS staff began regularly restraining S.D. on October 26, 2016 or earlier and continued to restrain and otherwise physically abuse him through November 2018. The restraints did not occur in response to clear and present dangers to the safety of S.D. or others but in response to predictable, disability-related behavior, including "non-compliance" and using profanity.

314.    GHS did not, as legally required, complete BERs or notify DAVIS each time they restrained S.D. Moreover, GHS staff and administrators represented to DAVIS that the restraints were legal, appropriate and necessary. As a result, Plaintiffs do not know all of the dates on which S.D. was restrained or the GHS staff involved. The GHS staff directly involved in restraining S.D. and/or witnessing the restraints without acting to protect S.D. include, but likely are not limited to, WOHLWEND, CHRISTENSON, SMITH, GATEWOOD, KELLER, Matt Carr ("CARR"), Ashley Oxford ("OXFORD"), and Julia Lyons ("LYONS").

315.    GHS staff restrained S.D. for predictable, disability-related behavior that did not constitute a clear and present danger to S.D. or others, such as yelling or refusing to follow instructions. Not only did the restraints and other physical interventions fail to address S.D.'s behavioral issues, they escalated the situation by frightening S.D., causing him to resist physically and try to escape.

316.    On or about September 27, 2017, S.D.'s IEP team held his annual IEP meeting. The accompanying documentation contains the following statement from his teacher, OXFORD: "[S.D.] has had 12 Handle With Care incidents this school year. They occurred when he was excessively non-compliant, and then began yanking on staff's arms and dropping his weight when physically prompted. He is not overtly aggressive, but refused to be safe once released and attempts to elope." Defendant MCDONALD was S.D.'s representative for PPESD, attended the meeting and signed the IEP documents containing the statement above. Although the restraints were, on their face, in violation of the Education Code § 56521.1 (a) and (b), MCDONALD did not object to the restraints. As a school psychologist, MCDONALD was a mandated reporter and therefore legally required to notify the authorities about the child abuse to which GHS had subjected S.D. Yet MCDONALD did not file a report of child abuse, take any action to stop the restraints, insist

1  on the use of positive behavioral interventions outlined in S.D.'s BIP, investigate GHS, or insure

2  that S.D. was in a safe placement.

3      317.    In fact, prior to the IEP meeting, MCDONALD had prepared a Psycho-Educational

4  Assessment Report on S.D.  In it, she noted S.D.'s behavioral problems, including non-compliance,

5  lack of motivation, negativity, and disorganization.  In discussing S.D.'s issues with "aggression,"

6  MCDONALD gave the following examples:  "defies teachers, threatens to hurt others, teases

   others."  There is nothing in the report indicating that S.D. had engaged in behavior that constituted

7  a clear and present danger to the physical safety of S.D. or others.  MCDONALD concluded in her

8  report that S.D.'s behavioral issues "require physical restraints."   In essence, PPESD and

9  MCDONALD approved the use of illegal restraints on S.D. by GHS.

10     318.    On February 8, 2018, S.D. was picking up and throwing sticks and ignored staff

11 demands that he stop.  OXFORD grabbed S.D., and S.D. responded by struggling and trying to

   escape.  OXFORD then put S.D. in a more restrictive restraint.  Plaintiffs allege on information and

12 belief that GHS did not file a BER for this incident as legally required.  GHS staff represented to

13 DAVIS that their actions were legal, justified and necessary.

14     319.    On or about May 18, 2018, S.D. was "struggling" with behavioral issues, so

15 OXFORD called for GATEWOOD and CARR.  GATEWOOD and CARR removed S.D. from the

16 classroom and restrained him mechanically by placing a harness on him, pulling his hands behind

17 his back and binding his arms with zip ties.  The wounds on S.D.'s wrists from the zip ties lasted

   for several weeks.  Plaintiffs allege on information and belief GHS did not file a BER for this

18 incident as legally required.  GHS staff represented to DAVIS that their actions were legal, justified

19 and necessary.

20     320.    On May 22, 2018, OXFORD restrained S.D. because he was not complying with

21 her instructions and being disrespectful.  When S.D. began to struggle in the restraint, OXFORD

22 put him in a more restrictive restraint.  S.D. continued to struggle and when he got loose from

   OXFORD, LYONS placed him in another restraint.  Rather than calming S.D., the restraints

23 aggravated the situation, frightened and upset S.D., and caused him to become aggressive.  GHS

24 staff placed him in yet another restraint to transport him from the classroom to the school bus at the

25 end of the day. This is likely one of the many incidents where, as reported by S.D., he was restrained

26 by a "harness" device and zip ties during transportation. Plaintiffs allege on information and belief

27 GHS did not file a BER for this incident as legally required.  GHS staff represented to DAVIS that

28 their actions were legal, justified and necessary.

321.   On May 31, 2018, OXFORD reported to DAVIS that GHS had to restrain S.D. twice because he had "a negative peer interaction" and tried to run away from staff.  Staff "grabbed" S.D., which made him "aggressive," so they restrained him twice.  Plaintiffs allege on information and belief that GHS did not file a BER for this incident as legally required.  GHS staff represented to DAVIS that their actions were legal, justified and necessary.

322.   Although GHS frequently failed to complete legally required Behavior Emergency Reports, it was not keeping the restraints a secret from PPESD.  GHS completed and sent a BER to PPESD and MCDONALD for at least one restraint incident, on August 13, 2018, in response to S.D.'s non-compliance, refusing direction and using profanity.

323.   On September 7, 2018, an IEP team held S.D.'s annual IEP meeting, which was attended by DAVIS, WOHLWEND, CHRISTENSON, and MCDONALD.  The documentation indicated that S.D. had been restrained in response to behavioral issues such as "non-compliance" or using profanity.  GHS staff misrepresented to DAVIS that these restraints were legal, appropriate, and the only effective response to S.D.'s behavioral issues.  GHS gave DAVIS a "Behavior Emergency Plan"—not to be confused with a legally required Behavior Improvement Plan—which would authorize GHS to perform "Therapeutic Physical Intervention Techniques" on S.D.  The form did not use the word "restraint" or describe the techniques, but it essentially sought authorization for the HWC restraints that GHS staff had been performing and would continue to perform on S.D.  Neither GHS nor MCDONALD disclosed to DAVIS the excessive and illegal nature of the restraints.

324.   Once again, although the restraints violated Education Code § 56521.1 (a) and (b), MCDONALD did not object to the restraints, file a child abuse report, insist on the use of positive behavioral interventions outlined in a BIP, investigate GHS, or insure that S.D. was in a safe placement.  Rather, MCDONALD signed GHS's "Behavior Emergency Plan" and approved S.D.'s continued placement at the school.  MCDONALD was deliberately indifferent to the discrimination and abuse to which GHS and its staff were subjecting S.D.

325.   On November 28, 2018, WOHLWEND and other GHS staff restrained S.D.'s classmate, MAX BENSON, and killed him.  Despite widespread media attention about MAX BENSON's death, neither MCDONALD nor PPESD's Superintendent, Pat ATKINS, notified DAVIS about the incident or took any action to remove S.D. from the school and find him a safe placement.  Rather, DAVIS pulled S.D. from the school on his own when he learned about what had happened in mid-December 2018.

326.    During the following months, ATKINS and MCDONALD made little to no effort to find another placement for S.D., who remained at home.  Staff for the El Dorado County SELPA repeatedly asked MCDONALD and ATKINS where S.D. had been placed.  On April 4, 2019, MCDONALD wrote to the SELPA offices apologizing for not finding a placement for S.D.: "Sorry for the delay on this!  I know we are out of compliance, but this is a student we are having great difficulty finding an appropriate placement for.  I'm working with our superintendent, Pat Atkins, to figure this out soon."

327.    PPESD finally placed S.D. at Sierra Ridge Elementary School.  Although PPESD knew that S.D.'s former teacher WOHLWEND had killed another GHS student by restraining him for almost two hours and that the CDE had subsequently revoked GHS's certification, PPESD hired WOHLWEND to be a special education teacher at Sierra Ridge.  Neither MCDONALD, ATKINS nor anyone else from PPESD told DAVIS that WOHLWEND was working at Sierra Ridge before S.D. started at the school.  When DAVIS found out, he had to specifically request that WOHLWEND have no contact with S.D.

328.    As the Superintendent of PPESD, ATKINS was responsible for the policies, practices and procedures governing the provision of special education services in the District, including the monitoring and supervision of nonpublic schools in which District students had been placed, including school compliance with anti-discrimination laws and those prohibiting corporal punishment and restricting the use of behavioral interventions.  Cal. Ed. Code §§ 56366(a)(2)(B), 56521.1, and 56523; 5 C.C.R. § 4960(a).  ATKINS failed to carry out his duties to supervise, train, investigate, report and ensure legal compliance in response to known and suspected uses of excessive force against the Plaintiff Students at GHS.  ATKINS also failed to train or supervise the PPESD staff who attended District IEPs and directly monitored the progress and placements of the District's special education students.  PPESD's special education staff, including MCDONALD and ATKINS, knew that students were being subjected to illegal and discriminatory restraints at GHS but took no action and continued to approve an unsafe placement.  In fact, MCDONALD approved the illegal restraints on S.D.   ATKINS was so indifferent to the use of illegal restraints on children with disabilities that he allowed PPESD to hire WOHLWEND as a special education teacher after she killed MAX BENSON.

329.    Defendants knew that students with disabilities were being subjected to illegal restraints in response to their predictable, disability-related behavior, but they took no action because they did not want to provide the necessary educational services themselves or take the

- 74 -

1  time, effort and/or expense necessary to ensure that S.D. and other students with disabilities were

2  receiving their educational services in a placement where staff followed the law, engaged in

3  positive behavioral interventions and did not subject students to excessive, harmful and illegal

4  restraints.  Defendants were deliberately indifferent to the rights of their students with disabilities,

5  including S.D., to be free from unreasonable restraints and disability-based discrimination.

6      330.    In addition to the physical injuries described above, S.D. often came home with

   bruising, red welts, marks across his shoulders or arms and on his stomach, and wounds on his

7  wrists, knees and chin.  Defendants' actions and failures to act also caused S.D. severe emotional

8  distress and injuries and exacerbated disabilities stemming from previous trauma suffered by S.D.

9  and known to Defendants. S.D. suffers from post-traumatic stress disorder and has difficulty

10 sleeping.  His behavior problems have gotten worse.   S.D. has become angry and despondent, is

11 easily frustrated, and frequently lashes out with physical violence in situations that did not

   previously generate such reactions.

12     331.    Defendants' actions and failures to act have caused DAVIS to suffer emotional

13 distress and injuries.  DAVIS has difficulty sleeping, with periods of insomnia and restless sleep.

14 He experiences increased levels of separation anxiety when he is separated from S.D.  DAVIS has

15 experienced an increase in negative ruminations.  He also has increased levels of social anxiety.

16 DAVIS experiences anxiety when he and/or S.D. leave the house, so they do not linger in public

17 spaces and try to return home as soon as possible.

18     332.    At all times relevant to the complaint, the employees of PPESD, El Dorado County

   SELPA, and GHS were agents and/or employees of their respective employers acting within the

19 scope of their employment/agency.

20                        **PLAINTIFF STUDENT J.P.**

21     333.    J.P. is a minor with autism spectrum disorder, ADHD, and other emotional, sensory

22 and mood disorders in the Amador County Unified School District ("ACUSD").  He was placed at

   GHS by ACUSD, ACOE and ACOE SELPA via his IEP in 2013.

23     334.    After J.P. eloped from Jackson Elementary School in 2013, he was suspended and

24 his mother, Cherilyn CALER, was told that J.P. could not return.  Defendant Mitzi FAULKNER,

25 at that time the Special Education Coordinator for ACOE, contacted CALER and offered three

26 possible schools, including GHS.  CALER and FAULKNER toured the schools and selected GHS

27 for J.P.  During their visit, GHS Principal MEYERS highlighted GHS's specialization in autism

28 spectrum disorder, small classes, high staff member to student ratio (8-10 students with 2 staff

                                                                                          - 75 -

members in the classroom at all times), staff highly trained to handle J.P.'s known behaviors, and a policy of inclusion and non-discrimination. No one at GHS informed CALER that that GHS had a policy and practice of regularly physically restraining students in response to predictable, disability-related behavior that did not constitute a clear and present danger to their or others' safety and in lieu of the positive behavioral interventions listed in students' BIP.

335.    As the Special Education Coordinator who placed J.P. at GHS, FAULKNER had a duty to investigate and monitor J.P.'s placement and ensure that GHS and its staff followed state and federal anti-discrimination and education laws, including those prohibiting corporal punishment and limiting behavioral interventions. FAULKNER had a duty to ensure that J.P. received an education in a safe, non-discriminatory placement. FAULKNER failed to fulfill these duties owed to J.P.

336.    When she became the SELPA Director, FAULKNER was responsible for the coordination of special education services and programs for students within ACUSD and for the implementation of the Local Plan in compliance with state and federal laws and regulations. FAULKNER was also responsible for the supervision and evaluation of personnel who provide special education services to ACUSD students and for assuring program compliance with state and federal law, including the programs and staffing at nonpublic schools at which ACUSD had placed its students via their IEPs. FAULKNER was also responsible for implementing master contracts with nonpublic schools, which include an agreement by the NPS to provide educational services to District students and comply with anti-discrimination and education laws in exchange for state and federal education funds.

337.    GHS frequently failed to complete BERs or notify CALER, as required by law, when GHS staff restrained J.P. Moreover, GHS staff assured CALER that all of the restraints were legal, appropriate and necessary to keep J.P. and others safe. As a result, Plaintiffs do not know all of the dates on which J.P. was restrained or otherwise physically abused by GHS, nor do they know the names of all individuals directly involved in the restraints. Defendants SMITH, ALLEN, CHAMBERS, MATLOCK and WOHLWEND were some, but not all, of the staff members directly involved in restraining J.P.

338.    From 2013 to 2015, GHS did not provide CALER with any records regarding behavior incidents or restraints with J.P., although on at least one occasion in 2015, GHS staff placed J.P. in a mechanical restraint (vest) because he did not want to get on the bus. GHS did not file a BER for this incident.

339.    At J.P.'s IEP in 2016, CALER requested that the school take measures to ensure that J.P. was not restrained by a male, as J.P. had significant trust issues with men.

340.    Toward the end of 2016, according to the incomplete records Plaintiffs have been able to obtain, GHS staff began to repeatedly and continuously restrain J.P. in response to predictable, disability-related behavior which did not present a clear and present threat to J.P.'s or others' safety and which should have been addressed by the less restrictive behavioral interventions in J.P.'s BIP. Despite CALER's specific request to avoid restraints by men, J.P. was regularly restrained by male staff.

341.    Starting as early as November 30, 2016, GHS frequently placed J.P. in lengthy restraints of 20-35 minutes in response to J.P.'s kicking or hitting walls or furniture. Between January 5 and December 20, 2017, GHS staff restrained J.P. at least 14 times, usually in response to J.P.'s kicking or hitting the walls or school furniture when he became frustrated. On February 22, 2017, GHS staff placed J.P. in a prone restraint on the classroom carpet after he ripped his spelling book, hit the wall and pulled on the window curtain. J.P. sustained carpet burns on the skin around his left eye. CALER had to take J.P. to urgent care when the wounds did not heal, and J.P. refused to go to school because he was embarrassed to face his peers.

342.    After that incident, CALER told Defendant CHRISTENSON that she wanted to remove her consent to restraints from J.P.'s file. CHRISTENSON responded that if CALER withdrew her consent to the Handle With Care restraints, J.P. could no longer attend GHS, as it was a required condition for attendance at GHS.

343.    GHS staff, including J.P.'s classroom teacher, Defendant WOHLWEND, continued to restrain J.P. in 2018 in response to predictable, disability-related behavior which did not present a clear and present threat to J.P.'s or others' safety and which should have been addressed by the less-restrictive behavioral interventions in J.P.'s BIP.

344.    On November 28, 2018, another student in J.P.'s classroom, MAX BENSON, was spitting. In response, WOHLWEND and other GHS staff placed MAX in a prone restraint for almost two hours during which he struggled, urinated on himself, vomited, stopped breathing and went into cardiac arrest. (See section on MAX BENSON above). J.P. was present in the classroom and witnessed MAX struggling for his life and losing consciousness.

345.    When CALER learned about MAX BENSON's death in early December 2018, she immediately removed J.P. from GHS.

346.    Defendants SLAVENSKY and FAULKNER failed to ensure that GHS, a nonpublic school at which they had placed J.P., complied with state and federal anti-discrimination and education laws, including those prohibiting corporal punishment and restricting the use of physical behavioral interventions.  Defendants failed to ensure that J.P. received access to the benefits and advantages of educational programs and services available to non-disabled students in the district and did not supervise or ensure that ACUSD personnel providing services to J.P. met the requirements of state and federal law.

347.    As an NPS which received state and federal education funds paid to ACUSD in exchange for providing education services to ACUSD students, GHS was a program of ACUSD. Defendants SLAVENSKY and FAULKNER failed to monitor or investigate GHS and its staff and ensure that they met the requirements of and complied with state and federal anti-discrimination and education laws and regulations.  They failed to ensure that the program in which they had placed J.P. was safe, did not discriminate against him on the basis of his disability and did not improperly restrain or otherwise abuse J.P.  Nor did SLAVENSKY or FAULKNER effectively delegate these duties to other ACUSD/ACOE staff.

348.    The restraints in which the GHS Defendants placed J.P. caused physical injuries, including welts, red marks, bruising and abrasions on his face, shoulders, wrists, back and chest. J.P. also suffers from chronic back pain for which he sees a chiropractor.

349.    In addition, being placed in repeated restraints and witnessing GHS staff restrain and ultimately kill MAX BENSON have caused J.P. to suffer extreme emotional distress and injuries.  J.P. suffers from post-traumatic stress disorder symptoms and still talks about how his teachers killed a fellow classmate.  J.P. becomes easily disturbed, suffers from panic attacks and bouts of anxiety, and a loss of concentration.  He is more defiant than previously with his parents and other adults, refusing to listen or follow simple orders.

350.    Defendants' actions and failures to act have also caused CALER emotional injuries, including emotional distress and pervasive thoughts about the abuse to which Defendants subjected J.P. and distress at what happened to Max Benson.  She thinks about how what happened to Max could have happened to J.P. and struggles with feelings of guilt that she failed her son and did not remove him sooner.  CALER has more difficulty sleeping since J.P.'s experience at GHS and must now take a sleep aid.  She has constant anxiety over how J.P. is doing and whether he is safe at his current school.

351.    At all times relevant to the complaint, the employees of ACUSD, ACOE, ACOE SELPA and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT H.K.**

352.    H.K. is a minor with A.D.H.D., Generalized Anxiety Disorder, Disruptive Mood Dysregulation Disorder, Depression, and other neurodevelopmental disabilities.  From 2017 through 2019, H.K. was a student within the Mother Lode Union School District ("MLUSD") and the Placerville Union School District ("PUSD").  He was placed at GHS in 2017 pursuant to his IEP and remained there until January 2019.

353.    MLUSD Director of Special Education, Sunny Lofton, recommended GHS to H.K.'s mother, Plaintiff Suzanne MULLER, and told her it was the "best" and only available option able to address H.K.'s special education needs, including increased physical aggression at his previous school.  GHS was billed as a nonpublic school "which focuses on supporting students with intensive needs in a highly therapeutic setting."

354.    No one at GHS informed MULLER that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to their or others' safety and that could have been addressed by less restrictive interventions outlined in students' BIPs.  GHS staff began to restrain H.K. almost immediately after he started school, on January 17, 2017, and continued to restrain him until November 20, 2018 or later.  GHS did not regularly complete a BER or notify H.K.'s parents as required by law when H.K. was restrained.  Moreover, GHS administrators and staff repeatedly misrepresented to MULLER that all restraints were legal, appropriate and necessary to keep H.K. and other safe.  As a result, Plaintiffs do not know the dates and circumstances for all of the instances in which GHS restrained H.K.  However, records obtained from El Dorado County SELPA demonstrate that H.K. was restrained at least 18 times between January 2017 and January 2019.

355.    GHS staff regularly placed H.K. in restraints, including prone restraints, in response to predictable, disability-related behaviors that did not pose a clear and present danger to H.K. or others and that could have been handled by less restrictive interventions.  H.K. was restrained for behaviors such as non-compliance, throwing items, kicking furniture or squirming away from staff members.  The restraints often involved staff members sitting or lying on top of H.K., making it difficult for him to breathe, and holding his hands behind his back for so long that they lost feeling.

- 79 -

PLAINTIFFS' THIRD AMENDED COMPLAINT

1    Staff did not monitor H.K.'s breathing or condition while holding him in a restraint; he often heard

2    them chatting and having trivial conversations with one another while sitting on top of him.

3        356.    H.K. was always terrified while a student at GHS.  He felt that GHS's main goal

4    was to induce fear in the students to make them compliant.  Staff regularly threatened students that

5    they could and would be restrained if they did anything considered "out of bounds" or "non-compliant."

6        357.    H.K. left GHS in January 2019 when the CDE revoked the school's certification,

7    and the school had to close.

8        358.    The restraints caused physical injuries to H.K., including bruising and abrasions to

9    his chin and cheeks, and back and neck pain.  Defendants' actions and failures to act also caused

10   H.K. severe emotional distress and fear of abuse.  H.K. is now hypersensitive to unexpected

11   physical contact and to having things close to his face (as a result of having his face pressed down

12   into mats during prone restraints).  H.K. also becomes scared in crowded or loud places.  For

13   approximately one year after leaving GHS, H.K. had regular nightmares from which he would wake

14   up shaking, in a cold sweat.  H.K. is angry at his parents for allowing school officials to place him

15   at GHS and for not realizing that H.K. was being abused at the school and immediately removing
     him.

16       359.    Defendants' actions and failures to act have also caused emotional distress and

17   injuries to Plaintiff MULLER, who feels extreme guilt about agreeing to H.K.'s placement at GHS

     and for not realizing that GHS staff were abusing H.K. and removing him from the school.

18       360.    At all times relevant to the complaint, the employees of MLUSD, PUSD, and GHS

19   were agents and/or employees of their respective employers acting within the scope of their

20   employment/agency.

21                    **PLAINTIFF STUDENT AUSTIN PETERSEN**

22       361.    AUSTIN PETERSEN was a student with autism spectrum disorder who was placed

23   at GHS by Rocklin Unified School District ("RUSD") via his IEP in September 2012 and remained

     there until approximately November 5, 2014.

24       362.    Prior to agreeing to AUSTIN's placement at GHS, his mother, Suzanne Brent-

25   Petersen, met with GHS principal MEYERS, who misrepresented to Ms. Brent-Petersen that: GHS

26   and its staff had the experience and skills necessary to work with children with autism; restraints

27   were used infrequently and only when a child was in immediate danger of harming himself or

28   others; GHS was fenced in and otherwise able to handle AUSTIN's known behavior of walking

away from school; and GHS had a high staff-to-student ratio and could provide adequate supervision. No one at GHS informed Ms. Brent-Petersen that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to their or others' safety and that could have been addressed by less restrictive interventions.

363.    GHS staff began restraining AUSTIN during his first week at GHS in the lunch room. AUSTIN tried to sit near the trash can, away from the other students, because he was nervous and did not know anyone. Staff told AUSTIN he could not sit there, so he started pacing while holding his tray and talking to himself. A staff member told AUSTIN to sit down, and when he refused, she grabbed his tray. Then two staff members placed him in a prone restraint, which shocked and frightened AUSTIN. When his mother later asked MEYERS why staff had restrained AUSTIN for nonviolent behavior, MEYERS responded that staff did not known know whether he had violent tendencies and that it would not happen again.

364.    Nonetheless, GHS continued to place AUSTIN in restraints approximately once a month until he left GHS in November of 2014. GHS did not regularly complete a BER or notify AUSTIN's parents as required by law when AUSTIN was restrained. Moreover, GHS administrators and staff repeatedly misrepresented to AUSTIN's parents that all restraints were legal, appropriate and necessary to keep AUSTIN and others safe. As a result, Plaintiffs do not know the dates and circumstances for all of the instances in which GHS restrained AUSTIN.

365.    GHS staff regularly placed AUSTIN in restraints, including prone restraints, in response to predictable, disability-related behavior that did not pose a clear and present danger to AUSTIN or others and that could have been handled by less restrictive interventions. These restraints often lasted for long periods of time—from 15 minutes to over an hour. AUSTIN was regularly restrained for behavior such as failing to follow instructions, "non-compliance," being "aggressive," yelling, or getting into a verbal fight with a classmate. GHS staff regularly substituted restraints for the intervention strategies outlined in AUSTIN's BIP, even when AUSTIN would himself request the opportunity to practice a self-regulating technique, such as taking a break or removing himself from the classroom.

366.    AUSTIN was restrained on numerous occasions for behavior that could not even reasonably be considered to be defiant, such as not immediately responding to an instruction because he did not hear or understand the teacher. On one occasion, staff restrained AUSTIN because he was arguing with a peer and "talking with his hands above his waist." In that instance,

the argument had ended and AUSTIN was walking away when a teacher's aide purposely tripped AUSTIN, threw him onto the asphalt and laid on top of him, severely restricting AUSTIN's breathing.

367.    GHS had a policy and practice of regularly restraining students to instill fear and compliance.  When a new student arrived at the school, AUSTIN and his friends would speculate about how soon the new student would be restrained, which was almost always within the first week. Every time four staff members would come into a classroom, AUSTIN would tense up, knowing that someone was in trouble and about to be restrained—possibly him.

368.    The supporting documents to AUSTIN's IEP in October 2012 include a Behavioral Report showing that from August 2012 to October 2012, GHS staff restrained AUSTIN twice, for "noncompliance" and for being "aggressive."  The report states that the incidents leading to the restraints stemmed from "misunderstandings."  This document understated the number of restraints in which GHS had placed AUSTIN.  Nonetheless, the document was provided to an RUSD program specialist Robin Smay ("SMAY"), who took no action in response to information that GHS was restraining an RUSD student in response to predictable, disability-related behavior that did not constitute a clear and present danger to the physical safety of the student or others.  SMAY approved AUSTIN's continued placement at GHS.  At all times relevant to this complaint, SMAY was an employee and/or agent of RUSD and was acting within the scope of her employment and/or agency.

369.    The supporting documents to AUSTIN's IEP in May 2013 include a Behavioral Report showing that from August 2012 to April 2013, GHS staff restrained AUSTIN ten times, often for things like "becoming aggressive with staff" or "noncompliance".  This document understated the number of restraints in which GHS had placed AUSTIN.  Nonetheless, the document was provided to RUSD program specialist Karla Salvo ("SALVO"), who took no action in response to information that GHS was restraining an RUSD student in response to predictable, disability-related behavior that did not constitute a clear and present danger to the physical safety of the student or others.  SALVO approved AUSTIN's continued placement at GHS. At all times relevant to this complaint, SALVO was an employee and/or agent of RUSD and was acting within the scope of her employment and/or agency.

370.    The supporting documents to AUSTIN's IEP in May 2014 include a Behavioral Report showing that from August 2012 to April 2014, GHS staff restrained AUSTIN thirteen times, often for things like "yelling" or "noncompliance."  These included two restraints over an hour

long.  This document understated the number of restraints in which GHS had placed AUSTIN.  Nonetheless, the document was provided to RUSD program specialist Jenn Kaiser ("KAISER"), who took no action in response to information that GHS was restraining an RUSD student in response to predictable, disability-related behavior that did not constitute a clear and present danger to the physical safety of the student or others.  KAISER approved AUSTIN's continued placement at GHS.  At all times relevant to this complaint, KAISER was an employee and/or agent of RUSD and was acting within the scope of her employment and/or agency.

371.    On or about November 5, 2014, GHS called Brent-Petersen and told her AUSTIN had brought a "weapon" to school and that GHS had called the police. In fact, AUSTIN had taken his favorite toy, a small hammer tool from an archaeology kit for children over five years old, to school. As AUSTIN lived in fear of being restrained, he showed the toy hammer to one of the aides early in the day to make sure it was okay. When the aide said the hammer was "cool," AUSTIN assumed it had been approved.  Shortly thereafter that, AUSTIN's teacher Heidi Spiess walked out of his classroom and returned with four staff members, including Defendant CHRISTENSON, who stood over AUSTIN.  AUSTIN thought that he was in trouble because his chair was not "four on the floor."   When the staff members asked AUSTIN to give them "the weapon," AUSTIN told him he did not have a weapon before he realized what they meant. The staff patted AUSTIN down. When AUSTIN refused to release the hammer because he knew that, like so many other things they had taken from him, he would not get it back, staff lifted him out of his chair and restrained him on the floor.  AUSTIN heard his neck pop and his arm lost feeling.  Staff kept AUSTIN face-up on the floor while a staff member laid over the top of him and other staff members held down each of his feet and hands. AUSTIN told the staff he couldn't breathe, but they ignored him.  During the 20-minute restraint, staff also refused AUSTIN's request for water as they chatted with each other as if AUSTIN wasn't even there.

372.    After receiving the call from the school, Brent-Petersen drove to the school and rang the doorbell.  While waiting approximately two minutes for someone to open the door, Brent-Petersen heard muffled screams and crying coming from inside.  When she entered the school, Brent-Petersen saw a small boy, approximately six to seven years old, face down on the ground with his arm sticking out from under a very large female staff member who was laying on him. The child was crying, but his voice was muffled and he appeared to be having difficulty breathing.  At that moment, GHS principal MEYERS arrived and whisked Brent-Petersen into her office saying the incident was "none of [Brent-Petersen's] business."

373.    Brent-Petersen begged MEYERS to stop the staff from restraining AUSTIN, as he was not a violent child.  When MEYERS refused to confirm that GHS would no longer restrain AUSTIN, Brent-Petersen removed AUSTIN from the school.

374.    Brent-Petersen reported the restraint on her son and what she had witnessed at GHS to the local sheriff, but never heard back.  She also called RUSD and spoke with a program specialist to tell them AUSTIN would not be returning to GHS and described the restraint of the small child she had seen there.  Brent-Petersen warned the staff member she spoke with that GHS was going to end up killing a student. The program specialist responded that they had been having so many problems with GHS that they would never send anyone there again.

375.    On November 7, 2014, the RUSD program specialist made a child abuse report to CPS based on the restraint in which AUSTIN had been placed on November 5, 2014.  The report noted that GHS staff had placed AUSTIN, a slim child with a height of 5 feet, 5 inches, in a four-person restraint in which his arms and legs were held down for 30 minutes.

376.    AUSTIN's mother subsequently placed him at Placer Learning Center, where he remained for the following two and a half years. AUSTIN felt safe there when he witnessed teachers respond in a calm and nonviolent manner, in response to student behavior that would have resulted in a restraint at GHS. During AUSTIN'S entire time at Placer Learning Center he was never restrained.

377.    Defendant Betty Jo WESSINGER was the Director of Special Education at RUSD from approximately 2011 to 2013.  Janna Cambra ("CAMBRA") was the Director of Special Education at RUSD from approximately 2013 to 2015.   As Directors of Special Education, WESSINGER and CAMBRA were responsible for the operation of RUSD special education programs to ensure that all eligible children with disabilities in RUSD received appropriate services, and that the District's education programs and services provided to children with disabilities were equivalent to those provided to students without disabilities.  WESSINGER and CAMBRA were also responsible for coordinating special education services and programs within RUSD and implementing the SELPA local plan, which includes assurances that: District programs will not discriminate in provision of  programs and services to children with disabilities; District programs will comply with state and federal laws, including the ADA, Section 504, the IDEA and the California Education Code, including provisions restricting the use of physical behavior interventions; and personnel providing special education services to District students will meet federal requirements and have the knowledge and skills necessary to serve children with

- 84 -

disabilities.  Moreover, WESSINGER and CAMBRA were ultimately responsible for evaluating nonpublic school placements of RUSD students on at least an annual basis and ensuring that the NPS provides the services specified in the students' IEP and remains an appropriate placement for the student.

378.    When GHS sent BERs for restraints placed on AUSTIN, they were sent to the attention of WESSINGER and later to CAMBRA.

379.    From approximately 2011 to 2013, WESSINGER was an employee and/or agent of RUSD and acting within the scope of her employment and/or agency. From approximately 2013 to 2015, CAMBRA was an employee and/or agent of RUSD and acting within the scope of her employment and/or agency. WESSINGER and CAMBRA failed to carry out their responsibilities and did not monitor or evaluate GHS or its staff.  Nor did they insure that AUSTIN or other students within the District placed at GHS were in a safe and appropriate placement in which they were not subjected to disability discrimination, illegal restraints or other physical and emotional abuse.

380.    The restraints caused physical injuries to AUSTIN, including facial abrasions, bruises to his jaw and neck pain.  Defendants also caused AUSTIN severe emotional distress and injuries.  AUSTIN has symptoms of post-traumatic stress disorder with which he struggles on a daily basis.  After GHS, AUSTIN became very angry about everything.  Austin has been seeing a psychologist since he left Guiding Hands and takes medication for mood disorders.

381.    At all times relevant to the complaint, the employees of RUSD and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

382.    AUSTIN was born on November 18, 1998, and was a minor while at GHS. Although AUSTIN turned eighteen on November 18, 2016, due to his mental health disabilities, AUSTIN remains legally incompetent.   AUSTIN cannot understand legal processes or the court system in such a way as to protect his interests.  He cannot make day-to-day decisions to protect his welfare and cannot live independently.  AUSTIN has cognitive impairments related to his autism that interfere with his ability to understand cause and effect or anticipate the results of his actions, thus impairing his ability to appreciate his responsibilities as a plaintiff in a lawsuit.  For this reason, Plaintiffs have filed a motion with this Court to appoint his father, Timothy Petersen, as his guardian ad litem for the purpose of bringing this lawsuit. ECF Nos. 124 and 125.

**HANDLE WITH CARE**

383.    The product that Handle With Care Behavioral Management System, Inc. (HWC) sold to GHS is known as "The Primary Restraint Technique" (PRT).  PRT was developed by the company's owner, Bruce Chapman, who holds nine patents on the system, and at least some of those patents have been assigned to HWC.

384.    At least three patents, numbers 67551971, 20020053348, and 63748292, reveal that Chapman invented an "apparatus and method for spit and bite protection from dangerous persons." In the abstract for patent number 6755197, it states that the "apparatus and method of use thereof remedies at least some of the problems and dangers associated with applying restraint holds to violent and/or struggling persons by protecting restraining or escorting personnel from harm that may be inflicted on them by the target person during and after application of restraint holds (such as spitting and biting). The inventive protective apparatus advantageously comprises a collar (for example a cervical collar) that protects and stabilizes the person's neck and prevents neck injuries and head-butting, and a readily deployable face shield that attaches to the cervical collar and that prevents the person from spitting on and/or biting the staff members.  The face shield may be permanently or reasonably attached to the collar."

385.    Another patent, number 63607483, provides for an "Apparatus and method for safely maintaining an extended restraining hold on a person." In the abstract it states: "An apparatus and method for assisting a first person in maintaining a safe restraining hold on a second person for extended period of time without danger of positional asphyxiation is disclosed. The apparatus comprises a first resilient pad with a receiving channel for receiving the first person's elbow and bottom flat surface having an extruded area positioned and configured to reasonably attach to an additional stabilizing pad underneath so that the position of the apparatus may be optionally elevated above the floor surface. The first person initiates the restraining hold by manipulating the second person into a face-down prone position onto the floor surface, such that the first person is disposed along and above the second person. The first person completes the restraining hold when the first person's weight is distributed between the first person's knees and the first person's elbow such that the first person's elbow is proximal to a corresponding arm of the second person."

386.    MAX BENSON and the plaintiff students were injured by a system of restraint developed and patented by Mr. Bruce Chapman (hereinafter "Chapman") and sold by him and his company Handle With Care Behavioral Management Systems, Inc. (hereinafter "HWC") to schools in California, including GHS.

PLAINTIFFS' THIRD AMENDED COMPLAINT

387.    At all times herein mentioned, HWC had no policy or training curricula on when the restraints they advocated to be used should be employed and negligently omitted such training from their program. They had no policy or plan in place to ensure that 911 was called immediately upon a child being rendered unconscious at defendant GHS when placed in a prone restraint designed by Chapman and sold by HWC.

388.    HWC had no policy or plan in place to ensure that a credentialed teacher perform CPR immediately when a student in their presence has been rendered unconscious from a prone restraint designed by Chapman and sold by HWC.

389.    Defendant HWC is the assignee of at least some of the restraint system patents held by Chapman and is a closely held corporation run out of a single-family residence, with Chapman acting as its President. and as only one of three of the corporation's employees.

390.    HWC was in the business of designing, developing, marketing, selling, and distributing the restraint system for use on behaviorally challenged, disabled child students within the United States, specifically within the State of California, and to GHS.

391.    HWC, through its creator, Chapman represented to CDE, the LEA's and their employees and GHS and its employees that the restraint system went through 10 years of field study, development and overview under the supervision of some of the most accomplished and experienced medical minds at Pennsylvania Hospital before the program was offered to the public and that defendant HWC's restraint system has been extensively evaluated by leading forensic (forensic pathologists) experts, chief medical examiners, doctors, and nurses.

392.    In developing and marketing the product, Chapman and HWC, knew that the use of a prone restraint carries with it a very well-known risk of injury and death, especially to children; and that other types of physical restraints cause serious injuries to children.

393.    In developing and marketing the product, Chapman and HWC knew when developing the restraint system, that documented injuries from use of prone restraints include: asphyxiation, choking, strangulation, cerebral and cerebellar oxygen deprivation (hypoxia and anoxia), broken bones, lacerations, abrasions, injury to joints and muscles, contusions or bruising, overheating, dehydration, exhaustion, blunt trauma to the head, broken neck, wrist and leg compression, dislocation of the shoulder and other joints, hyperextension or hyperflexion of the arms, exacerbation of existing respiratory problems, decreased respiratory efficiency, decrease in circulation to extremities, deep vein thrombosis, pulmonary embolism, cardiac arrest, respiratory arrest, and death.

394.     In developing and marketing the product, Chapman and HWC knew that the risk of injury or death is increased where the person restrained has neurological, cardiac, respiratory conditions, or is obese.

395.     In developing and marketing the product, Chapman and HWC knew upon whom the restraint system was intended to be used, have physical limitations and/or other medical conditions that would contraindicate the use of the restraint system upon them.

396.     Chapman and HWC's patented restraint system is intended for use in physically restraining a child, including use of a prone (face down) restraint.  The system includes a method to "take down" the student to the ground, force the student into a face down position, and to immobilize the student while face down on the ground.

397.     In marketing the product, Chapman and HWC promoted the restraint system as a safe and effective way to gain control over a child who is in a behavioral crisis.

398.     In developing and marketing the product, Chapman and HWC knew, or should have known, that a disproportionate number of children are injured and/or have died from restraints because children struggle against physical restraints, particularly when the situation or method of restraint is extremely unpleasant or aversive.

399.     In developing and marketing the product, Chapman and HWC knew that struggling against a hold is a natural and foreseeable response, and that the user of the restraint system may exert pressure, in a variety of forms, on the thoracic cavity of the child upon whom the restraint system is used, and on the child's neck, head, shoulders, ankles, or limbs, which may cause injury.

400.     In developing and marketing the product, Chapman and HWC knew that children upon whom the restraint system was intended to be used may have medical or emotional conditions that make it difficult for the child to communicate his/her physical needs or concerns.

401.     Chapman, personally, and through HWC represented to CDE, the LEA's and their employees and GHS and its employees that use of defendant HWC's restraint system on "behaviorally challenged" students eliminated injuries during takedown, as well as chest compression and the possibility of positional asphyxiation during a prone hold; and further represented that their restraint system allowed educational professionals to work in teams and to maintain a safe hold on children, including modifications for orthopedic and physical conditions; and that HWC would customize their deployment system to include a variety of tactical adjustments for an "unprecedented range" of ergonomic considerations.

402.    Chapman and HWC knew that struggling against a restraint is a natural response and cannot be assumed to be "oppositional."

403.    Chapman and HWC knew that bruising, causing traumatic conditions, severe injuries and death can occur when adults physically overpower a child or when a child struggles well beyond the point of physical exhaustion.

404.    Chapman and HWC knew that, in a crisis situation, a disabled, mentally impaired, child cannot be expected to fully understand directions and to effectively communicate their personal needs.

405.    Chapman and HWC knew the product would be purchased and used without inspection for defects because the schools and staff would rely on Chapman's representations about its safety.

406.    The above-described devices and products were defective when they were sold and placed into the stream of commerce by Chapman and HWC.

407.    In marketing the restraint system, Chapman and HWC made representations that the restraint system was endorsed by the medical profession, when, in fact, the medical profession has not placed their imprimatur on the use of the restraint system, and in particular, has not indicated any approval of the use of prone restraint on an obese child with a fused neck, such as MAX was on the date the restraint system caused his death, and the risks of asphyxiation and aspiration in prone restraints are well known to the medical community.

408.    Chapman and HWC knew that the restraint system was defective and knew that the defect was due, in part, on the fact that prone holds should not be used on medically compromised children, on children who were obese, who were taking psychiatric medications, or on autistic children who cannot communicate their needs to an adult, and for whom struggling against a restraint is a natural reaction.

409.    Chapman and HWC represented to consumers of the restraint system that it complied with California law.

410.    Chapman and HWC knew that the restraint system was defective, and that the defect was due, in part, to the fact that it was prohibited to use the restraint system under California law for behaviors of the person being restrained that do not pose a risk of harm to that person or to others; and for known and predictable behaviors that are addressed in a behavioral intervention plan.  Further, defendants knew or should have known that the restraint system that violated California Education Code sections 56521.1 and 56521.2 which, in pertinent part, prohibits the use

- 89 -

of any interventions that 1) cause physical pain; 2) simultaneously immobile all four extremities, 3) apply an amount of force that exceeds that which is reasonable and necessary under the circumstances, or 4) subjects the individual to verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma.

411. Chapman and HWC knew or should have known that of the hazardous and dangerous propensities of the restraint system, in that numerous studies, including those of the U.S. government have established that prone restraints of the type used in Chapman and HWC's restraint system have resulted in large numbers of deaths and innumerable injuries involving children across the United States.

412. The restraint system was not reasonably fit, suitable, or safe for its intended purpose, and the foreseeable risks of injury and death exceed any benefits associated with its design and formulation.

413. Chapman and HWC's restraint system, was insufficiently studied and tested for use on medically compromised or obese children, or children who were taking psychiatric medications, or for use on autistic children in behavioral crisis who cannot convey their needs to an adult, and for whom struggling against a restraint is a natural reaction.

414. MAX and other minor plaintiffs are within the class of persons that Chapman and HWC should reasonably foresee as being subject to harm caused by the defective restraint system because MAX and the other minor plaintiffs were disabled children within the State of California upon whom the product was intended to be used.

415. MAX suffered injuries and ultimately death, and other minor plaintiffs named in this cause of action were injured by said restraint system.

416. Chapman and HWC were under a duty not to design, develop, market, and sell a restraint system that presented an unreasonable risk of death or harm to children.

417. Defendant HWC breached their duty of reasonable care and were negligent in designing and marketing a restraint system that presented said unreasonable risks of injury and death. Defendant HWC further breached their duty of reasonable care and were negligent in designing and marketing a restraint system that violated California Education Code sections 56521.1 and 56521.2 which, in pertinent part, prohibits the use of any interventions that 1) cause physical pain; 2) simultaneously immobile all four extremities, 3) apply an amount of force that exceeds that which is reasonable and necessary under the circumstances, or 4) subjects the

- 90 -

individual to verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma.

418.    Defendant HWC breached their duty of care to design and market a safe restraint system for use on "behaviorally challenged" students.

419.    Notwithstanding the foregoing, the other named Defendants knew or should have known that HWC's restraint system was fraudulently misrepresented by HWC and, in fact, posed a dangerous risk of harm, to include even death, to vulnerable students to whom it was to be applied by these Defendants, yet these Defendants nevertheless embraced HWC's false claims and disclaimers of accountability for their own discriminatory and abusive purposes. Given the extensive negative reports filed and distributed by the government agencies described in the preceding paragraphs about the harm that these restraints have inflicted upon children, including death, as well as the visible and otherwise reported actual injuries sustained by the children as a result of the use of these devices purchased from HWC, GHS and the other Defendants knew or had to have known that they were violating all of the California laws set forth herein prohibiting inflicting pain, traumatic conditions and abuse upon these children, especially given the written and verbal complaints made by the parents of the children who suffered the injuries as described herein. Defendants should not have relied on the misrepresentations of HWC and should have immediately discontinued the use of HWC's restraint system when Defendants realized it was not only ineffective but actually inflicted physical and emotional harm upon the children in their care.

## FIRST CLAIM FOR RELIEF

### Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq.

ESTATE OF MAX BENSON and M.S. against the CDE

ESTATE OF MAX BENSON against DJUSD, YCOE, and YOLO SELPA

M.S. against EGUSD and EG SELPA

AUSTIN against RUSD

420.    Plaintiffs incorporate by reference all preceding paragraphs.

421.    Title II of the ADA prohibits public entities from denying persons with disabilities the benefits of its programs, services or activities. 28 U.S.C. § 12132.

422.    Defendants CDE, DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, and RUSD are public entities.

423.    MAX, M.S., and AUSTIN were at all relevant times students with disabilities who had been placed at GHS via their IEPs.

424.    The ADA is violated not only by outright discrimination but also when a public entity engages in "forms of discrimination which deny disabled persons public services disproportionately due to their disability." *Crowder v. Kitagawa*, 81 F. 3d 1480, 1483 (9th Cir. 1996); *see also*, *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008).  The ADA prohibits governmental agencies from denying persons with disabilities from "the benefits" of their programs.  *Mark H.*, 513 F.3d at 937.  The ADA requires more than just some access to governmental services; it requires "meaningful access". *Id.*

425.    A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

    a.  Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

    b.  Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

    c.  Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

    d.  Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1)(ii)(iii)(v) and (vii).

426.    A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—

    a.  That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

    b.  That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

    c.  That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

28 C.F.R. § 35.130(b)(3).

427. A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(6).

428. A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).

429. A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d).

430. The LEA Defendants discriminated against the Plaintiff Students through their contractual arrangements with GHS to provide education services to LEA students with disabilities. Through GHS:

    a. The LEA Defendants provided the Plaintiff Students with educational aid, benefits and services that were not equal to those provided to students without disabilities;

    b. The LEA Defendants provided the Plaintiff Students with educational aid, benefits and services that did not afford equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to LEA students without disabilities;

    c. The LEA Defendants aided and perpetuated disability discrimination against the Plaintiff Students by providing significant state and federal financial assistance to GHS, which discriminated against LEA students on the basis of their disabilities by subjecting them to repeated physical and emotional abuse in response to predictable, disability-related behavior which did not constitute a clear and present danger to the safety of the students or others and which could have been addressed by less restrictive measures, including those outlined in the students' behavioral intervention plans;

    d. The LEA Defendants limited the Plaintiff Students from enjoying their right to a free public education in a safe placement, free from discrimination or abuse; and

1

2

3

4

5

e.   The LEA Defendants used administrative methods—specifically the policies and practices of GHS regarding behavioral interventions—that subjected Plaintiff Students to disability discrimination and defeated or substantially impaired the objective of providing a free public education to the Plaintiff Students.

431.   Moreover, the LEA Defendants directly discriminated against the Plaintiff Students by administering their public education program and local plans in a manner that resulted in placing and keeping students with disabilities in an unsafe, abusive educational placement.  The LEA Defendants did not sufficiently—if at all—investigate, monitor, or supervise the placement.  Nor did it acknowledge or direct GHS to correct its known violations of state and federal law against the Plaintiff Students.  As a result, the Plaintiff Students were not afforded education services equal to those afforded to other students and were subject to disability discrimination and repeated physical and emotional abuse.

432.   The LEA Defendants failed to make reasonable modifications to their program of providing special education services to children within the LEA, such that LEA students with disabilities would not be subject to discrimination and abuse in their educational placements.  These modifications—meaningful investigations and evaluations of the NPS prior to placing an LEA student there and forceful oversight, investigation, and measures to ensure compliance with state and federal laws during the placement, including site visits and regular review of school and student records and BERs—would not have constituted a fundamental alteration in the LEAs' programs of providing educational services to their students.

433.   GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency interventions and were physically abusing their students.  However, the CDE and the LEAs ignored their legal duties to supervise and monitor the program and continued to re-certify GHS and place and leave vulnerable students in the school's care.

434.   The LEA Defendants were deliberately indifferent to disability discrimination and abuse of which they knew or should have known had they taken seriously their duties to investigate and evaluate GHS prior to placing LEA students there; to supervise, monitor, investigate, and ensure the legal compliance of GHS during the placement; and to remove LEA students when it

became clear that GHS was not a safe placement and was subjecting the students to physical and emotional abuse and discriminating against them on the basis of their disabilities.

435.    Defendant CDE knew or should have known that:  students with disabilities at nonpublic schools—including GHS—were being restrained frequently, for excessive periods of time, with excessive force, and in response to predictable, disability-related behavior that did not constitute a clear and present danger to the students' or others' safety; the types of restraints being used against children with disabilities were dangerous and have resulted in serious injury to and death of students with disabilities in response to behavior that was known to be a manifestation of the students' disabilities; that the particular disabilities of the children against whom these restraints were used made the restraints even more dangerous; and that the restraints were not only ineffective and contrary to the students' BIPs, but more often than not aggravated the students' behavioral problems.

436.    Defendant CDE discriminated against Plaintiffs on the basis of their disabilities by:

a.    Abdicating its duties to supervise, monitor, investigate, train, and ensure legal compliance of nonpublic schools, including GHS, with laws designed to protect students with disabilities from discrimination and abuse;

b.    Failing to take even minimal measures to ensure statewide compliance with state and federal laws within nonpublic schools, including GHS;

c.    Administering its licensing program of certifying, monitoring, investigating and taking corrective action against nonpublic schools which provide educational services to children with disabilities in a discriminatory, cursory, and indifferent manner;

d.    Failing to make reasonable modifications to its policies and practices regarding certification, monitoring, supervision, investigation, and legal compliance of nonpublic schools in light of repeated notifications from the U.S. Department of Education and other sources regarding the disproportionate use of restraints on children with disabilities and their tragic outcomes; and

e.    Completely abandoning its duty to monitor and supervise the use of emergency behavioral interventions in nonpublic schools under Cal. Ed. Code § 56521(b).

437.    The CDE knew and was deliberately indifferent to the fact that children with disabilities were being restrained at far greater rates than children without disabilities and that the rates of restraint use were significantly higher at "nonpublic" schools such as GHS than at public

- 95 -

schools.  It took no action to strengthen its oversight and monitoring of nonpublic schools or laws restricting the use of physical interventions.  The CDE knew and was deliberately indifferent to allegations that children with disabilities being improperly restrained at GHS and failed to conduct an emergency site visit when they had a substantial reason to believe that there was an immediate danger to the health, safety and welfare of students at GHS.  The CDE did not conduct a real investigation or visit the school until after GHS staff killed a student by restraining him.

438.    Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students as outlined above.

439.    Plaintiffs seek compensatory damages and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

ESTATE OF MAX BENSON and M.S. against the CDE

ESTATE OF MAX BENSON against DJUSD, YCOE, and YOLO SELPA

ESTATE OF MAX BENSON, M.S., D.Z., J.P., H.K., AUSTIN, S.D., and E.G. against GHS

M.S. against EGUSD and EGSELPA

AUSTIN against RUSD

440.    Plaintiffs incorporate by reference all preceding paragraphs.

441.    Section 504 prohibits entities that receive federal financial assistance from denying persons with disabilities the benefits of their programs, services or activities or otherwise discriminate against them on the basis of their disabilities.  29 U.S.C. § 794; 34 C.F.R. pt. 104.

442.    MAX, M.S., E.D., D.Z., S.D., J.P., H.K. and AUSTIN were at all relevant times students with disabilities who had been placed at GHS by the LEAs in which they resided via their IEPs.

443.    The CDE and the LEA Defendants receive federal financial assistance to provide special education services to children with disabilities in California.  20 U.S.C. §§ 1411-1413.

444.    Defendant GHS was a "nonpublic school" that contracted with the LEA Defendants to provide educational services to students with disabilities, including the Plaintiff Students, on behalf of the LEA Defendants in exchange for the state and federal financial assistance provided to the LEA Defendants to perform those services. Cal. Ed. Code § 56365.  Section 504 therefore applies to GHS.  34 C.F.R. § 104.2 ("This part applies to each recipient of Federal financial assistance from the Department of Education and to the program or activity that receives such assistance.").

445.    Section 504 prohibits recipients of federal financial assistance from directly or through contractual, licensing, or other arrangements, on the basis of disability:

      a.    Denying a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit or service;

      b.    Affording a qualified person with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

      c.    Providing a qualified person with a disability with an aid, benefit, or service that is not as effective as that provided to others;

      d.    Aiding or perpetuating discrimination against a qualified person with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to the beneficiaries of the recipients' program or activity;

      e.    Otherwise limiting a qualified person with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

C.F.R. 104.4(b)(1)(i)(ii)(iii)(v) and (vii).

446.    Section 504 prohibits recipients of federal financial assistance from directly or through contractual or other arrangements, utilizing criteria or methods of administration:

      a.    that have the effect of subjecting persons with disabilities to discrimination on the basis of their disabilities;

      b.    that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to persons with disabilities; or

      c.    that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

C.F.R. § 104.4(b)(4).

447.    GHS engaged in deliberate discrimination against the Plaintiff Students on the basis of their disabilities.  GHS and its staff subjected the Plaintiff Students to illegal, excessive and harmful restraints in response to known, disability-related behaviors that did not constitute a clear and present danger to the safety of the students or others and that could have been addressed by less restrictive measures, including those outlined in the students' BIPs. GHS discriminated against the Plaintiff Students by:

- 97 -

a. Denying them the opportunity to participate in educational services free from physical and emotional abuse;

b. Providing them educational services that were not equal to or as effective as those afforded to children without disabilities;

c. Preventing students with disabilities from enjoying their rights to receive a free, public education and the benefits that come with it in an environment free from physical and emotional abuse; and

d. administration methods, particularly those regarding behavioral interventions—that subjected students to disability discrimination and that defeated and/or substantially impaired the accomplishment of the students' educational objectives.

448. The LEA Defendants discriminated against the Plaintiff Students through their contractual arrangements with GHS to provide education services to LEA students with disabilities by:

a. Denying them the opportunity to participate in educational services free from physical and emotional abuse;

b. Providing them educational services that were not equal to or as effective as those afforded to children without disabilities;

c. Preventing students with disabilities from enjoying their rights to receive a free, public education and the benefits that come with it in an environment free from physical and emotional abuse; and

d. Using administration methods, particularly those regarding behavioral interventions—that subjected students to disability discrimination and that defeated and/or substantially impaired the accomplishment of the students' educational objectives.

449. The LEA Defendants aided and perpetuated disability discrimination against the Plaintiff Students by providing significant state and federal financial assistance to GHS, which discriminated against LEA students on the basis of their disabilities by subjecting them to repeated physical and emotional abuse in response to predictable, disability-related behavior which did not constitute a clear and present danger to the safety of the students or others and which could have been addressed by less restrictive measures, including those outlined in the students' behavioral intervention plans.

450. Moreover, the LEA Defendants directly discriminated against the Plaintiff Students by administering their public education program and local plans in a manner that resulted in placing and keeping students with disabilities in an unsafe, abusive educational placement. The LEA Defendants did not sufficiently—if at all—investigate, monitor, or supervise the placement. Nor did they acknowledge or direct GHS to correct its known violations of state and federal law against the Plaintiff Students. As a result, the Plaintiff Students were not afforded education services equal to those afforded to other students and were subject to disability discrimination and repeated physical and emotional abuse.

451. GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency interventions and were physically abusing their students. However, the CDE and the LEAs ignored their legal duties to supervise and monitor the program and continued to re-certify GHS and place and leave vulnerable students in the school's care.

452. The LEA Defendants were deliberately indifferent to disability discrimination and abuse of which they knew or should have known had they taken seriously their duties to investigate and evaluate GHS prior to placing LEA students there; to supervise, monitor, investigate, and ensure the legal compliance of GHS during the placement; and to remove LEA students when it became clear that GHS was not a safe placement and was subjecting the students to physical and emotional abuse and discriminating against them on the basis of their disabilities.

453. Defendant CDE knew or should have known that: students with disabilities at nonpublic schools—including GHS—were being restrained frequently, for excessive periods of time, with excessive force, and in response to predictable, disability-related behavior that did not constitute a clear and present danger to the students' or others' safety; the types of restraints being used against children with disabilities were dangerous and have resulted in serious injury to and death of students with disabilities in response to behavior that was known to be a manifestation of the students' disabilities; that the particular disabilities of the children against whom these restraints were used made the restraints even more dangerous; and that the restraints were not only ineffective and contrary to the students' BIPs, but more often than not aggravated the students' behavioral problems.

454. Defendant CDE discriminated against Plaintiffs on the basis of their disabilities by:

PLAINTIFFS' THIRD AMENDED COMPLAINT

a. Abdicating its monitoring, investigation and compliance duties with regard to nonpublic schools, including GHS;

b. Failing to take even minimal measures to ensure statewide compliance with state and federal laws within nonpublic schools, including GHS;

c. Administering its licensing program of certifying, monitoring, investigating and taking corrective action against nonpublic schools which provide educational services to children with disabilities in a discriminatory, cursory, and indifferent manner;

d. Failing to make reasonable modifications to its policies and practices regarding certification, monitoring, supervision, investigation, and compliance of nonpublic schools in light of repeated notifications from the U.S. Department of Education regarding the disproportionate use of restraints on children with disabilities and their tragic outcomes; and

e. Completely abandoning its duty to monitor and supervise the use of emergency behavioral interventions in nonpublic schools under Cal. Ed. Code § 56521(b).

455.    The CDE knew and was deliberately indifferent to the fact that children with disabilities were being restrained at far greater rates than children without disabilities and that the rates of restraint use were significantly higher at "nonpublic" schools such as GHS than at public schools.  It took no action to strengthen its oversight and monitoring of nonpublic schools or laws restricting the use of physical interventions.  The CDE knew and was deliberately indifferent to allegations that children with disabilities were being improperly restrained at GHS and failed to conduct an emergency site visit when they had a substantial reason to believe that there was an immediate danger to the health, safety and welfare of students at GHS.  The CDE did not conduct a real investigation or visit the school until after GHS staff killed a student by restraining him.

456.    Defendants actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students as outlined above.

457.    Plaintiffs seek compensatory damages and attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983, Fourth Amendment to the U.S. Constitution

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

ESTATE OF MAX BENSON against BENO, HOLSTEGE, GALAS, MCGREW,

- 100 -

1    CHESSMAN, WOHLWEND, MORGAN, WATSON, and THOMAS

2    M.S. against DELGADO, PHILLIPS, STEARN, DILLON, LAYMON, HINDS,

3    ROMANO, SCHUMANN, and JONES

     D.Z. against WESSINGER, TRIGUERO, MAGEE, CHAMBERS, MATLOCK,
4
     MCCOY, OEHRING, and GODBOUT
5
     S.D. against MCDONALD, ATKINS, WOHLWEND, SMITH, and GATEWOOD
6
     J.P. against FAULKNER, SLAVENSKY, SMITH, ALLEN, and MATLOCK
7
          458.    Plaintiffs incorporate by reference all preceding paragraphs.

8    ***GHS Defendants***

9         459.    Defendants WOHLWEND, MORGAN, WATSON, and THOMAS used excessive

10   force against Max Benson when they restrained him in response to predictable, disability-related

11   behavior that did not constitute a clear and present danger to Max's or others' safety and that could

12   have been addressed by less restrictive measures, including those outlined in his BIP.  Defendants'

13   use of force was objectively unreasonable in light of Max's behavior and California law restricting

14   the use of physical interventions. Defendants' use of restraints was also unreasonable in their

15   frequency, duration, pressure and restrictions applied, lack of monitoring of Max's health condition,

16   and the pain and injuries caused to Max. Indeed, Max was killed by a restraint applied by

     Defendants because he was spitting.
17
          460.    Defendants STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN,
18
     MEYERS, CHRISTENSON, NARAN and JONES used excessive force against Plaintiff M.S.
19
     when they restrained him in response to predictable, disability-related behavior that did not
20
     constitute a clear and present danger to the safety of M.S. or others and that could have been
21
     addressed by less restrictive measures, including those outlined in his BIP.  Defendants' use of
22
     force was objectively unreasonable in light of M.S.'s behavior and California law restricting the
23   use of physical interventions. Defendants' use of restraints was also unreasonable in their

24   frequency, duration, pressure and restrictions applied, and pain and injuries caused.

25        461.    Defendants CHRISTENSON, CHAMBERS, MATLOCK, MCCOY, OEHRING,

26   and GODBOUT used excessive force against D.Z. when they restrained him in response to

     predictable, disability-related behavior that did not constitute a clear and present danger to the
27
     safety of D.Z. or others and that could have been addressed by less restrictive measures, including
28
     those outlined in his BIP.  Defendants' use of force was objectively unreasonable in light of D.Z.'s

     behavior and California law restricting the use of physical interventions. Defendants' use of

restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

462.    Defendants WOHLWEND, CHRISTENSON, SMITH, GATEWOOD, and KELLER used excessive force against S.D. when they restrained him in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of S.D. or others and that could have been addressed by less restrictive measures, including those outlined in his BIP.  Defendants' use of force was objectively unreasonable in light of S.D.'s behavior and California law restricting the use of physical interventions. Defendants' use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

463.    Defendants SMITH, ALLEN and MATLOCK used excessive force against J.P. when they restrained him in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of J.P. or others and that could have been addressed by less restrictive measures, including those outlined in his BIP.  Defendants' use of force was objectively unreasonable in light of J.P.'s behavior and California law restricting the use of physical interventions. Defendants' use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

464.    GHS staff used excessive force against H.K. when they restrained him in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of H.K. or others and that could have been addressed by less restrictive measures, including those outlined in his BIP.  Their use of force was objectively unreasonable in light of H.K.'s behavior and California law restricting the use of physical interventions. The use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

465.    CHRISTENSON and other GHS staff used excessive force against AUSTIN when they restrained him in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures, including those outlined in his BIP.  Their use of force was objectively unreasonable in light of AUSTIN'S behavior and California law restricting the use of physical interventions. The use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

466.    Defendants GHS, CHRISTENSON, NARAN, MEYERS, and KELLER violated the Plaintiff Students' Fourth Amendment rights when they instituted and maintained a policy and practice at GHS of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed by less restrictive interventions, such as those outlined in students' BIPs.

467.    The GHS Defendants were acting under color of state law when they instituted and practiced a policy of restraining students, including the Plaintiff Students, in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed by less restrictive interventions, such as those outlined in students' BIPs.

468.    Defendant GHS was performing a public function that the LEA Defendants were legally required to provide and for which they were receiving state and federal funds—that of providing free educational services, including special education, to the Plaintiff Students.  If an LEA does not have an appropriate special education placement within its district, it may place a student in a nonpublic school.  Cal. Ed. Code § 56365.  In turn, the student "will be deemed to be enrolled in public schools" for the purpose of state and federal funding.  Cal. Ed. Code § 56365(b).  However, the LEAs are to monitor and supervise the placement and transition the student back to the public schools if the NPS is no longer appropriate to meet the student's needs.  Cal. Ed. Code § 56366(a)(2)(B).  The LEA continues to be responsible for the child's placement and special education needs and must participate in their IEP meetings. 20 U.S.C. § 1414(d)(1)(B)(iv).

469.    The Plaintiff Students were placed and kept at GHS by the LEA Defendants pursuant to their IEPs.  GHS had a Master Contract with each of the Defendant LEAs to provide education services to the Plaintiff Students.

470.    GHS sent BERs to the LEA Defendants demonstrating the excessive and illegal nature of the restraints, but this information was filed away and ignored.  The IEP teams, in which the LEA Defendants participated, did not review and modify students' BIPs when it was clear they were ineffective or not being followed.  Despite knowing that their students were being illegally restrained by GHS staff, the LEA Defendants left the Plaintiff Students at the school and did not take any action to stop the restraints.  Because they were unable and unwilling to provide the educational services themselves, the LEA Defendants ignored and thereby allowed the violations of Plaintiffs' constitutional rights, knowingly accepting the benefits of GHS's illegal behavior.

471.    At all times relevant to the complaint, the individual GHS Defendants were acting in the performance of their official duties to provide educational services, including special education services, to the Plaintiff Students pursuant to state and federal law and GHS's contract with the LEA Defendants.

472.    The GHS Defendants knowingly deprived the Plaintiff Students of their Fourth Amendment rights to be free from excessive force.

**Employees and Officers of the LEA Defendants**

**Defendants BENO and HOLSTEGE**

473.    Defendants BENO and HOLSTEGE deprived MAX BENSON of his Fourth Amendment rights to be free from excessive force.   As administrators of the YOLO SELPA, Defendants BENO and HOLSTEGE were responsible for overseeing the Plan's implementation, which included: 1) coordinating with school districts to ensure that all special education students in the Plan area have equal access to the full continuum of programs and services;   2) working with the school districts to identify unmet student needs and resources to meet those needs; 3) receiving, distributing, and monitoring the use of special education funding; 4) entering into Master Contracts with nonpublic schools, reviewing and monitoring those contracts, issuing and monitoring the assurances for those contracts, and maintaining updated contracts; and 5) submitting for approval to the Superintendents' Council policies and procedures governing regional and District-operated programs, including nonpublic schools. BENO and HOLSTEGE had a duty to monitor GHS as a nonpublic school with which it had a Master Contract to provide services for students in the Plan area.  They also had a duty to monitor the use of special education funding and ensure that it was not going to programs that used behavioral interventions that violated state or federal law.  Cal. Ed. Code §§ 56521.2, 56523(d).

474.    Despite widespread knowledge within the educational community about the disproportionate use of excessive, illegal and dangerous restraints on children with disabilities and in nonpublic schools, BENO and HOLSTEGE were deliberately indifferent to the Fourth Amendment rights of students in the YOLO SELPA plan area to be free from excessive force.  They maintained a policy and practice within YCOE and YOLO SELPA of ignoring their duties to monitor GHS and ensure that it was complying with state and federal laws prohibiting discrimination and restricting the use of physical behavior interventions.

475.    From media reports, U.S. Department of Education publications and letters, and reports published by nonprofits advocating for students with disabilities, it was well-known within

the educational community that children with disabilities were being subjected to illegal restraints at a greater rate than those without disabilities and that nonpublic schools restrained students at higher rates. As administrators of YOLO SELPA, BENO and HOLSTEGE were deliberately indifferent to this information and failed to implement policies and procedures for training, monitoring and supervision of nonpublic school placements. BENO and HOLSTEGE failed to supervise and train staff to ensure that they understood the laws preventing illegal restraints and were adequately monitoring the NPS placements of YOLO SELPA students to ensure that they were not being subjected to excessive force.

476. YOLO SELPA decided not to renew its contract with GHS for the 2018-2019 school year, the fact or reasons for which BENO and HOLSTEGE did not disclose to MAX's parents, even though they were aware that MAX had already been enrolled at and was attending GHS. BENO and HOLSTEGE failed to ensure that MAX, a student in the YOLO SELPA plan area, had equal access to a safe, approved educational placement where he was not being subjected to excessive force. BENO and HOLSTEGE completely abdicated their monitoring duties and were deliberately indifferent to the fact that MAX remained in a no-longer-approved program they were not monitoring and from which they no longer demanded compliance assurances.

477. At all times relevant to the complaint, BENO and HOLSTEGE were acting under color of state law in the performance of their official duties as administrators for public entities, YCOE and YOLO SELPA.

478. BENO's and HOLSTEGE's actions and failures to act were a substantial factor in causing MAX's physical and emotional pain and suffering and his death.

*Defendants GALAS, CHESSMAN and MCGREW*

479. GALAS, CHESSMAN and MCGREW deprived MAX BENSON of his Fourth Amendment right to be free from excessive force. DJUSD Director of Special Education MCGREW was responsible for the coordination of special education services and programs within the DJUSD and the implementation of the YOLO SELPA plan. This included assuring that the District's programs—including any nonpublic school in which the District has placed a special education student—did not discriminate against children on the basis of disability and followed state and federal education laws, including those prohibiting the use of excessive force against students. McGREW was the direct supervisor of Defendants GALAS and CHESSMAN, the DJUSD Program Specialists assigned to MAX BENSON. GALAS and CHESSMAN were responsible for developing MAX's IEP, ensuring that MAX's educational placement at GHS was

- 105 -

appropriate, monitoring the delivery of services to MAX, and ensuring that the program in which MAX had been placed complied with state and federal laws, including those related to the use of behavioral interventions and use of physical force. GALAS and CHESSMAN were also responsible for coordinating and monitoring the implementation of educational programs and services at nonpublic schools at which DJUSD students had been placed.

480.    Throughout MAX's placement at GHS, MCGREW, GALAS and CHESSMAN received information and documents demonstrating that GHS was subjecting MAX to excessive force. Specifically, GHS staff was placing MAX in illegal restraints in response to predictable, disability-related behaviors which did not pose a clear and present danger to the safety of the student or others and could have been addressed by less restrictive interventions. This information included, but was not limited to, Behavior Emergency Reports, information provided by GHS staff at MAX's IEP meetings, and documents accompanying MAX's IEP meetings. Additionally, MCGREW and GALAS knew that Yolo SELPA had removed GHS from its list of approved schools and did not renew its Master Contract with the school.

481.    MCGREW, GALAS and CHESSMAN were deliberately indifferent to the knowledge that GHS was subjecting MAX to excessive force. Defendants did nothing to investigate GHS, stop the restraints, or remove MAX to a safe, approved placement.

482.    From media reports, U.S. Department of Education publications and letters, and reports published by nonprofits advocating for students with disabilities, it was well-known within the educational community that children with disabilities were being subjected to illegal restraints at a greater rate than those without disabilities and that nonpublic schools restrained students at higher rates. As the Director of Special Education for DJUSD, MCGREW was deliberately indifferent to this information and failed to implement policies and procedures for training, monitoring and supervision of nonpublic school placements. MCGREW failed to supervise and train the program specialists working under him to ensure that they understood the laws preventing illegal restraints and were adequately monitoring the NPS placements of DJUSD students to ensure that they were not being subjected to excessive force.

483.    At all times relevant to the complaint, MCGREW, GALAS and CHESSMAN were acting under color of state law in the performance of their official duties for public entity DJUSD.

484.    MCGREW's, GALAS's and CHESSMAN's actions and failures to act were a substantial factor in causing MAX's physical and emotional pain and suffering and his death.

**Defendants DELGADO and PHILLIPS**

- 106 -

485.    Defendants DELGADO and PHILLIPS deprived M.S. of his Fourth Amendment right to be free from excessive force.   Defendant Doug PHILLIPS was at all times relevant to the complaint the Director of Special Education for EGUSD and the EG SELPA and therefore responsible for ensuring that all EG SELPA programs—including nonpublic schools in which EG SELPA students are placed—comply with state and federal special education and anti-discrimination laws.  Cal. Ed. Code § 56205(a) and (c).  This included assuring that the District's programs—including any nonpublic school in which the District has placed a special education student—did not discriminate against children on the basis of disability and followed state and federal education laws, including those prohibiting the use of excessive force against students. Defendant Marilyn DELGADO was the EGUSD program specialist who placed M.S. at GHS. DELGADO was responsible for developing M.S.'s IEP, ensuring that M.S.'s educational placement at GHS was appropriate, monitoring the delivery of services to M.S., and ensuring that the program in which M.S. had been placed complied with state and federal laws, including those related to the use of behavioral interventions and use of physical force.  DELGADO was also responsible for coordinating and monitoring the implementation of educational programs and services at nonpublic schools at which EGUSD/EGSELPA students had been placed.

486.    GHS staff began to restrain M.S. on his first day of school.  A belated CDE investigation found that between September 10, 2018 and November 6, 2018, GHS staff restrained or physically intervened with M.S. 61 times. On many days, M.S. was restrained on multiple occasions and for time periods in excess of 30 minutes.

487.    Throughout M.S.'s placement at GHS, DELGADO and PHILLIPS received information and documents demonstrating that GHS was subjecting M.S. to excessive force. Specifically, GHS staff was placing M.S. in illegal restraints in response to predictable, disability-related behaviors which did not pose a clear and present danger to the safety of the student or others and could have been addressed by less restrictive interventions.  This information included, but was not limited to, approximately eighteen Behavior Emergency Reports completed by GHS regarding restraints or other physical interventions applied to M.S.; repeated communications from M.S.'s mother, STERN, about her concerns regarding excessive restraint use; information provided by GHS staff at M.S.'s IEP meetings; documents accompanying M.S.'s IEP meetings: and a compliance complaint filed by STERN with the CDE, a copy of which STERN provided to DELGADO.

488.    Despite receiving information that GHS was injuring and improperly restraining M.S. as a substitute for the techniques prescribed in his BIP, neither PHILLIPS nor DELGADO took action.

489.    DELGADO and PHILLIPS were deliberately indifferent to the knowledge that GHS was subjecting M.S. to excessive force.  Defendants did nothing to investigate GHS, stop the restraints, or remove M.S. to a safe, approved placement.  Nor did they take any action in response to or inform STARK about the November 28, 2018 incident at GHS resulting in MAX BENSON's death.

490.    DELGADO attended an IEP team meeting for M.S. on December 5, 2018 during which GHS team members misrepresented their legal authority to restrain M.S.  DELGADO did not contradict these representations and recommended that M.S. continue at GHS.

491.    Despite knowledge that GHS had illegally restrained students, injuring them and killing at least one, PHILLIPS did not terminate GHS's master contract or remove EGUSD students from GHS.  He did not conduct or direct his employees to conduct an onsite visit or investigation of GHS in response to reports of excessive force against students at GHS.  From media reports, U.S. Department of Education publications and letters, and reports published by nonprofits advocating for students with disabilities, it was well-known within the educational community that children with disabilities were being subjected to illegal restraints at a greater rate than those without disabilities and that nonpublic schools restrained students at higher rates.  As the Director of Special Education for EGUSD, PHILLIPS was deliberately indifferent to this information and failed to implement policies and procedures for training, monitoring and supervision of nonpublic school placements.  PHILLIPS failed to supervise and train the program specialists working under him to ensure that they understood the laws preventing illegal restraints and were adequately monitoring the NPS placements of EGUSD students to ensure that they were not being subjected to excessive force.

492.    The CDE's investigation into STARK's complaint concluded that EGUSD had violated the law regarding emergency interventions and had failed to take the legally required response to a report of serious behavioral incidents for which M.S.'s BIP had not been effective.

493.    Defendants PHILLIPS and DELGADO abdicated their responsibilities to monitor and supervise the NPS placements of District students and ensure the NPS's compliance with state and federal laws prohibiting discrimination and the improper use of restraints.  Defendants were deliberately indifferent in the face of knowledge that a District student was being repeatedly

- 108 -

restrained in response to predictable, disability-related behavior that should have been addressed by his BIP and that did not constitute a clear and present danger to his or others' safety. They took no action and permitted the abuse and discrimination to continue.

494.    At all times relevant to the complaint, DELGADO and PHILLIPS were acting under color of state law in the performance of their official duties for public entities EGUSD and EGSELPA.

495.    DELGADO's and PHILLIPS's actions and failures to act were a substantial factor in causing physical and emotional pain and suffering to M.S.

**Defendants WESSINGER, TRIGUERO, MAGEE**

496.    Defendants WESSINGER, TRIGUERO and MAGEE deprived D.Z. of his Fourth Amendment rights to be free from excessive force.

497.    As Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA, WESSINGER had a duty to monitor and ensure that its programs—including a nonpublic school in which FCUSD had placed a District student—were complying with state and federal education and anti-discrimination laws, including those restricting behavioral interventions.

498.    Defendant TRIGUERO was a FCUSD/FC SELPA Program Specialist and her supervisor, Defendant MAGEE, was a Special Education Program Coordinator. Both were directly involved in and responsible for monitoring D.Z.'s placement and ensuring that GHS was following state and federal law, including in its use of behavioral interventions.

499.    Prior to D.Z.'s placement at GHS, WESSINGER knew from her experience at RUSD and FCUSD that GHS had improperly and aggressively restrained students in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of the students or others and that could have been handled with less restrictive measures. Yet WESSINGER approved the placement of FCUSD students—including D.Z.—at GHS.

500.    Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA, WESSINGER failed to implement policies and procedures for training, monitoring, supervision, compliance, and reporting at nonpublic school placements. WESSINGER failed to supervise and train the FCUSD/FC SELPA staff who attended District IEPs and directly monitored the progress and placements of the District's special education students.

501.    Beginning as early as October 4, 2017, WESSINGER, TRIGUERO and MAGEE received information and documents demonstrating that GHS was subjecting D.Z. to excessive force. Specifically, GHS staff was frequently placing D.Z. in illegal restraints and otherwise

subjecting him to physical force in response to predictable, disability-related behaviors which did not pose a clear and present danger to the safety of the student or others and could have been addressed by less restrictive interventions. This information included, but was not limited to, BERs regarding approximately 28 restraints placed on D.Z. provided to FCUSD/FC SELPA over a period of one year; documentation and information provided in connection with D.Z.'s IEP meetings; and an email D.Z.'s mother, KINSER, wrote to WESSINGER expressing her concerns about the restraints placed on D.Z. which were copied to TRIGUERO and MAGEE.

502.    Yet WESSINGER, TRIGUERO and MAGEE took no action to investigate GHS or to ensure that D.Z. and other students were in a safe placement where they were not subject to abuse and discrimination. Defendants were deliberately indifferent to the rights of their students with disabilities, including D.Z., to be free from excessive force.

503.    At all times relevant to the complaint, WESSINGER was acting under color of state law in the performance of her official duties as Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA. At all times relevant to the complaint, TRIGUERO was acting under color of state law in the performance of her official duties as a FCUSD/FC SELPA Program Specialist. At all times relevant to the complaint, MAGEE was acting under color of state law in the performance of her official duties as a FCUSD/FC SELPA Special Education Program Coordinator.

504.    WESSINGER's, TRIGUERO's and MAGEE's actions and failures to act were a substantial factor in causing physical and emotional pain and suffering to D.Z.

**Defendants MCDONALD and ATKINS**

505.    Defendants MCDONALD and ATKINS deprived S.D. of his Fourth Amendment rights to be free from excessive force.

506.    As Superintendent of PPESD, ATKINS was responsible for the policies, practices and procedures governing the provision of special education services in the District, including the monitoring and supervision of nonpublic schools in which District students had been placed, including school compliance with anti-discrimination laws and those prohibiting corporal punishment and restricting the use of behavioral interventions. Cal. Ed. Code §§ 56366(a)(2)(B), 56521.1, and 56523; 5 C.C.R. § 4960(a).

507.    Defendant MCDONALD was a school psychologist and special needs coordinator at PPESD. She was responsible for placing S.D. at GHS, overseeing the placement, and ensuring that S.D. was receiving the services specified in his IEP in a safe, non-discriminatory placement.

- 110 -

As a psychologist, she was also mandated by law to report child abuse, such as the use of excessive force against a PPESD student.

508.     Throughout S.D.'s placement at GHS, MCDONALD and ATKINS received information and documents demonstrating that GHS was subjecting S.D. to excessive force. Specifically, GHS staff was frequently placing S.D. in illegal restraints and otherwise subjecting him to physical force in response to predictable, disability-related behaviors which did not pose a clear and present danger to the safety of the student or others and could have been addressed by less restrictive interventions.  This information included, but was not limited to, documentation and information provided in connection with S.D.'s IEP meetings; information provided by GHS staff to MCDONALD about the restraints imposed on S.D. and their illegal justifications; BERs in which GHS documented illegal restraints placed on S.D. in response to behaviors such as non-compliance and profanity; and a "Behavior Emergency Plan" that called for the use of illegal, unjustified restraints in response to behavior that did not pose a clear and present danger to S.D.'s safety or that of others and that should have been addressed by less restrictive interventions.

509.     Although the restraints GHS had imposed on S.D. and the "behavioral interventions" outlined in S.D.'s IEP documents were, on their face, in violation of the Education Code § 56521.1 (a) and (b), MCDONALD did not object, report child abuse as legally mandated, insist on the use of positive behavioral interventions, investigate GHS, or take any action to stop the restraints and/or ensure that S.D. was in a safe placement.  Instead, MCDONALD approved of and encouraged the use of excessive force by GHS staff against S.D. in her Psycho-Educational Assessment Report and consent to the "Behavior Emergency Plan" and IEP authorizing such illegal and excessive force.

510.     Even after MCDONALD and ATKINS learned that GHS staff killed a student by placing him in an unjustified, illegal and excessive restraint, they took no action to remove S.D. from GHS, terminate GHS's contract, or notify S.D.'s father.  Rather, Defendants permitted the District to hire one of the teachers directly involved with the restraint that killed MAX BENSON. After Christopher DAVIS removed his son from GHS, MCDONALD and ATKINS did not find S.D. another placement for over four months and then placed him at the PPESD school at which Defendant WOHLWEND was working, without notifying DAVIS.

511.     MCDONALD and ATKINS, knew that students with disabilities—including S.D.— were being subjected to illegal and discriminatory restraints at nonpublic schools, including GHS. Yet they took no action and continued to approve an unsafe placement at which S.D. was repeatedly

subjected to violations of his right to be free from excessive force. Defendants MCDONALD and ATKINS were deliberately indifferent to the rights of their students with disabilities, including S.D., to be free from excessive force.

512.    As District Superintendent ATKINS failed to implement policies and procedures for training, monitoring, supervision, compliance, and reporting at nonpublic school placements. ATKINS failed to supervise and train the PPESD staff who attended District IEPs and directly monitored the progress and placements of the District's special education students.

513.    At all times relevant to the complaint, ATKINS was acting under color of state law in the performance of his official duties as superintendent of PPESD. At all times relevant to the complaint, MCDONALD was acting under color of state law in the performance of her official duties as a school psychologist and PPESD representative tasked with overseeing S.D.'s special education placement.

514.    ATKIN's and MCDONALD's actions and failures to act were a substantial factor in causing physical and emotional pain and suffering to S.D.

**Defendants SLAVENSKY and FAULKNER**

515.    Defendants SLAVENSKY and FAULKNER deprived J.P. of his Fourth Amendment rights to be free from excessive force.

516.    As Superintendent of ACUSD, SLAVENSKY was responsible for the policies, practices and procedures governing the provision of special education services in the District, including the monitoring and supervision of nonpublic schools in which District students had been placed, including school compliance with anti-discrimination laws and those prohibiting corporal punishment and restricting the use of behavioral interventions (Cal. Ed. Code §§ 56366(a)(2)(B), 56521.1, and 56523; 5 C.C.R. § 4960(a)), and ensuring that the staff serving ACUSD students with disabilities have sufficient training, supervision and knowledge to comply with such state and federal laws.

517.    As the Special Education Coordinator who paced J.P. at GHS, FAULKNER had a duty to investigate and monitor J.P.'s placement and ensure that GHS and its staff followed state and federal anti-discrimination and education laws, including those prohibiting corporal punishment and limiting behavioral interventions. FAULKNER had a duty to ensure that J.P. received an education in a safe, non-discriminatory placement. When she became the SELPA Director, FAULKNER was responsible for the coordination of special education services and programs for students within ACUSD and for the implementation of the Local Plan in compliance

- 112 -

with state and federal laws and regulations. FAULKNER was also responsible for the supervision and evaluation of personnel who provide special education services to ACUSD students and for assuring program compliance with state and federal law, including the programs and staffing at nonpublic schools at which ACUSD had placed its students via their IEPs. FAULKNER was also responsible for implementing master contracts with nonpublic schools, which include an agreement by the NPS to provide educational services to District students and comply with anti-discrimination and education laws in exchange for state and federal education funds.

518.    Throughout his stay at GHS, staff frequently placed J.P. in lengthy, excessive and painful restraints in response to predictable, disability-related behavior which did not present a clear and present threat to J.P.'s or others' safety and which should have been addressed by the less restrictive behavioral interventions in J.P.'s BIP. Information that GHS was subjecting J.P. to excessive force was repeatedly provided to ACUSD in the form of BERs and J.P.'s IEP records and accompanying documentation. Defendants SLAVENSKY and FAULKNER knew or should have known that students with disabilities—including J.P.—were being subjected to illegal and discriminatory restraints at nonpublic schools, including GHS. Yet they took no action and continued to approve an unsafe placement at which J.P. was repeatedly subjected to violations of his right to be free from excessive force. Defendants SLAVENSKY and FAULKNER were deliberately indifferent to the rights of their students with disabilities, including J.P., to be free from excessive force.

519.    SLAVENSKY and FAULKNER failed to implement policies and procedures for training, monitoring, supervision, compliance, and reporting to prevent the use of excessive force at nonpublic school placements. SLAVENSKY and FAULKNER failed to supervise and train the staff who attended ACUSD IEPs and directly monitored the progress and placements of the District's special education students to ensure that they were not being subjected to excessive force.

520.    At all times relevant to the complaint, SLAVENSKY was acting under color of state law in the performance of her official duties as superintendent of ACUSD. At all times relevant to the complaint, FAULKNER was acting under color of state law in the performance of her official duties as Special Education Coordinator and SELPA Director.

521.    SLAVENSKY's and FAULKNER's actions and failures to act were a substantial factor in causing physical and emotional pain and suffering to J.P.

522.    Plaintiffs seek compensatory damages, punitive damages, attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**

- 113 -

**(42 U.S.C. § 1983, Fourteenth Amendment to the U.S. Constitution, Fourteenth Amendment Due Process)**

STACIA LANGLEY and DAVID BENSON against BENO, HOLSTEGE, McGREW, GALAS, CHESSMAN, GHS, MEYERS, CHRISTENSON, NARAN, KELLER, WOHLWEND, MORGAN, WATSON, THOMAS and CHAMBERS

523.    Plaintiffs incorporate by reference all preceding paragraphs.

524.    Defendants deprived Plaintiffs STACIA LANGLEY and DAVID BENSON of their Fourteenth Amendment right under the U.S. Constitution to the companionship and society of their son, MAX BENSON.

***LEA Employee Defendants***

525.    As professionals working in the area of special education, McGREW, GALAS, CHESSMAN, BENO and HOLSTEGE knew from reports and communications from the U.S. Department of Education, media reports, and reports from nonprofits focusing on special education and children with disabilities that: students with disabilities—particularly those with disabilities that manifested in behavioral issues—were being subjected to restraints at a greater rate than those without disabilities; nonpublic schools that served children with behavioral challenges were more likely to impose restraints on their students, often in response to disability-related behavior that did not pose a clear threat to the physical safety of the student or others and that should be resolved by less restrictive measures; that the physical restraints used against students with disabilities were often excessive, violent and dangerous, frequently leading to serious injury and, in some cases, death; and that the U.S. Department of Education had recommended the complete elimination of prone restraints against students.

526.    As detailed above, Defendants McGREW, BENO and HOLSTEGE had a duty to develop and implement policies and procedures within DJUSD and the YOLO SELPA to ensure that DJUSD, YOLO SELPA, its programs and services, and the individuals providing those programs and services complied with state and federal law, including those laws prohibiting discrimination against students with disabilities and the illegal and excessive use of restraints against students within the District and SELPA. As DJUSD program specialists assigned to MAX BENSON's case, GALAS and CHESSMAN had a duty to ensure that MAX BENSON received an education in a safe, approved placement where he was not subjected to disability discrimination or behavioral interventions that were excessive, dangerous, and illegal. All Defendants had a duty to ensure that the nonpublic schools in which DJUSD and YOLO SELPA placed their students

complied with the laws prohibiting discrimination and illegal restraints, including training, monitoring, and supervision, not only of GHS and its employees but also of the LEAs and their employees.

527.   All Defendants knew that YOLO SELPA had refused to renew its Master Contract with GHS for the 2018-2019 school year.  Yet none took any action to remove DJUSD and YOLO SELPA students—including MAX BENSON—from GHS or to ensure that their students were in a safe, approved placement.  Nor did they inform the parents of said students—including LANGLEY and DAVID BENSON—of the SELPA's decision not to renew the contract and the fact that MAX BENSON remained in an unapproved, unmonitored NPS placement.  Moreover, Plaintiffs are informed and believe and thereon allege that Defendants knew that the non-renewal of GHS's master contract was due to GHS's failure to comply with its legal obligations, including those prohibiting disability discrimination and illegal restraints.

528.   Defendants GALAS and CHESSMAN knew from MAX BENSON's IEPs and accompanying documentation, as well as BERs submitted by GHS, that GHS was placing MAX into dangerous, lengthy and excessive restraints—including prone restraints—in response to predictable, disability-related behavior that did not pose a clear and present threat to the safety of MAX or others and that should have been addressed by less restrictive measures, including those outlined in his BIP.  They also knew that MAX's physical and mental disabilities placed him a greater risk of injury and death from the use of restraints.  Defendants MCGREW, BENO and HOLSTEGE knew or, had they fulfilled their duties of supervision, training, oversight and monitoring, should have known of the dangerous and illegal restraints to which GHS was subjecting MAX BENSON.

529.   Despite the knowledge outlined above, Defendants were deliberately indifferent to the significant risk of serious injury and death to DJUSD/YOLO SELPA students.  They were deliberately indifferent to the significant risk that DJUSD/YOLO SELPA students' parents—including MAX BENSON's parents—would suffer the loss of companionship and society of their children.

530.   At all times relevant to the complaint, MCGREW, GALAS and CHESSMAN were acting under color of state law in the performance of their official duties for public entity DJUSD.

531.   At all times relevant to the complaint, BENO and HOLSTEGE were acting under color of state law in the performance of their official duties for public entities YCOE and YOLO SELPA.

- 115 -

532.    Defendants BENO's, HOLSTEGE's, MCGREW's, GALAS's and CHESSMAN's actions and failures to act were a substantial factor in causing Plaintiffs LANGLEY and BENSON to lose the companionship and society of their son.

***GHS and GHS Staff***

533.    Defendants WOHLWEND, MORGAN, WATSON, and THOMAS used excessive force against Max Benson when they restrained him in response to predictable, disability-related behavior that did not constitute a clear and present danger to Max's or others' safety and that could have been addressed by less restrictive measures, including those outlined in his BIP. Defendants' use of force was objectively unreasonable in light of Max's behavior and California law restricting the use of physical interventions. Defendants' use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, lack of monitoring of Max's health condition, and the pain and injuries caused to Max. Indeed, Max was killed by a restraint applied by Defendants because he was spitting. Defendants knew and were deliberately indifferent to the substantial risk that the excessive force to which they subjected MAX BENSON could cause his death and result in the loss to his parents, LANGLEY and DAVID BENSON, of the companionship and society of their son.

534.    Defendant CHAMBERS knew and was deliberately indifferent to the fact that his lack of sufficient training to fulfill the duties of school nurse, his failure to respond immediately to a call for medical assistance, his failure to perform emergency resuscitation measure properly, and his failure to immediately summon emergency medical professionals could cause MAX BENSON's death and result in the loss to his parents, LANGLEY and DAVID BENSON, of the companionship and society of their son.

535.    Defendants GHS, CHRISTENSON, NARAN, MEYERS, and KELLER instituted and maintained a policy and practice at GHS of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed by less restrictive interventions, such as those outlined in students' BIPs. Defendants knew and were deliberately indifferent to the substantial risk that such policies could cause the death of their student MAX BENSON, resulting in the loss to his parents, LANGLEY and DAVID BENSON, of the companionship and society of their son.

536.    DEFENDANTS CHRISTENSON, NARAN, MEYERS, and KELLER knew and were deliberately indifferent to the fact that GHS staff were regularly placing MAX BENSON in lengthy, dangerous and excessive restraints—including prone restraints—in response to

- 116 -

predictable, disability-related behavior that did not constitute a clear and present danger to Max's or others' safety and that could have been addressed by less restrictive measures, including those outlined in his BIP. Defendants knew and were deliberately indifferent to the fact that such restraints posed a serious risk of death to MAX BENSON.

537. At all times relevant to the complaint, the GHS Defendants were acting under color of state law.

538. Defendants GHS was performing a public function that the LEA Defendants were legally required to provide and for which they were receiving state and federal funds—that of providing free educational services, including special education, to the Plaintiff Students. If an LEA does not have an appropriate special education placement within its district, it may place a student in a nonpublic school. Cal. Ed. Code § 56365. In turn, the student "will be deemed to be enrolled in public schools" for the purpose of state and federal funding. Cal. Ed. Code § 56365(b). However, the LEAs are to monitor and supervise the placement and transition the student back to the public schools if the NPS is no longer appropriate to meet the student's needs. Cal. Ed. Code § 56366(a)(2)(B). The LEA continues to be responsible for the child's placement and special education needs and must participate in their IEP meetings. 20 U.S.C. § 1414(d)(1)(B)(iv).

539. The Plaintiff Students were placed and kept at GHS by the LEA Defendants pursuant to their IEPs. GHS had a Master Contract with each of the Defendant LEAs to provide education services to the Plaintiff Students.

540. GHS sent BERs to the LEA Defendants demonstrating the excessive and illegal nature of the restraints, but this information was filed away and ignored. The IEP teams, in which the LEA Defendants participated, did not review and modify students' BIPs when it was clear they were ineffective or not being followed. Despite knowing that their students were being illegally restrained by GHS staff, the LEA Defendants left the Plaintiff Students at the school and did not take any action to stop the restraints. Because they were unable and unwilling to provide the educational services themselves, the LEA Defendants ignored and thereby allowed the violations of Plaintiffs' constitutional rights, knowingly accepting the benefits of GHS's illegal behavior.

541. At all times relevant to the complaint, the individual GHS Defendants were acting in the performance of their official duties to provide educational services, including special education services, to the Plaintiff Students pursuant to state and federal law and GHS's contract with the LEA Defendants.

- 117 -

542.    Defendants' conduct caused severe emotional distress and injuries to Plaintiff LANGLEY, including extreme grief and anguish over knowing how her son suffered and died, the loss of MAX's love and companionship, and profound sadness over all of the experiences Defendants robbed from her and her son.

543.    Defendants' conduct caused significant emotional distress and injuries to Plaintiff DAVID BENSON, including grief and anguish about his son's suffering and death, the loss of MAX's love and companionship, and the loss of future experiences he will never have with his son.

544.    Plaintiffs seek compensatory damages, punitive damages, attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF

### Cal. Education Code §§ 220

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS

ESTATE OF MAX BENSON against the CDE, DJUSD, YCOE, and YOLO SELPA

M.S. against the CDE, EGUSD and EG SELPA

D.Z. against FCUSD and FC SELPA

545.    Plaintiffs incorporate by reference all preceding paragraphs.

546.    At all times relevant to the complaint, Defendants GHS, CDE, DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD and FC SELPA received state financial assistance.

547.    As a nonpublic school with which Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD and FC SELPA had contracted to provide the Plaintiffs Students with the educational services the LEA Defendants had a legal duty to provide, GHS was a program of the LEA Defendants.

548.    GHS and its staff subjected the Plaintiff Students to severe, pervasive and offensive physical and emotional abuse in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that should have been addressed by less restrictive measures.

549.    Defendants DJUSD, YCOE, and YOLO SELPA placed and maintained their student, MAX BENSON, at GHS.  Despite knowledge that GHS was subjecting MAX BENSON and other students with disabilities to illegal and excessive restraints in response to predictable, disability-related behavior that could and should have been addressed by less restrictive measures, Defendants took no action to stop the restraints or transfer MAX BENSON to a safe, non-discriminatory placement.   Defendants were deliberately indifferent.

- 118 -

550.    Defendants EGUSD and EG SELPA placed and maintained their student, M.S., at GHS.  Despite knowledge that GHS was subjecting M.S. and other students with disabilities to illegal and excessive restraints in response to predictable, disability-related behavior that could and should have been addressed by less restrictive measures, Defendants took no action to stop the restraints or transfer M.S. to a safe, non-discriminatory placement.   Defendants were deliberately indifferent.

551.    Defendants FCUSD and FC SELPA placed and maintained their student, D.Z., at GHS.  Despite knowledge that GHS was subjecting D.Z. and other students with disabilities to illegal and excessive restraints in response to predictable, disability-related behavior that could and should have been addressed by less restrictive measures, Defendants took no action to stop the restraints or transfer D.Z. to a safe, non-discriminatory placement.   Defendants were deliberately indifferent.

552.    The CDE knew that nonpublic schools were disproportionately placing students with disabilities in excessive, dangerous and illegal restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures.  Yet the CDE maintained a policy and practice of ignoring this behavior, failing to proactively monitor nonpublic schools or their use of behavioral interventions, failing to respond to allegations of abuse and illegal behavioral interventions, and failing to respond to sustained complaints of restrain abuse with measures effective to ensure compliance.  Moreover, the CDE ignored its duty to respond to allegations of restraint abuse at GHS and did not conduct a site visit or investigation until after GHS had killed MAX BENSON and repeatedly abused the Plaintiff Students.   The CDE was deliberately indifferent to the disability discrimination and abuse to which the Plaintiff Students were subjected at GHS.

553.    Defendants' actions and failures to act deprived the Plaintiff Students of equal access to the benefits and opportunities of receiving a public education in a safe, non-discriminatory, non-abusive placement.

554.    Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students.

555.    Plaintiffs seek compensatory damages and attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

### Unruh Civil Rights Act, Cal. Civ. Code § 51

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS

ESTATE OF MAX BENSON against DJUSD

M.S. against EGUSD

D.Z. against FCUSD

556.    Plaintiffs incorporate by reference all preceding paragraphs.

557.    MAX BENSON filed a timely government tort claim against DJUSD which is based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ. Code § 51.

558.    M.S.'s filed a timely government tort claim against EGUSD which is based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ. Code § 51.

559.    D.Z. filed a timely government tort claims against FCUSD which is based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ. Code § 51.

560.    Defendants GHS, DJUSD, EGUSD and FCUSD are business establishments within the meaning of Cal. Civ. Code § 51.

561.    Defendant GHS discriminated against the Plaintiff Students by subjecting them to physical and emotional abuse in response to disability-related behavior that did not constitute a clear and present danger to the safety of the students or others and that could and should have been addressed by less restrictive measures, including those listed in the students' BIPs.

562.    DJUSD, EGUSD and FCUSD discriminated against the Plaintiff Students through their contractual arrangements with GHS to provide education services to LEA students with disabilities.  Through GHS:

       a.  Defendants provided the Plaintiff Students with educational aid, benefits and services that were not equal to those provided to students without disabilities;

       b.  Defendants provided the Plaintiff Students with educational aid, benefits and services that did not afford equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to Defendants' students without disabilities;

       c.  Defendants aided and perpetuated disability discrimination against the Plaintiff Students by providing significant state and federal financial assistance to GHS, which discriminated against Defendants' students on the basis of their disabilities by subjecting them to repeated physical and emotional abuse in

response to predictable, disability-related behavior which did not constitute a clear and present danger to the safety of the students or others and which could have been addressed by less restrictive measures, including those outlined in the students' behavioral intervention plans;

d.  Defendants limited the Plaintiff Students from enjoying their right to a free public education in a safe placement, free from discrimination or abuse; and

e.  Defendants used administrative methods—specifically the policies and practices of GHS regarding behavioral interventions—that subjected Plaintiff Students to disability discrimination and defeated or substantially impaired the objective of providing a free public education to the Plaintiff Students.

563.    Moreover, DJUSD, EGUSD and FCUSD directly discriminated against the Plaintiff Students by administering their public education programs and local plans in a manner that resulted in placing and keeping students with disabilities in an unsafe, abusive educational placement. Defendants did not sufficiently—if at all—investigate, monitor, or supervise the placement.  Nor did they acknowledge or direct GHS to correct its known violations of state and federal law against the Plaintiff Students.  As a result, the Plaintiff Students were not afforded education services equal to those afforded to other students and were subject to disability discrimination and repeated physical and emotional abuse.

564.    Defendants failed to make reasonable modifications to their program of providing special education services to children within their districts, such that students with disabilities would not be subject to discrimination and abuse in their educational placements.  These modifications—meaningful investigations and evaluations of the NPS prior to placing a student there and forceful oversight, investigation, and measures to ensure compliance with state and federal laws during the placement, including site visits and regular review of school and student records and BERs—would not have constituted a fundamental alteration in the Defendants' programs of providing educational services to their students.

565.    GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency interventions and were physically abusing their students.  However, DJUSD, EGUSD and FCUSD ignored their legal duties to supervise and monitor the program and continued to place and leave vulnerable students in the school's care.

- 121 -

566.    Defendants' behavior constitutes a violation of the Americans with Disabilities Act of 1990.  A violation of the ADA is a violation of the Unruh Act, Cal. Civ. Code § 51(f).

567.    Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students.

568.    Plaintiffs therefore seek actual damages, treble damages (only against GHS), and attorneys' fees and costs pursuant to Cal. Civ. Code § 52(a).

**SEVENTH CLAIM FOR RELIEF**

**(Ralph Act, Cal. Civ. Code § 51.7)**

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS

STATE OF MAX BENSON against DJUSD, YCOE, and YOLO SELPA

M.S. against EGUSD and EG SELPA

D.Z. against FCUSD and FC SELPA

569.    Plaintiffs incorporate by reference all preceding paragraphs.

570.    The Plaintiff Students are persons with disabilities.

571.    Defendant GHS, its administrators and its employees threatened to and did commit physical violence against the Plaintiff Students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could and should have been addressed by less restrictive measures.  These actions constituted violations Cal. Civ. Code § 51.7.  GHS's staff and administrators were employees and/or agents of GHS and were acting within the scope of their employment and/or agency at all times relevant to the complaint.  GHS is therefore vicariously liable for its staff members' and administrators' violations of Cal. Civ. Code § 51.7.

572.    MAX BENSON filed timely government tort claims against DJUSD and YOLO SELPA which are based on the factual circumstances herein alleged and encompass a claim for violation of claim for violation of Cal. Civ. Code § 51.7.

573.    M.S. filed timely government tort claims against EGUSD and EG SELPA which are based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ. Code § 51.7.

574.    D.Z. filed timely government tort claims against FCUSD and FC SELPA which are based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ. Code § 51.7.

575.    Defendants DJUSD, YCOE and YOLO SELPA entered into the Yolo County SELPA plan, which constituted an interagency agreement to provide special education services to qualifying children with disabilities in the plan area.  Defendants are therefore jointly and severally liable for one another's acts and omissions occurring during the performance of the Yolo County SELPA.  Cal. Gov't Code § 895.2.

576.    Defendants EGUSD and EG SELPA entered into the Elk Grove SELPA plan, which constituted an interagency agreement to provide special education services to qualifying children with disabilities in the plan area.  Defendants are therefore jointly and severally liable for one another's acts and omissions occurring during the performance of the Elk Grove SELPA.   Cal. Gov't Code § 895.2.

577.    Defendants FCUSD and FC SELPA entered into the Folsom Cordova SELPA plan, which constituted an interagency agreement to provide special education services to qualifying children with disabilities in the plan area.  Defendants are therefore jointly and severally liable for one another's acts and omissions occurring during the performance of the Folsom Cordova SELPA. Cal. Gov't Code § 895.2.

578.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD and FC SELPA had a nondelegable duty to provide a free public education, including special education services, to students with disabilities in their area.  Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD and FC SELPA contracted with GHS to provide these services to the Plaintiff Students.  GHS was therefore a program of the LEA Defendants, who are vicariously liable for GHS's violations of Cal. Civ. Code § 51.7 against the Plaintiff Students.

579.    Defendants' actions and omissions caused physical and emotional injuries to the Plaintiff Students.

580.    Plaintiffs therefore seek actual damages, exemplary damages (against GHS), attorneys' fees and costs, and a civil penalty against GHS of $25,000 per Plaintiff pursuant to Cal. Civ. Code 52(b)(2).

## EIGHTH CLAIM FOR RELIEF

### (Thomas Bane Civil Rights Act, Cal. Civ. Code § 52.1)

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS

ESTATE OF MAX BENSON against DJUSD, YCOE, and YOLO SELPA

M.S. against EGUSD and EG SELPA

D.Z. against FCUSD and FC SELPA

- 123 -

1     581.    Plaintiffs incorporate by reference all preceding paragraphs.

2     582.    Defendant GHS, its administrators and its employees interfered with the Plaintiff

3  Students' exercise and enjoyment of their rights to a free, public education by threatening,

4  intimidating and coercing them with physical violence, specifically by subjecting them to unlawful

5  restraints and other abusive physical interventions in response to predictable, disability-related

6  behavior that did not constitute a clear and present threat to the safety of the students or others and

7  that could and should have been addressed by less restrictive measures.    Defendants' actions

8  constituted violations Cal. Civ. Code § 52.1.  GHS's staff and administrators were employees

9  and/or agents of GHS and were acting within the scope of their employment and/or agency at all

10  times relevant to the complaint.  GHS is therefore vicariously liable for its staff members' and

administrators' violations of Cal. Civ. Code § 52.1.

11     583.    MAX BENSON filed timely government tort claims against DJUSD and YOLO

12  SELPA which are based on the factual circumstances herein alleged and encompass a claim for

violation of Cal. Civ. Code § 52.1.

13     584.    M.S. filed timely government tort claims against EGUSD and EG SELPA which are

14  based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ.

15  Code § 52.1 against EGUSD and EG SELPA.

16     585.    D.Z. filed timely government tort claims against FCUSD and FC SELPA which are

17  based on the factual circumstances herein alleged and encompass a claim for violation of Cal. Civ.

Code § 52.1.

18     586.    Defendants DJUSD, YCOE and YOLO SELPA entered into the Yolo County

19  SELPA plan, which constituted an interagency agreement to provide special education services to

20  qualifying children with disabilities in the plan area.  Defendants are therefore jointly and severally

21  liable for one another's acts and omissions occurring during the performance of the Yolo County

22  SELPA.  Cal. Gov't Code § 895.2.

23     587.    Defendants EGUSD and EG SELPA entered into the Elk Grove SELPA plan, which

24  constituted an interagency agreement to provide special education services to qualifying children

with disabilities in the plan area.  Defendants are therefore jointly and severally liable for one

25  another's acts and omissions occurring during the performance of the Elk Grove SELPA.   Cal.

26  Gov't Code § 895.2.

27     588.    Defendants FCUSD and FC SELPA entered into the Folsom Cordova SELPA plan,

28  which constituted an interagency agreement to provide special education services to qualifying

- 124 -

children with disabilities in the plan area. Defendants are therefore jointly and severally liable for one another's acts and omissions occurring during the performance of the Folsom Cordova SELPA. Cal. Gov't Code § 895.2.

589. Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD and FC SELPA had a nondelegable duty to provide a free public education, including special education services, to students with disabilities in their area. Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD and FC SELPA contracted with GHS to provide these services to the Plaintiff Students. GHS was therefore a program of the LEA Defendants, who are vicariously liable for GHS's violations of Cal. Civ. Code § 52.1 against the Plaintiff Students.

590. Defendants' actions and omissions caused physical and emotional injuries to the Plaintiff Students.

591. Plaintiffs seek actual damages, exemplary damages (only against GHS), and attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF

### (Battery)

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

ESTATE OF MAX BENSON against DJUSD, YCOE, YOLO SELPA, WOHLWEND, MORGAN, WATSON, and THOMAS

M.S. against EGUSD, EG SELPA, STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, and JONES

D.Z. against FCUSD, FC SELPA, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT

S.D. against WOHLWEND, SMITH, and GATEWOOD

J.P. against SMITH, ALLEN, and MATLOCK

592. Plaintiffs incorporate by reference all preceding paragraphs.

*GHS and GHS Employees*

593. As described more fully above, Defendants WOHLWEND, MORGAN, WATSON, and THOMAS intentionally restrained or otherwise performed physical interventions on MAX BENSON in response to predictable, disability-related behavior that did not present a clear and

- 125 -

present danger to the safety of MAX or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

594.    MAX did not consent to such restraints or physical interventions.

595.    Defendants thereby caused MAX physical and emotional injuries, including death.

596.    As described more fully above, Defendants STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN, and JONES intentionally restrained or otherwise performed physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

597.    M.S. did not consent to such restraints or physical interventions.

598.    Defendants caused M.S. physical and emotional injuries.

599.    As described more fully above, Defendants CHRISTENSON, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT intentionally restrained or otherwise performed physical interventions on Plaintiff D.Z. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of D.Z. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

600.    D.Z. did not consent to such restraints or physical interventions.

601.    Defendants caused D.Z. physical and emotional injuries.

602.    As described more fully above, Defendants WOHLWEND, SMITH, KELLER, CHRISTENSON, and GATEWOOD intentionally restrained or otherwise performed physical interventions on Plaintiff S.D. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of S.D. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

603.    S.D. did not consent to such restraints or physical interventions.

604.    Defendants caused S.D. physical and emotional injuries.

605.    As described more fully above, Defendants SMITH, ALLEN, and MATLOCK intentionally restrained or otherwise performed physical interventions on Plaintiff J.P. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of J.P. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

1

606.    J.P. did not consent to such restraints or physical interventions.

2

607.    Defendants caused J.P. physical and emotional injuries.

3

608.    As described more fully above, GHS staff intentionally restrained E.D. in response

4

to predictable, disability-related behavior that did not present a clear and present danger to the

5

safety of E.D. or others and that could have been addressed by less restrictive measures.  This

restraint was not legally justified.

6

609.    E.D. did not consent to the restraint.

7

610.    Defendants caused E.D. physical and emotional injuries.

8

611.    As described more fully above, GHS staff intentionally restrained or otherwise

9

performed physical interventions on H.K. in response to predictable, disability-related behavior

10

that did not present a clear and present danger to the safety of H.K. or others and that could have

been addressed by less restrictive measures.  These restraints and interventions were not legally

11

justified.

12

612.    H.K did not consent to such restraints or physical interventions.

13

613.    Defendants caused H.K. physical and emotional injuries.

14

614.    As described more fully above, CHRISTENSON and other GHS staff intentionally

15

restrained or otherwise performed physical interventions on AUSTIN in response to predictable,

16

disability-related behavior that did not present a clear and present danger to the safety of AUSTIN

or others and that could have been addressed by less restrictive measures.  These restraints and

17

interventions were not legally justified.

18

615.    AUSTIN did not consent to such restraints or physical interventions.

19

616.    Defendants caused AUSTIN physical and emotional injuries.

20

617.    As GHS administrators, Defendants CHRISTENSON, NARAN, MEYERS, and

21

KELLER had the responsibility and power to develop, implement and enforce policies and

22

procedures regarding the use of physical interventions and restraints at GHS.  Defendants created,

23

implemented and maintained a policy and practice at GHS of subjecting students to restraints in

response to predictable, disability-related behavior that did not constitute a clear and present threat

24

to the safety of the students or others and that could have been addressed by less restrictive

25

measures.  Defendants knew and were deliberately indifferent to the fact that GHS staff were

26

subjecting students to illegal restraints and other unreasonable physical interventions.  Plaintiffs

27

allege on information and believe that in some cases Defendants CHRISTENSON, NARAN,

28

MEYERS, and KELLER participated directly in the restraints and physical interventions to which

- 127 -

1    the Plaintiff Students were subjected.  Defendants' actions and failures to act caused the Plaintiff
2    Students to be subjected to restraints and other physical interventions to which they did not consent.
3    As a result, the Plaintiff Students suffered physical and emotional injuries, and in the case of MAX
4    BENSON, death.

**LEA Defendants**

5    618.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and
6    FC SELPA are vicariously liable for the actions of GHS and GHS's employees.  They are also
7    jointly and vicariously liable for one another's actions and those of their employees.

8    619.    MAX BENSON filed timely government tort claims against DJUSD and YOLO
9    SELPA which are based on the factual circumstances herein alleged and encompass a claim for
10   battery.

    620.    M.S. filed timely government tort claims against EGUSD and EG SELPA which are
11   based on the factual circumstances herein alleged and encompass a claim for battery.

12   621.    D.Z. filed timely government tort claims against FCUSD and FC SELPA which are
13   based on the factual circumstances herein alleged and encompass a claim for battery.

14   622.    State law guarantees free special education instruction and services to all qualifying
15   children.  Cal. Ed. Code §§ 56040(a); 56344(c).    Local educational agencies have a mandatory,
16   nondelegable duty to provide a free, public education—including special education instruction—
     to qualifying children within their area.  *B.H. v. Manhattan Beach Unified Sch. Dist.*, 35
17   Cal.App.5th 563, 582, 587 (2019). An LEA may place an eligible special education student in a
18   nonpublic school pursuant to a Master Contract, but the LEA retains responsibilities to the student
19   under the law and the contract, including oversight and evaluation of the placement. Cal. Ed. Code
20   §§ 56342.1, 56365(a), 56366(a)(2)(B); *L.A. Unified Sch. Dist. v. Garcia*, 741 F.3d 922, 937 (9th
21   Cir. 2014).  For the purposes of determining allocations of state and federal funding to the district,
22   "[p]upils enrolled in nonpublic, nonsectarian schools … shall be deemed to be enrolled in public
23   schools. Cal. Ed. Code § 56365(b).

24   623.    California prohibits corporal punishment—defined as "the willful infliction of, or
     willfully causing the infliction of, physical pain on a pupil"—in public schools. Cal. Educ. Code §
25   49001.    California law limits the use of physical "behavioral interventions" on children with
26   disabilities, including those in nonpublic schools.  Cal. Ed. Code §§ 56520 et. seq.  "Emergency
27   interventions may only be used to control unpredictable, spontaneous behavior that poses clear and
28   present danger of serious physical harm to the individual with exceptional needs, or others, and that

- 128 -

cannot be immediately prevented by a response less restrictive . . . "Cal. Ed. Code § 56521.1(a). California law prohibits the use of restraints: a) as a substitute for the positive interventions outlined in a student's behavioral intervention plan; b) "for longer than is necessary to contain the behavior"; c) that employ the use of prone restraints by untrained staff; or d) that exert "[a]n amount of force that exceeds that which is reasonable and necessary under the circumstances." Cal. Ed. Code § 56521.1(b)-(d).

624.   LEAs may not "authorize, order, consent to, or pay for" interventions that, among other prohibitions: 1) are designed or likely to cause physical pain; 2) deny adequate "food, water, . . . physical comfort, or access to bathroom facilities"; 3) are designed, used or likely to subject the student to "verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma"; 4) preclude adequate supervision of the student; or 5) deprive the student of one or more of his senses. Cal. Ed. Code § 56521.2(a)(1)(3)(4)(7) and (8).   Prone restraints are prohibited, except as a limited emergency intervention subject to the prohibitions outlined above. Cal. Ed. Code § 56521.2(a)(5).

625.   LEAs are responsible for the implementation of laws prohibiting excessive, prolonged, and harmful restraints in response to predictable, disability-related behavior.   Cal. Ed. Code §§ 49001; 56520; 56521; 56521.1 and 56523(b).   Compliance with these laws is a condition of receiving federal funding for special education.   § 56523(d).

626.   Under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, public entities and those receiving federal financial assistance may not discriminate on the basis of disability in their services or programs.   Under Cal. Ed. Code § 220, educational entities receiving state financial assistance may not discriminate on the basis of disability.   The Unruh Civil Rights Act, Cal. Civ. Code § 51 prohibits disability discrimination by business establishments.   Cal. Civ. Code § 52.1 makes it unlawful to threaten, intimidate or coerce one from exercising and enjoying their rights.   Cal. Civ. Code § 51.7 makes it unlawful to threaten or commit physical violence against someone based on their disability.   School districts and county offices of education "have primary responsibility to ensure that [their] programs and activities" do not discriminate on the basis of disability and must investigate discrimination complaints.   5 C.C.R. § 4960(a).

627.   The above-listed prohibitions and mandatory duties of the Defendant LEAs were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities, receive an education free from discrimination and abuse.

628.    At all times relevant to this complaint, Defendants DJUSD, YCOE and YOLO SELPA were members of an interagency agreement, the Yolo County Special Education Local Plan, formed pursuant to Cal. Ed. Code § 56195.1(c) for the purposes of ensuring "access to special education and services for all individuals with exceptional needs residing in the geographic area served by the plan." As a result, they are jointly and severally liable for one another's actions and omissions. Cal. Gov't Code § 895.2.

629.    At all times relevant to this complaint, Defendants EGUSD and EG SELPA were members of an interagency agreement, the Elk Grove Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District. As a result, they are jointly and severally liable for one another's actions and omissions. Cal. Gov't Code § 895.2.

630.    At all times relevant to this complaint, Defendants FCUSD and FC SELPA were members of an interagency agreement, the Folsom-Cordova Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District. As a result, they are jointly and severally liable for one another's actions and omissions. Cal. Gov't Code § 895.2.

631.    Moreover, YOLO SELPA, EG SELPA and FC SELPA each had responsibilities under the law and their respective local plans, including: ensuring equal access to the programs and services to the special education students for whom the SELPA Administrator was receiving state and federal special education funds; monitoring the appropriate use of those funds; entering into Master Contracts with nonpublic schools, reviewing and monitoring those contracts, issuing and monitoring compliance assurances for those contracts, and maintaining updated contracts. Cal. Ed. Code §§ 56195; 56195.1(c); 56195.7(a) and (c)(6); 56195.8(a) and (b)(1); 56205(a)(5), (11) and (12)(D), and (c); 56360; 56361(e); 56365(a) and (d); 56366(a)(2)(B). As the intended beneficiaries of the federal and state education funding these SELPA Defendants were receiving, Plaintiff students MAX BENSON, M.S. and D.Z., were the intended beneficiaries of these statutory and SELPA plan duties. Their purpose is to ensure that special education funds are being used to provide safe, monitored special education services and programs to the students that qualify for them. It is not a discretionary function of the Defendant SELPAs to take special education funding for a student and then delegate the student's education to an NPS with little to no oversight, training,

- 130 -

or supervision, amounting to deliberate indifference as to whether the NPS complies with laws prohibiting discrimination and improper restraints.

632.   Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA did not exercise reasonable diligence and failed to discharge their duties.  These failures proximately caused MAX BENSON, M.S., and D.Z. to suffer from repeated restraints and other physical interventions at GHS without Plaintiffs' consent and without legal justification.  MAX BENSON, M.S. and D.Z. suffered physical and emotional injuries, and in the case of MAX BENSON, death.

633.   Plaintiffs seek compensatory damages and punitive damages (except against the LEA Defendants).

## TENTH CLAIM FOR RELIEF

### (Assault)

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

ESTATE OF MAX BENSON against DJUSD, YCOE, YOLO SELPA, WOHLWEND, MORGAN, WATSON, and THOMAS

M.S. against EGUSD, EG SELPA, STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, and JONES

D.Z. against FCUSD, FC SELPA, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT

S.D. against WOHLWEND, SMITH, and GATEWOOD

J.P. against SMITH, ALLEN, and MATLOCK

634.   Plaintiffs incorporate by reference all preceding paragraphs.

*GHS and GHS Employees*

635.   As described more fully above, Defendants WOHLWEND, MORGAN, WATSON, and THOMAS acted with the intent to cause harmful or offensive contact to MAX BENSON. Specifically, Defendants intentionally restrained or otherwise performed physical interventions on MAX BENSON in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of MAX or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

636.   MAX reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

637.    Defendants' actions caused MAX physical and emotional injuries, including death.

638.    As described more fully above, Defendants STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN, and JONES acted with the intent to cause harmful or offensive contact to M.S.  Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

639.    M.S. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

640.    Defendants caused M.S. physical and emotional injuries.

641.    As described more fully above, Defendants CHRISTENSON, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT acted with the intent to cause harmful or offensive contact to D.Z.  Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff D.Z. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of D.Z. or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

642.    D.Z. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

643.    Defendants caused D.Z. physical and emotional injuries.

644.    As described more fully above, Defendants WOHLWEND, SMITH, KELLER, CHRISTENSON and GATEWOOD acted with the intent to cause harmful or offensive contact to S.D.  Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff S.D. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of S.D. or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

645.    S.D. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

646.    Defendants caused S.D. physical and emotional injuries.

647.    As described more fully above, Defendants SMITH, ALLEN, and MATLOCK acted with the intent to cause harmful or offensive contact to J.P.  Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff J.P. in response

to predictable, disability-related behavior that did not present a clear and present danger to the safety of J.P. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

648.    J.P. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

649.    Defendants caused J.P. physical and emotional injuries.

650.    As described more fully above, GHS staff acted with the intent to cause harmful or offensive contact to E.D. Specifically, Defendants intentionally restrained E.D. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of E.D. or others and that could have been addressed by less restrictive measures. This restraint was not legally justified.

651.    E.D. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

652.    Defendants caused E.D. physical and emotional injuries.

653.    As described more fully above, GHS staff acted with the intent to cause harmful or offensive contact to H.K. Specifically, Defendants intentionally restrained or otherwise performed physical interventions on H.K. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of H.K. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

654.    H.K. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

655.    Defendants caused H.K. physical and emotional injuries.

656.    As described more fully above, CHRISTENSON and other GHS staff acted with the intent to cause harmful or offensive contact to AUSTIN. Specifically, Defendants intentionally restrained or otherwise performed physical interventions on AUSTIN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

657.    AUSTIN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

658.    Defendants caused AUSTIN physical and emotional injuries.

- 133 -

659.    As GHS administrators, Defendants CHRISTENSON, NARAN, MEYERS, and KELLER had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS.  Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures.  Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions.  Plaintiffs allege on information and believe that in some cases Defendants CHRISTENSON, NARAN, MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected.

660.    Defendants' actions and failures to act were a substantial factor in causing the Plaintiff Students to reasonably believe that GHS staff intended to subject them to harmful and offensive contact to which they did not consent.  As a result, the Plaintiff Students suffered physical and emotional injuries, and in the case of MAX BENSON, death.

***LEA Defendants***

661.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA are vicariously liable for the actions of GHS and GHS's employees.  They are also jointly and vicariously liable for one another's actions and those of their employees.

662.    MAX BENSON filed timely government tort claims against DJUSD and YOLO SELPA which are based on the factual circumstances herein alleged and encompass a claim for assault.

663.    M.S. filed timely government tort claims against EGUSD and EG SELPA which are based on the factual circumstances herein alleged and encompass a claim for assault.

664.    D.Z. filed timely government tort claims against FCUSD and FC SELPA which are based on the factual circumstances herein alleged and encompass a claim for assault.

665.    State law guarantees free special education instruction and services to all qualifying children.  Cal. Ed. Code §§ 56040(a); 56344(c).    Local educational agencies have a mandatory, nondelegable duty to provide a free, public education—including special education instruction— to qualifying children within their area.  *B.H. v. Manhattan Beach Unified Sch. Dist.*, 35 Cal.App.5th 563, 582, 587 (2019). An LEA may place an eligible special education student in a nonpublic school pursuant to a Master Contract, but the LEA retains responsibilities to the student

- 134 -

under the law and the contract, including oversight and evaluation of the placement. Cal. Ed. Code §§ 56342.1, 56365(a), 56366(a)(2)(B); *L.A. Unified Sch. Dist. v. Garcia*, 741 F.3d 922, 937 (9th Cir. 2014).  For the purposes of determining allocations of state and federal funding to the district, "[p]upils enrolled in nonpublic, nonsectarian schools … shall be deemed to be enrolled in public schools. Cal. Ed. Code § 56365(b).

666.    California prohibits corporal punishment—defined as "the willful infliction of, or willfully causing the infliction of, physical pain on a pupil"—in public schools. Cal. Educ. Code § 49001.  California law limits the use of physical "behavioral interventions" on children with disabilities, including those in nonpublic schools.  Cal. Ed. Code §§ 56520 et. seq.  "Emergency interventions may only be used to control unpredictable, spontaneous behavior that poses clear and present danger of serious physical harm to the individual with exceptional needs, or others, and that cannot be immediately prevented by a response less restrictive . . . "Cal. Ed. Code § 56521.1(a).  California law prohibits the use of restraints: a) as a substitute for the positive interventions outlined in a student's behavioral intervention plan; b) "for longer than is necessary to contain the behavior"; c) that employ the use of prone restraints by untrained staff; or d) that exert "[a]n amount of force that exceeds that which is reasonable and necessary under the circumstances." Cal. Ed. Code § 56521.1(b)-(d).

667.    LEAs may not "authorize, order, consent to, or pay for" interventions that, among other prohibitions: 1) are designed or likely to cause physical pain; 2) deny adequate "food, water, . . . physical comfort, or access to bathroom facilities"; 3) are designed, used or likely to subject the student to "verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma"; 4) preclude adequate supervision of the student; or 5) deprive the student of one or more of his senses. Cal. Ed. Code § 56521.2(a)(1)(3)(4)(7) and (8).  Prone restraints are prohibited, except as a limited emergency intervention subject to the prohibitions outlined above. Cal. Ed. Code § 56521.2(a)(5).

668.    LEAs are responsible for the implementation of laws prohibiting excessive, prolonged, and harmful restraints in response to predictable, disability-related behavior.  Cal. Ed. Code §§ 49001; 56520; 56521; 56521.1 and 56523(b).  Compliance with these laws is a condition of receiving federal funding for special education.  § 56523(d).

669.    Under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, public entities and those receiving federal financial assistance may not discriminate on the basis of disability in their services or programs.  Under Cal. Ed. Code § 220, educational entities

receiving state financial assistance may not discriminate on the basis of disability.  The Unruh Civil Rights Act, Cal. Civ. Code § 51 prohibits disability discrimination by business establishments.  Cal. Civ. Code § 52.1 makes it unlawful to threaten, intimidate or coerce one from exercising and enjoying their rights.  Cal. Civ. Code § 51.7 makes it unlawful to threaten or commit physical violence against someone based on their disability.  School districts and county offices of education "have primary responsibility to ensure that [their] programs and activities" do not discriminate on the basis of disability and must investigate discrimination complaints.  5 C.C.R. § 4960(a).

670.    The above-listed prohibitions and mandatory duties of the Defendant LEAs were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities, receive an education free from discrimination and abuse.

671.    At all times relevant to this complaint, Defendants DJUSD, YCOE and YOLO SELPA were members of an interagency agreement, the Yolo County Special Education Local Plan, formed pursuant to Cal. Ed. Code § 56195.1(c) for the purposes of ensuring "access to special education and services for all individuals with exceptional needs residing in the geographic area served by the plan."  As a result, they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

672.    At all times relevant to this complaint, Defendants EGUSD and EG SELPA were members of an interagency agreement, the Elk Grove Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District.  As a result, they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

673.    At all times relevant to this complaint, Defendants FCUSD and FC SELPA were members of an interagency agreement, the Folsom-Cordova Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District.  As a result, they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

674.    Moreover, YOLO SELPA, EG SELPA and FC SELPA each had responsibilities under the law and their respective local plans, including: ensuring equal access to the programs and services to the special education students for whom the SELPA Administrator was receiving state and federal special education funds; monitoring the appropriate use of those funds; entering into

- 136 -

Master Contracts with nonpublic schools, reviewing and monitoring those contracts, issuing and monitoring compliance assurances for those contracts, and maintaining updated contracts. Cal. Ed. Code §§ 56195; 56195.1(c); 56195.7(a) and (c)(6); 56195.8(a) and (b)(1); 56205(a)(5), (11) and (12)(D), and (c); 56360; 56361(e); 56365(a) and (d); 56366(a)(2)(B).

675.    As the intended beneficiary of the federal and state education funding these SELPA Defendants were receiving, Plaintiff students MAX BENSON, M.S. and D.Z., were the intended beneficiary of these statutory and SELPA plan duties. Their purpose is to ensure that special education funds are being used to provide safe, monitored special education services and programs to the students that qualify for them. It is not a discretionary function of the Defendant SELPAs to take special education funding for a student and then delegate the student's education to an NPS with little to no oversight, training, or supervision, amounting to deliberate indifference as to whether the NPS complies with laws prohibiting discrimination and improper restraints.

676.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA did not exercise reasonable diligence and failed to discharge their duties. These failures proximately were a substantial factor in causing MAX BENSON, M.S., and D.Z. to reasonably believe that GHS staff intended to subject them to harmful and offensive contact--specifically repeated restraints and other physical interventions without Plaintiffs' consent and without legal justification. As a result, MAX BENSON, M.S. and D.Z. suffered physical and emotional injuries, and in the case of MAX BENSON, death.

677.    Plaintiffs seek compensatory damages and punitive damages (with the exception of the LEA Defendants).

### ELEVENTH CLAIM FOR RELIEF

**(False Imprisonment)**

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

ESTATE OF MAX BENSON against DJUSD, YCOE, YOLO SELPA, WOHLWEND, MORGAN, WATSON, and THOMAS

M.S. against EGUSD, EG SELPA, STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, and JONES

D.Z. against FCUSD, FC SELPA, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT

S.D. against WOHLWEND, SMITH, and GATEWOOD

J.P. against SMITH, ALLEN, and MATLOCK

678.    Plaintiffs incorporate by reference all preceding paragraphs.

***GHS and GHS Employees***

679.    As described more fully above, Defendants WOHLWEND, MORGAN, WATSON, and THOMAS intentionally confined MAX BENSON for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on MAX BENSON in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of MAX or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

680.    MAX did not consent to the confinement.

681.    Defendant caused MAX physical and emotional injuries, including death.

682.    As described more fully above, Defendants STEARN, DILLON, LAYMAN, HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN, and JONES intentionally confined M.S. for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

683.    M.S. did not consent to the confinement.

684.    Defendants caused M.S. physical and emotional injuries.

685.    As described more fully above, Defendants CHRISTENSON, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT intentionally confined D.Z. for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff D.Z. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of D.Z. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

686.    D.Z. did not consent to the confinement.

687.    Defendants caused D.Z. physical and emotional injuries.

688.    As described more fully above, Defendants WOHLWEND, SMITH, KELLER, CHRISTENSON, and GATEWOOD intentionally confined S.D. for an appreciable length of time.

Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff S.D. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of S.D. or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

689.   S.D. did not consent to the confinement.

690.   Defendants caused S.D. physical and emotional injuries.

691.   As described more fully above, Defendants SMITH, ALLEN, and MATLOCK intentionally confined J.P. for an appreciable length of time.  Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff J.P. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of J.P. or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

692.   J.P. did not consent to the confinement.

693.   Defendants caused J.P. physical and emotional injuries.

694.   As described more fully above, GHS staff intentionally confined E.D. for an appreciable length of time.  Specifically, Defendants intentionally restrained E.D. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of E.D. or others and that could have been addressed by less restrictive measures.  This restraint was not legally justified.

695.   E.D. did not consent to the confinement.

696.   Defendants caused E.D. physical and emotional injuries.

697.   As described more fully above, GHS staff intentionally confined H.K. for an appreciable length of time.   Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on H.K. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of H.K. or others and that could have been addressed by less restrictive measures.   These restraints and interventions were not legally justified.

698.   H.K. did not consent to the confinement.

699.   Defendants caused H.K. physical and emotional injuries.

700.   As described more fully above, CHRISTENSON and other GHS staff intentionally confined AUSTIN for an appreciable length of time.   Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on AUSTIN in

response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

701.     AUSTIN did not consent to the confinement.

702.     Defendants caused AUSTIN physical and emotional injuries.

703.     As GHS administrators, Defendants CHRISTENSON, NARAN, MEYERS, and KELLER had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS.  Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures.  Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions.  Plaintiffs allege on information and believe that in some cases Defendants CHRISTENSON, NARAN, MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected.  Defendants' actions and failures to act were a substantial factor in causing the Plaintiff Students to be intentionally and illegally confined for an appreciable length of time without their consent.  As a result, the Plaintiff Students suffered physical and emotional injuries, and in the case of MAX BENSON, death.

**LEA Defendants**

704.     Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA are vicariously liable for the actions of GHS and GHS's employees.  They are also jointly and vicariously liable for one another's actions and those of their employees.

705.     MAX BENSON filed timely government tort claims against DJUSD and YOLO SELPA which are based on the factual circumstances herein alleged and encompass a claim for false imprisonment.

706.     M.S. filed timely government tort claims against EGUSD and EG SELPA which are based on the factual circumstances herein alleged and encompass a claim for false imprisonment.

707.     D.Z. filed timely government tort claims against FCUSD and FC SELPA which are based on the factual circumstances herein alleged and encompass a claim for false imprisonment.

708.     State law guarantees free special education instruction and services to all qualifying children.  Cal. Ed. Code §§ 56040(a); 56344(c).    Local educational agencies have a mandatory,

nondelegable duty to provide a free, public education—including special education instruction—to qualifying children within their area. *B.H. v. Manhattan Beach Unified Sch. Dist.*, 35 Cal.App.5th 563, 582, 587 (2019). An LEA may place an eligible special education student in a nonpublic school pursuant to a Master Contract, but the LEA retains responsibilities to the student under the law and the contract, including oversight and evaluation of the placement. Cal. Ed. Code §§ 56342.1, 56365(a), 56366(a)(2)(B); *L.A. Unified Sch. Dist. v. Garcia*, 741 F.3d 922, 937 (9th Cir. 2014). For the purposes of determining allocations of state and federal funding to the district, "[p]upils enrolled in nonpublic, nonsectarian schools … shall be deemed to be enrolled in public schools. Cal. Ed. Code § 56365(b).

709.    California prohibits corporal punishment—defined as "the willful infliction of, or willfully causing the infliction of, physical pain on a pupil"—in public schools. Cal. Educ. Code § 49001. California law limits the use of physical "behavioral interventions" on children with disabilities, including those in nonpublic schools. Cal. Ed. Code §§ 56520 et. seq. "Emergency interventions may only be used to control unpredictable, spontaneous behavior that poses clear and present danger of serious physical harm to the individual with exceptional needs, or others, and that cannot be immediately prevented by a response less restrictive . . . "Cal. Ed. Code § 56521.1(a). California law prohibits the use of restraints: a) as a substitute for the positive interventions outlined in a student's behavioral intervention plan; b) "for longer than is necessary to contain the behavior"; c) that employ the use of prone restraints by untrained staff; or d) that exert "[a]n amount of force that exceeds that which is reasonable and necessary under the circumstances." Cal. Ed. Code § 56521.1(b)-(d).

710.    LEAs may not "authorize, order, consent to, or pay for" interventions that, among other prohibitions: 1) are designed or likely to cause physical pain; 2) deny adequate "food, water, . . . physical comfort, or access to bathroom facilities"; 3) are designed, used or likely to subject the student to "verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma"; 4) preclude adequate supervision of the student; or 5) deprive the student of one or more of his senses. Cal. Ed. Code § 56521.2(a)(1)(3)(4)(7) and (8). Prone restraints are prohibited, except as a limited emergency intervention subject to the prohibitions outlined above. Cal. Ed. Code § 56521.2(a)(5).

711.    LEAs are responsible for the implementation of laws prohibiting excessive, prolonged, and harmful restraints in response to predictable, disability-related behavior. Cal. Ed.

Code §§ 49001; 56520; 56521; 56521.1 and 56523(b).  Compliance with these laws is a condition of receiving federal funding for special education.  § 56523(d).

712.    Under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, public entities and those receiving federal financial assistance may not discriminate on the basis of disability in their services or programs.  Under Cal. Ed. Code § 220, educational entities receiving state financial assistance may not discriminate on the basis of disability.  The Unruh Civil Rights Act, Cal. Civ. Code § 51 prohibits disability discrimination by business establishments.  Cal. Civ. Code § 52.1 makes it unlawful to threaten, intimidate or coerce one from exercising and enjoying their rights.  Cal. Civ. Code § 51.7 makes it unlawful to threaten or commit physical violence against someone based on their disability.  School districts and county offices of education "have primary responsibility to ensure that [their] programs and activities" do not discriminate on the basis of disability and must investigate discrimination complaints.  5 C.C.R. § 4960(a).

713.    The above-listed prohibitions and mandatory duties of the Defendant LEAs were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities, receive an education free from discrimination and abuse.

714.    At all times relevant to this complaint, Defendants DJUSD, YCOE and YOLO SELPA were members of an interagency agreement, the Yolo County Special Education Local Plan, formed pursuant to Cal. Ed. Code § 56195.1(c) for the purposes of ensuring "access to special education and services for all individuals with exceptional needs residing in the geographic area served by the plan."  As a result, they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

715.    At all times relevant to this complaint, Defendants EGUSD and EG SELPA were members of an interagency agreement, the Elk Grove Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District.  As a result, they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

716.    At all times relevant to this complaint, Defendants FCUSD and FC SELPA were members of an interagency agreement, the Folsom-Cordova Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District.  As a

result, they are jointly and severally liable for one another's actions and omissions. Cal. Gov't Code § 895.2.

717.    Moreover, YOLO SELPA, EG SELPA and FC SELPA each had responsibilities under the law and their respective local plans, including: ensuring equal access to the programs and services to the special education students for whom the SELPA Administrator was receiving state and federal special education funds; monitoring the appropriate use of those funds; entering into Master Contracts with nonpublic schools, reviewing and monitoring those contracts, issuing and monitoring compliance assurances for those contracts, and maintaining updated contracts. Cal. Ed. Code §§ 56195; 56195.1(c); 56195.7(a) and (c)(6); 56195.8(a) and (b)(1); 56205(a)(5), (11) and (12)(D), and (c); 56360; 56361(e); 56365(a) and (d); 56366(a)(2)(B).

718.    As the intended beneficiary of the federal and state education funding these SELPA Defendants were receiving, Plaintiff students MAX BENSON, M.S. and D.Z., were the intended beneficiary of these statutory and SELPA plan duties. Their purpose is to ensure that special education funds are being used to provide safe, monitored special education services and programs to the students that qualify for them. It is not a discretionary function of the Defendant SELPAs to take special education funding for a student and then delegate the student's education to an NPS with little to no oversight, training, or supervision, amounting to deliberate indifference as to whether the NPS complies with laws prohibiting discrimination and improper restraints.

719.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA did not exercise reasonable diligence and failed to discharge their duties. These failures proximately were a substantial factor in causing MAX BENSON, M.S., and D.Z. to be intentionally and illegally confined for an appreciable length of time without their consent. As a result, MAX BENSON, M.S. and D.Z. suffered physical and emotional injuries, and in the case of MAX BENSON, death.

720.    Plaintiffs seek compensatory damages and punitive damages (with the exception of the LEA Defendants).

## TWELFTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

ESTATE OF MAX BENSON against DJUSD, YCOE, YOLO SELPA, WOHLWEND, MORGAN, WATSON, and THOMAS

- 143 -

M.S. against EGUSD, EG SELPA, STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, and JONES

D.Z. against FCUSD, FC SELPA, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT

S.D. against WOHLWEND, SMITH, and GATEWOOD

J.P. against SMITH, ALLEN, and MATLOCK

721.    Plaintiffs incorporate by reference all preceding paragraphs.

***GHS Defendants***

722.    As described more fully above, the conduct of Defendants WOHLWEND, MORGAN, WATSON, and THOMAS was extreme and outrageous.  This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to MAX BENSON. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on MAX BENSON in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of MAX or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

723.    Defendants' conduct did cause severe and extreme emotional distress to MAX BENSON.

724.    As described more fully above, the conduct of Defendants STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN, and JONES was extreme and outrageous.  This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to M.S.

725.    Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures.  These restraints and interventions were not legally justified.

726.    Defendants' conduct did cause severe and extreme emotional distress to M.S.

727.    As described more fully above, the conduct of Defendants CHRISTENSON, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to D.Z.  Specifically, Defendants intentionally restrained or otherwise performed excessive

1   and lengthy physical interventions on Plaintiff D.Z. in response to predictable, disability-related

2   behavior that did not present a clear and present danger to the safety of D.Z. or others and that could

3   have been addressed by less restrictive measures.  These restraints and interventions were not

4   legally justified.

        728.    Defendants' conduct did cause severe and extreme emotional distress to D.Z.

5       729.    As described more fully above, the conduct of Defendants WOHLWEND, SMITH,

6   KELLER, CHRISTENSON and GATEWOOD was extreme and outrageous.  This conduct was

7   intended to cause distress or with reckless disregard of the probability of causing distress to S.D.

8   Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy

9   physical interventions on Plaintiff S.D. in response to predictable, disability-related behavior that

10  did not present a clear and present danger to the safety of S.D. or others and that could have been

11  addressed by less restrictive measures.  These restraints and interventions were not legally justified.

        730.    Defendants' conduct did cause severe and extreme emotional distress to S.D.

12      731.    As described more fully above, the conduct of Defendants SMITH, ALLEN, and

13  MATLOCK was extreme and outrageous.  This conduct was intended to cause distress or with

14  reckless disregard of the probability of causing distress to J.P.      Specifically, Defendants

15  intentionally restrained or otherwise performed excessive and lengthy physical interventions on

16  Plaintiff J.P. in response to predictable, disability-related behavior that did not present a clear and

17  present danger to the safety of J.P. or others and that could have been addressed by less restrictive

    measures.  These restraints and interventions were not legally justified.

18      732.    Defendants' conduct did cause severe and extreme emotional distress to J.P.

19      733.    As described more fully above, the conduct of GHS staff was extreme and

20  outrageous.  This conduct was intended to cause distress or with reckless disregard of the

21  probability of causing distress to E.D.   Specifically, GHS staff intentionally restrained E.D. in

22  response to predictable, disability-related behavior that did not present a clear and present danger

23  to the safety of E.D. or others and that could have been addressed by less restrictive measures.  This

    restraint was not legally justified.

24      734.    The conduct of GHS staff did cause severe and extreme emotional distress to E.D.

25      735.    As described more fully above, the conduct of GHS staff was extreme and

26  outrageous.  This conduct was intended to cause distress or with reckless disregard of the

27  probability of causing distress to H.K.    Specifically, Defendants intentionally restrained or

28  otherwise performed excessive and lengthy physical interventions on H.K. in response to

predictable, disability-related behavior that did not present a clear and present danger to the safety of H.K. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

736.    The conduct of GHS staff did cause severe and extreme emotional distress to H.K.

737.    As described more fully above, the conduct of CHRISTENSON and other GHS staff was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to AUSTIN.   Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on AUSTIN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures.   These restraints and interventions were not legally justified.

738.    The conduct of CHRISTENSON and other GHS staff did cause severe and extreme emotional distress to AUSTIN.

739.    As GHS administrators, Defendants CHRISTENSON, NARAN, MEYERS, and KELLER had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS.  Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures.   Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions.  Plaintiffs allege on information and believe that in some cases Defendants CHRISTENSON, NARAN, MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected.  Defendants' actions and failures to act were a substantial factor in causing the Plaintiff Students to suffer severe and extreme emotional distress.

***LEA Defendants***

740.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA are vicariously liable for the actions of GHS and GHS's employees.  They are also jointly and vicariously liable for one another's actions and those of their employees.

741.    MAX BENSON filed timely government tort claims against DJUSD and YOLO SELPA which are based on the factual circumstances herein alleged and encompass a claim for intentional infliction of emotional distress.

742.    M.S. filed timely government tort claims against EGUSD and EG SELPA which are based on the factual circumstances herein alleged and encompass a claim for intentional infliction of emotional distress.

743.    D.Z. filed timely government tort claims against FCUSD and FC SELPA which are based on the factual circumstances herein alleged and encompass a claim for intentional infliction of emotional distress.

744.    State law guarantees free special education instruction and services to all qualifying children.  Cal. Ed. Code §§ 56040(a); 56344(c).    Local educational agencies have a mandatory, nondelegable duty to provide a free, public education—including special education instruction—to qualifying children within their area.  *B.H. v. Manhattan Beach Unified Sch. Dist.*, 35 Cal.App.5th 563, 582, 587 (2019). An LEA may place an eligible special education student in a nonpublic school pursuant to a Master Contract, but the LEA retains responsibilities to the student under the law and the contract, including oversight and evaluation of the placement. Cal. Ed. Code §§ 56342.1, 56365(a), 56366(a)(2)(B); *L.A. Unified Sch. Dist. v. Garcia*, 741 F.3d 922, 937 (9th Cir. 2014).  For the purposes of determining allocations of state and federal funding to the district, "[p]upils enrolled in nonpublic, nonsectarian schools … shall be deemed to be enrolled in public schools.  Cal. Ed. Code § 56365(b).

745.    California prohibits corporal punishment—defined as "the willful infliction of, or willfully causing the infliction of, physical pain on a pupil"—in public schools.  Cal. Educ. Code § 49001.  California law limits the use of physical "behavioral interventions" on children with disabilities, including those in nonpublic schools.  Cal. Ed. Code §§ 56520 et. seq.  "Emergency interventions may only be used to control unpredictable, spontaneous behavior that poses clear and present danger of serious physical harm to the individual with exceptional needs, or others, and that cannot be immediately prevented by a response less restrictive . . . "Cal. Ed. Code § 56521.1(a). California law prohibits the use of restraints: a) as a substitute for the positive interventions outlined in a student's behavioral intervention plan; b) "for longer than is necessary to contain the behavior"; c) that employ the use of prone restraints by untrained staff; or d) that exert "[a]n amount of force that exceeds that which is reasonable and necessary under the circumstances." Cal. Ed. Code § 56521.1(b)-(d).

746.    LEAs may not "authorize, order, consent to, or pay for" interventions that, among other prohibitions: 1) are designed or likely to cause physical pain; 2) deny adequate "food, water, . . . physical comfort, or access to bathroom facilities"; 3) are designed, used or likely to subject the

- 147 -

student to "verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma"; 4) preclude adequate supervision of the student; or 5) deprive the student of one or more of his senses. Cal. Ed. Code § 56521.2(a)(1)(3)(4)(7) and (8). Prone restraints are prohibited, except as a limited emergency intervention subject to the prohibitions outlined above. Cal. Ed. Code § 56521.2(a)(5).

747.    LEAs are responsible for the implementation of laws prohibiting excessive, prolonged, and harmful restraints in response to predictable, disability-related behavior. Cal. Ed. Code §§ 49001; 56520; 56521; 56521.1 and 56523(b). Compliance with these laws is a condition of receiving federal funding for special education. § 56523(d).

748.    Under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, public entities and those receiving federal financial assistance may not discriminate on the basis of disability in their services or programs. Under Cal. Ed. Code § 220, educational entities receiving state financial assistance may not discriminate on the basis of disability. The Unruh Civil Rights Act, Cal. Civ. Code § 51 prohibits disability discrimination by business establishments. Cal. Civ. Code § 52.1 makes it unlawful to threaten, intimidate or coerce one from exercising and enjoying their rights. Cal. Civ. Code § 51.7 makes it unlawful to threaten or commit physical violence against someone based on their disability. School districts and county offices of education "have primary responsibility to ensure that [their] programs and activities" do not discriminate on the basis of disability and must investigate discrimination complaints. 5 C.C.R. § 4960(a).

749.    The above-listed prohibitions and mandatory duties of the Defendant LEAs were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities, receive an education free from discrimination and abuse.

750.    At all times relevant to this complaint, Defendants DJUSD, YCOE and YOLO SELPA were members of an interagency agreement, the Yolo County Special Education Local Plan, formed pursuant to Cal. Ed. Code § 56195.1(c) for the purposes of ensuring "access to special education and services for all individuals with exceptional needs residing in the geographic area served by the plan." As a result, they are jointly and severally liable for one another's actions and omissions. Cal. Gov't Code § 895.2.

751.    At all times relevant to this complaint, Defendants EGUSD and EG SELPA were members of an interagency agreement, the Elk Grove Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District. As a result,

- 148 -

they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

752.    At all times relevant to this complaint, Defendants FCUSD and FC SELPA were members of an interagency agreement, the Folsom-Cordova Unified School District Special Education Local Plan, formed pursuant to Cal. Ed. 56195.1(a) for the purposes providing access to special education and services for qualified students with disabilities residing in the District.  As a result, they are jointly and severally liable for one another's actions and omissions.  Cal. Gov't Code § 895.2.

753.    Moreover, YOLO SELPA, EG SELPA and FC SELPA each had responsibilities under the law and their respective local plans, including: ensuring equal access to the programs and services to the special education students for whom the SELPA Administrator was receiving state and federal special education funds; monitoring the appropriate use of those funds; entering into Master Contracts with nonpublic schools, reviewing and monitoring those contracts, issuing and monitoring compliance assurances for those contracts, and maintaining updated contracts.  Cal. Ed. Code §§ 56195; 56195.1(c); 56195.7(a) and (c)(6); 56195.8(a) and (b)(1); 56205(a)(5), (11) and (12)(D), and (c); 56360; 56361(e); 56365(a) and (d); 56366(a)(2)(B).  As the intended beneficiary of the federal and state education funding these SELPA Defendants were receiving, Plaintiff students MAX BENSON, M.S. and D.Z., were the intended beneficiary of these statutory and SELPA plan duties.  Their purpose is to ensure that special education funds are being used to provide safe, monitored special education services and programs to the students that qualify for them.  It is not a discretionary function of the Defendant SELPAs to take special education funding for a student and then delegate the student's education to an NPS with little to no oversight, training, or supervision, amounting to deliberate indifference as to whether the NPS complies with laws prohibiting discrimination and improper restraints.

754.    Defendants DJUSD, YCOE, YOLO SELPA, EGUSD, EG SELPA, FCUSD, and FC SELPA did not exercise reasonable diligence and failed to discharge their duties.  These failures proximately were a substantial factor in causing MAX BENSON, M.S., and D.Z. to suffer physical injuries and severe and extreme emotional distress.

755.    Plaintiffs seek compensatory damages and punitive damages (with the exception of the LEA Defendants).

### THIRTEENTH CLAIM FOR RELIEF

**(Negligence)**

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

ESTATE OF MAX BENSON against the CDE, DJUSD, YCOE, YOLO SELPA, WOHLWEND, MORGAN, WATSON, CHAMBERS and THOMAS

M.S. against the CDE, EGUSD, EG SELPA, STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, and JONES

D.Z. against FCUSD, FC SELPA, CHAMBERS, MATLOCK, MCCOY, OEHRING, and GODBOUT

S.D. against WOHLWEND, SMITH, and GATEWOOD

J.P. against SMITH, ALLEN, and MATLOCK

756.    Plaintiffs incorporate by reference all preceding paragraphs

**GHS and GHS Employees**

757.    Defendants WOHLWEND, MORGAN, WATSON, and THOMAS owed a duty to MAX BENSON not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse.  Defendants breached this duty repeatedly when they placed MAX BENSON in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to MAX's physical safety or those of others and that could have been addressed by less restrictive measures.  Defendants' breach of their duties to MAX caused him foreseeable physical and emotional injuries, including his death.

758.    As the designated "school nurse", Defendant CHAMBERS owed a duty to GHS students, including MAX BENSON, to respond promptly to medical emergencies, to have the necessary and legally required training to perform the functions of a school nurse, to provide prompt and competent emergency care, and to immediately notify emergency personnel in response to a life-threatening injury.  Defendant CHAMBERS breached these duties when he failed to respond promptly to multiple calls for medical assistance, did not have the training necessary to be a school nurse, did not provide proper assistance to MAX when he finally arrived, and waited approximately 10 minutes after finding MAX without a pulse to seek emergency assistance.  Defendant's breach of his duties to MAX caused MAX foreseeable physical and emotional injuries, including his death.

759.    Defendants STEARN, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN, and JONES owed a duty to M.S. not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse.  Defendants breached this duty repeatedly when they placed M.S. in lengthy, harmful, and illegal restraints in

1   response to predictable, disability-related behavior that did not cause a clear and present threat to
2   M.S.'s physical safety or those of others and that could have been addressed by less restrictive
3   measures. Defendants' breach of their duties to M.S. caused him foreseeable physical and
4   emotional injuries.

5   760.   Defendants CHRISTENSON, CHAMBERS, MATLOCK, MCCOY, OEHRING,
6   and GODBOUT owed a duty to D.Z. not to place him in illegal and harmful restraints or subject
    him to other legally unjustified physical abuse. Defendants breached this duty repeatedly when
7   they placed D.Z. in lengthy, harmful, and illegal restraints in response to predictable, disability-
8   related behavior that did not cause a clear and present threat to D.Z.'s physical safety or those of
9   others and that could have been addressed by less restrictive measures. Defendants' breach of their
10  duties to D.Z. caused him foreseeable physical and emotional injuries.

11  761.   Defendants   WOHLWEND,   SMITH,   CHRISTENSON,   KELLER   and
    GATEWOOD owed a duty to S.D. not to place him in illegal and harmful restraints or subject him
12  to other legally unjustified physical abuse. Defendants breached this duty repeatedly when they
13  placed S.D. in lengthy, harmful, and illegal restraints in response to predictable, disability-related
14  behavior that did not cause a clear and present threat to S.D.'s physical safety or those of others
15  and that could have been addressed by less restrictive measures. Defendants' breach of their duties
16  to S.D. caused him foreseeable physical and emotional injuries.

17  762.   Defendants SMITH, ALLEN, and MATLOCK owed a duty to J.P. not to place him
18  in illegal and harmful restraints or subject him to other legally unjustified physical abuse.
    Defendants breached this duty repeatedly when they placed J.P. in lengthy, harmful, and illegal
19  restraints in response to predictable, disability-related behavior that did not cause a clear and
20  present threat to J.P.'s physical safety or those of others and that could have been addressed by less
21  restrictive measures. Defendants' breach of their duties to J.P.'s caused him foreseeable physical
22  and emotional injuries.

23  763.   GHS staff members owed a duty to E.D. not to place him in illegal and harmful
24  restraints or subject him to other legally unjustified physical abuse. These staff members breached
    their duty when they placed E.D. in a lengthy, harmful, and illegal restraint in response to
25  predictable, disability-related behavior that did not cause a clear and present threat to E.D.'s
26  physical safety or those of others and that could have been addressed by less restrictive measures.
27  This breach of duties to E.D. caused him foreseeable physical and emotional injuries.

28

764.    GHS staff members owed a duty to H.K. not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse.  These staff members breached their duty repeatedly when they placed H.K. in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to H.K.'s physical safety or those of others and that could have been addressed by less restrictive measures.  This breach of duties to H.K. caused him foreseeable physical and emotional injuries.

765.    CHRISTENSON and other GHS staff members owed a duty to AUSTIN not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse.  These staff members breached their duty repeatedly when they placed AUSTIN in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to AUSTIN's physical safety or those of others and that could have been addressed by less restrictive measures.  This breach of duties to AUSTIN caused him foreseeable physical and emotional injuries.

766.    At all times relevant to this complaint, GHS staff were acting within the scope of their employment and/or agency.  GHS is therefore vicariously liable for their acts and failures to act as described above.

767.    Schools owe a special duty to their students arising from the comprehensive control over students exercised by the staff of the school in which a student is placed.  *Hoff v. Vacaville Unified School Dist.*, 19 Cal.4th 925, 935 (1998); *Virginia G. v. ABC Unified School Dist.*, 15 Cal.App.4th 1848, 1851–1855 (1993). This includes a duty to ensure that students are not subjected to discrimination or abuse. School administrators have a duty to take "reasonable measures to guard pupils against harassment and abuse from foreseeable sources, including any teachers and counselors they know or have reason to know are prone to such abuse."

768.    As administrators of GHS, Defendants CHRISTENSON, NARAN, MEYERS, and KELLER breached this duty to the Plaintiff students.  CHRISTENSON, NARAN, MEYERS, and KELLER knew that GHS staff were subjecting its students, including the Plaintiff Students, to illegal restraints and other unlawful physical interventions and failed to take actions to prevent such abuse, such as the development and effective implementation of policies and practices governing emergency interventions, staff training, supervision, and retention.  To the contrary, Defendants implemented and encouraged a policy and practice at GHS of responding to students' predictable, disability-related behavior with lengthy, harmful, and illegal restraints, even when the students' behavior did not cause a clear and present threat to the physical safety of the students or others and

could have been addressed by less restrictive measures. The breach of these duties caused foreseeable physical and emotional injuries to the Plaintiff Students. In the case of MAX BENSON, Defendants' breach was a substantial factor in causing MAX BENSON's death.

769. At all times relevant to the complaint, GHS's staff and administrators were employees and/or agents of GHS and were acting within the scope of their employment and/or agency. GHS is therefore vicariously liable for their actions and failures to act.

***LEA Defendants***

>*Negligent supervision*

770. The LEA Defendants have a special relationship with the students in their geographical area. In the case of special education students for which the LEA Defendants receive state and federal funding, this relationship is even stronger. This relationship arises from the comprehensive control over students exercised by the staff of the school in which a student is placed. *Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal.4th 925, 935 (1998); *Virginia G. v. ABC Unified Sch. Dist.*, 15 Cal.App.4th 1848, 1851–1855 (1993). LEA administrators have a duty to take "reasonable measures to guard pupils against harassment and abuse from foreseeable sources, including any teachers and counselors they know or have reason to know are prone to such abuse." *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 871(2012). This includes the staff of nonpublic schools in which the LEA has placed its students in order to discharge the LEA's duty to provide the student with special education services

771. As described more fully above, the LEA Defendants and their staff—acting within the scope of their employment and/or agency for the LEA Defendants—failed to provide adequate training, monitoring, or supervision to ensure that the nonpublic schools at which the LEAs had placed their students were complying with anti-discrimination laws and those limiting the use of restraints and other physical interventions. The LEA Defendants continued to place their students at GHS and did not take any measures to ensure compliance with anti-discrimination laws or those preventing illegal restraints. Nor did they remove the Plaintiff students from GHS. In light of the knowledge the LEA Defendants and their staff had about the disproportionate use of restraints against students with disabilities, particularly in nonpublic schools, as well as specific information regarding the illegal restraints being performed on the Plaintiff students, the LEA's breach of their duties was unreasonable, and it was foreseeable that such a failure would cause the Plaintiff students to suffer physical and emotional injuries.

772.     Defendants DJUSD, YCOE, and YOLO SELPA had mandatory statutory and regulatory duties to MAX BENSON as described above and in Paragraphs 622-632 (Ninth Claim for Relief).  Those duties were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities such as MAX BENSON, receive an education free from discrimination and abuse.  Defendants negligently and unreasonably breached these duties with regard to MAX BENSON.  It was foreseeable that such a breach of Defendants' duties would cause students with disabilities to be subjected to discrimination and harmful, unlawful restraints.  Defendants' actions and failures to act were a substantial factor in causing foreseeable physical and emotional injuries to MAX BENSON, including his death.

773.     Defendants EGUSD and EG SELPA had mandatory statutory and regulatory duties to M.S. as described above in Paragraphs 622-632 (Ninth Claim for Relief).  Those duties were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities such as M.S., receive an education free from discrimination and abuse.  Defendants negligently and unreasonably breached these duties with regard to M.S.  It was foreseeable that such a breach of Defendants' duties would cause students with disabilities to be subjected to discrimination and harmful, unlawful restraints.  Defendants' actions and failures to act were a substantial factor in causing foreseeable physical and emotional injuries to M.S.

774.     Defendants FCUSD and FC SELPA had mandatory statutory and regulatory duties to D.Z. as described above and in Paragraphs 622-632 (Ninth Claim for Relief).  Those duties were designed to ensure that all children within the District and/or Local Plan Area, including those with disabilities such as D.Z., receive an education free from discrimination and abuse.  Defendants negligently and unreasonably breached these duties with regard to D.Z.  It was foreseeable that such a breach of Defendants' duties would cause students with disabilities to be subjected to discrimination and harmful, unlawful restraints.  Defendants' actions and failures to act were a substantial factor in causing foreseeable physical and emotional injuries to D.Z.

***CDE***

775.     Defendant CDE owed mandatory statutory and regulatory duties to the Plaintiff Students, including but not limited to:

   a.  Monitoring and supervision of the implementation of laws restricting the use of physical interventions on children with disabilities, including those placed in nonpublic schools. Cal. Ed. Code § 56520, *et. seq.*; Cal. Ed. Code § 56521(a) and (b);

b.  Monitoring "the implementation of local plans by periodically conducting onsite program and fiscal reviews," including at nonpublic schools. Cal. Ed. Code § 56125(b);

c.  Assuring "provision of, and supervising, education and related services to individuals with exceptional needs as specifically required pursuant to the Individuals with Disabilities Education Act." Cal. Ed. Code § 56135(a);

d.  Providing onsite program reviews of the implementation of special education plans. Cal. Ed. Code § 56606;

e.  Monitoring pupil and program performance results and provide monitoring and technical assistance to assure compliance with the IDEA. Cal. Ed. Code § 56600.6;

f.  Post-certification onsite reviews of nonpublic schools every three years if there are no formal complaints, but once a year if there has been a formal complaint against the school. Cal. Ed. Code § 56366.1(e)(1);

g.  Onsite, unannounced investigations of nonpublic schools "if there is substantial reason to believe that there is an immediate danger to the health, safety, or welfare of a child." Cal. Ed. Code § 56366.1(i)(1);

h.  An investigation of the nonpublic school if the SSPI "receives evidence of a significant deficiency in the quality of educational services provided". Cal. Ed. Code § 56366.1(i)(2); and

i.  Monitoring of "the facilities, the educational environment, and the quality of the educational program, including the teaching staff" of any certified nonpublic school, which includes onsite reviews every two out of three years. Cal. Ed. Code § 56366.1(j).

776.  Those duties were designed to ensure that all children in California, including those with disabilities, receive an education free from discrimination and abuse.

777.  From repeated communications from the U.S. Department of Education and non-profit advocates, as well as media reports, lawsuits and compliance complaints, the CDE knew that nonpublic schools were disproportionately placing students with disabilities in excessive, dangerous and illegal restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Yet the CDE maintained a policy and practice of ignoring

this behavior, failing to proactively monitor nonpublic schools or their use of behavioral interventions, failing to respond to allegations of abuse and illegal behavioral interventions, and failing to respond to sustained complaints of restrain abuse with measures effective to ensure compliance. Moreover, the CDE ignored its duty to respond to specific allegations of restraint abuse at GHS and did not conduct a site visit or investigation until after GHS had killed MAX BENSON and repeatedly abused the Plaintiff Students.

778. Defendant CDE negligently and unreasonably breached its legal duties to MAX BENSON and M.S. It was foreseeable that such a breach of Defendants' duties would cause students such as MAX BENSON and M.S. to be subjected to discrimination and harmful, unlawful restraints. Defendant's actions and failures to act were a substantial factor in causing foreseeable physical and emotional injuries to MAX BENSON and M.S.

779. Plaintiffs seek compensatory damages and punitive damages (except against the public entities).

## FOURTEENTH CLAIM FOR RELIEF
### (WRONGFUL DEATH)

LANGLEY against the CDE, DJUSD, YOLO SELPA, YCOE

LANGLEY and BENSON against GHS, MEYERS, KELLER, CHRISTENSON, NARAN, WOHLWEND, MORGAN, WATSON, CHAMBERS and THOMAS

780. Plaintiffs incorporate by reference all preceding paragraphs.

***GHS Defendants***

781. As detailed above, Defendants WOHLWEND, MORGAN, WATSON, and THOMAS subjected MAX BENSON to battery, assault and false imprisonment when they placed him in a prone restraint for an hour and forty-five minutes. Defendants breached their legal duties to MAX BENSON not to place him in a restraint in response to predictable, disability-related behavior that did not constitute a clear and present danger to MAX or others and that could have been addressed by less restrictive measures.

782. GHS administrators, Defendants MEYERS, KELLER, CHRISTENSON, NARAN, knew of and failed to take action to prevent GHS staff from repeatedly subjecting MAX BENSON to illegal, harmful, and lengthy restraints. To the contrary, Defendants implemented and encouraged a policy and practice of restraining GHS students in response to predictable, disability-related behavior that did not constitute a clear and present danger to the student or others and that could have been addressed by less restrictive measures.

- 156 -

783.   As the designated "school nurse", Defendant CHAMBERS owed a duty to GHS students, including MAX BENSON, to respond promptly to medical emergencies, to have the necessary and legally required training to perform the functions of a school nurse, to provide prompt and competent emergency care, and to immediately notify emergency personnel in response to a life-threatening injury.  Defendant CHAMBERS breached these duties when he failed to respond promptly to multiple calls for medical assistance, did not have the training necessary to be a school nurse, did not provide proper assistance to MAX when he finally arrived, and waited approximately 10 minutes after finding MAX without a pulse to seek emergency assistance.  Defendant's breach of his duties to MAX caused MAX foreseeable physical and emotional injuries, including his death.

784.   At all times relevant to the complaint, Defendants MEYERS, KELLER, CHRISTENSON, NARAN, WOHLWEND, MORGAN, WATSON, CHAMBERS and THOMAS were employees and/or agents of Defendant GHS and were acting within the scope of their employment/agency.  Defendant GHS is therefore vicariously liable for their actions and failures to act.

785.   Defendants' actions and failures to act were a substantial factor in causing MAX BENSON's death.

***LEA Defendants***

786.   LANGLEY filed timely government tort claims with DJUSD and YOLO SELPA, which are based on the factual circumstances herein alleged and encompass a claim for wrongful death.

787.   As detailed more fully above, DJUSD, YCOE and YOLO SELPA failed to discharge their statutory and regulatory duties designed to protect children with disabilities, such as MAX BENSON, from disability discrimination and illegal restraints.  Defendants knew of the disproportionate use of restraints against students with disabilities and in nonpublic schools, and had received specific information that MAX BENSON was being subjected to repeated, lengthy and harmful restraints in response to his predictable, disability-related behavior that did not pose a clear or direct threat to the safety of MAX or others and that could have been addressed by less restrictive measures.  Yet Defendants failed to supervise, monitor, train, and ensure compliance with anti-discrimination laws and those prohibiting illegal physical interventions at GHS, a nonpublic school to which Defendants had entrusted the education of a student within their District/SELPA.  Defendants' breach of their duties to MAX BENSON was a substantial factor in causing MAX BENSON to be illegally restrained and killed.

*CDE*

788.    Langley filed a timely government tort claim with the CDE which is based on the factual circumstances herein alleged and encompass a claim for wrongful death.

789.    As explained more fully above, the CDE failed to discharge its statutory and regulatory duties designed to protect children with disabilities, such as MAX BENSON, from disability discrimination and illegal restraints.  These failures were a substantial factor in causing MAX BENSON to be illegally restrained and killed.

790.    Plaintiff LANGLEY has suffered severe emotional distress and injuries, including extreme grief and anguish over knowing how her son suffered and died, the loss of MAX's love and companionship, and profound sadness over all of the experiences Defendants robbed from her and her son.

791.    Plaintiff DAVID BENSON has suffered severe emotional distress and injuries including grief and anguish about his son's suffering and death, the loss of MAX's love and companionship, and the loss of future experiences he will never have with his son.

792.    Plaintiffs seek compensatory damages.  Plaintiffs reserve their rights to seek punitive damages against Defendants GHS, WOHLWEND, KELLER and/or MEYERS should any of them be convicted of a felony in the pending criminal case against them.

## FIFTEENTH CLAIM FOR RELIEF

### (Fraud)

LANGLEY, BENSON, STARK, DARROUGH, COUGHLIN, KINSER, DAVIS, CALER and MULLER against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

793.    Plaintiff Parents incorporate by reference all preceding paragraphs.

794.    The above-identified Defendants were under a duty to speak to or to disclose to Plaintiffs all material facts regarding the care and treatment of Plaintiffs' children while such children were in Defendants' care and to disclose all known material facts relating to such care that would impact in any way upon the physical and psychological well-being of such children, to include, but not limited to all measures to be utilized by Defendants to enforce discipline or to otherwise control or regulate the behavior of such children, specifically the utilization and corresponding risks of the restraint system designed by HWC, in addition to other  applications of potentially dangerous and harmful physical force.

795.    Such duty was born of Defendants' superior knowledge concerning the methods, "educational," "disciplinary" or otherwise, that Defendants had and would condone and/or approve of to be utilized by one or more of the Defendants in order to effectuate discipline and/or control of Plaintiffs' children.

796.    Such duty of disclosure was breached by Defendants', as more specifically identified above, through said Defendants' failure to disclose to the Plaintiffs material facts, to include, but not limited to, the physical means and methods, and corresponding risk of the same, that would be applied by Defendants upon and against Plaintiffs' children while the children were in the care, custody and control of Defendants, to include all of the means and methods described hereinabove.

797.    The failure of the Defendants to fully disclose such material facts was intentional and/or undertaken with reckless disregard for the rights and feelings of the Plaintiffs and/or their children.

798.    Such failure was therefore fraudulent, this failure was undertaken with the intent to deceive Plaintiffs and to falsely assure Plaintiffs that their children were safe and secure while in the care, custody and control of Defendants.  There was a tacit agreement among the Defendants to undertake this deception, knowing that the Plaintiffs and their children could be irreparably harmed.

799.    Plaintiffs were consequently deceived by Defendants' and relied upon the failure to disclose such information critical to the well-being and safety of Plaintiffs' children, and Plaintiffs did, in fact, rely on these false and fraudulent misrepresentations and/or failures to disclose material facts, to the detriment of the physical, psychological and emotional well-being of the Plaintiffs and their children, and such fraud, accomplished by Defendants through their deliberate act(s) and/or omission(s), was a proximate cause of the resulting harm inflicted upon Plaintiffs' children as is described hereinabove.  *See* details in Plaintiff Students' narratives in paragraphs 169-383 above, which are incorporated herein by reference, and detail each defendants' corresponding act demonstrative of fraud.

800.    Such misrepresentations and failures to disclose were "material" to the breach of Defendants' duty owed to the Plaintiffs, as the Plaintiffs would have acted differently and taken measures to protect their children from harm by the Defendants (including refusing to enroll their children in the care of Defendants) had full disclosure of the potential harm to their children been disclosed to them.

801.    The schools represented to or misled the Plaintiff Parents to assume that their children would be safely cared for.  Such representation was false because the schools knew that physical restraints could be applied to the children, potentially causing them to suffer harm, yet failed to disclose this potentiality to the parents.  The schools knew that such presentation was false when it was made.  The identified Defendants intended for the Plaintiff Parents to rely on their representation. The Plaintiff Parents reasonably relied on such representation to their ultimate detriment.  The children were harmed.  The Plaintiff Parents' reliance on such representation was a substantial factor in causing the children harm.  The Plaintiff Parents would not have permitted the identified Defendants to have custodial control over their children, knowing that the identified Defendants school could, in its sole discretion, apply dangerous restraints to their children which could cause injury or even death.

802.    Each and every one of the Defendants identified above undertook one or more wrongful acts and/or omissions as identified above to insure that full disclosure to the Plaintiffs of the potential for resultant harm to their children was not made, and such acts and/or omissions caused proximate harm to Plaintiffs and were accomplished by the Defendants intentionally, maliciously and/or with reckless disregard for the rights and feelings of Plaintiffs and their children, for which damages (including for severe and extreme emotional) distress Defendants are jointly and/or severally liable to Plaintiffs.

803.    Plaintiffs seek compensatory and punitive damages.

## SIXTEENTH CLAIM FOR RELIEF

### (Tortious Breach of the Duty of Good Faith and Fair Dealing)

LANGLEY, BENSON, STARK, DARROUGH, COUGHLIN, KINSER, DAVIS, CALER and MULLER against GHS, CHRISTENSON, NARAN, MEYERS, and KELLER

804.    Plaintiffs incorporate by reference all preceding paragraphs.

805.     In every contract where there is a special relationship between the tortfeasors (here the Defendants) and the victims (here the Plaintiffs and their children), a breach of such contract's implied covenant of good faith and fair dealing is actionable.

806.    Here, there was a "special relationship" between Plaintiffs and all of the named Defendants, which was characterized by elements of public interest, adhesion, fiduciary responsibility and natural reliance.  The Plaintiffs naturally relied upon all of the named Defendants to care for and protect Plaintiffs' children in a psychologically and physically safe environment,

- 160 -

and Defendants represented, verbally and in writing and by advertisement, to Plaintiffs that such reliance was justified and would indeed be honored.

807.    This representation by Defendants and corresponding reliance by Plaintiffs constituted a covenant of good faith and fair deal implied within Defendants' contract with Plaintiffs for the care and custody and education of their children, upon which Plaintiffs were entitled to rely.

808.    This implied covenant was embedded within the written contract between Plaintiffs and Defendants for the care and custody of Plaintiffs' children because the nature of the contract required a need to "'protect the weak [the Plaintiffs' children] from the insults of the stronger [the Defendants]' that is not adequately met by ordinary contract damages." *See K Mart Corp. v. Ponsock*, 103 Nev. 39, 49, 732 P.2d 1364, 1371 (1987). This remedy is also extended to situations in which one party (Defendants herein) holds "vastly superior bargaining power." *See Aluevich*, 99 Nev. at 217, 660 P.2d at 987.

809.    This remedy is available to Plaintiffs because the aggrieving party (Defendants) was in a "superior or entrusted position" and has engaged in "grievous and perfidious misconduct." *See Great American Ins. v. General Builders*, 113 Nev. 346, 934 P.2d 257 (1997).

810.    Each and every one of the Defendants undertook one or more wrongful acts and/or omissions to breach this implied covenant, and such acts and/or omissions caused proximate harm to Plaintiffs and were accomplished by the Defendants intentionally, maliciously and/or with reckless disregard for the rights and feelings of Plaintiffs and their children, for which damage Defendants are jointly and/or severally liable to Plaintiffs.

811.    Plaintiffs seek compensatory and punitive damages.

### SEVENTEENTH CLAIM FOR RELIEF

### GENERAL NEGLIGENCE

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN Against HWC

812.    Plaintiffs incorporate by reference all preceding paragraphs.

813.    At all times herein mentioned, defendant HWC was under a duty not to design, develop, market, and sell a restraint system that presented an unreasonable risk of death or harm to children.

814.    At the time of development and sale of the restraint system, Chapman and HWC knew or reasonably should have known that the restraint system presented an unreasonable risk of

- 161 -

injury or death and should not be used on medically compromised children, on obese children, on children who take psychiatric medications, on autistic children who cannot communicate their needs to adults and who have a natural inclination to struggle against restraint, or for prolonged periods of time.

815.    Defendant HWC breached its duty of reasonable care and were negligent in designing and marketing a restraint system that presented said unreasonable risks of injury and death.    Defendant HWC further breached its duty of reasonable care and was negligent in designing and marketing a restraint system that violated California Education Code sections 56521.1 and 56521.2 which, in pertinent part, prohibits the use of any interventions that 1) cause physical pain; 2) simultaneously immobile all four extremities, 3) apply an amount of force that exceeds that which is reasonable and necessary under the circumstances, or 4)  subjects the individual to verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma.

816.    At all times herein mentioned, defendant HWC breached its duty of care to design and market a safe restraint system for use on "behaviorally challenged" students by, but not limited to: failing to instruct GHS school staff on the known dangers of the use of a prone restraint on children; failing to instruct GHS school staff on the types of medical conditions in which use of a prone restraint is contraindicated; failure to instruct GHS school staff that prone restraints should not be used on children who are obese, who have neurological and muscular-skeletal compromise, or who use pain and/or psychiatric medications; teaching GHS school staff to use a prone restraint that constricted the child's ability to breathe; failing to instruct GHS school staff on signs that would indicate when a child being held in restraint was in physical distress; failure to instruct GHS school staff to identify signs or complaints of distress that must be immediately addressed, including but not limited to: urination, vomiting, and agitation; failing to instruct GHS school staff that agitation by a child in a restraint is a natural response to being restrained, and is not necessarily a threat to authority; failing to protect children from foreseeable abuses of its restraint system; failing to instruct GHS school staff that prone restraints should not be used except as a last resort; failing to instruct school staff that restraints should not be used except to control dangerous, unpredictable behavior; failure to instruct GHS staff not to use prone restraints in excess of 15 minutes; failure to instruct GHS school staff that a child must be released from a restraint at the earliest possible moment; failed to instruct GHS school staff not to use multiple staff members during a prone restraint; failing to instruct GHS school staff that they must provide for the comfort of a child being

held in a prone restraint, including offering a restrained child fluids, bathroom use, exercise, range of motion and periodic release of limbs; failure to instruct GHS school staff that vital signs of the restrained child must be monitored regularly throughout the restraint; failure to instruct GHS school staff that continuous, close supervision of a restraint must be performed by the HWC trainer or another staff member who is not involved in the restraint; failure to instruct GHS school staff that an immediate and accurate report must be provided to all educational professionals after each restraint; failure to instruct GHS school staff that prompt and thorough review of any restraint imposed just be performed as a means to ensure compliance with laws and policies, to ensure continuing safety of students, and to prevent other incidents of restraint; failure to instruct GHS school staff of primary preventative measures available rather than restraints; failure to instruct GHS school staff of interventions that are less intrusive than restraints; failure to instruct GHS school staff of effective ways to de-escalate situations to avoid restraints; failure to instruct GHS school staff of crisis intervention techniques that utilize alternatives to restraint; teaching use of prone restraints to GHS school staff that create an aversive environment counterproductive to facilitating learning; teaching the use of prone restraints to GHS school staff that cause significant physical harm, serious, foreseeable long term psychological impairment; failure to provide oversight to GHS school staff on the use of restraints to determine whether the intervention was necessary; failure to provide oversight to GHS school staff on whether restraints were being implemented in a manner consistent with staff training; failing to teach GHS school staff basic life-saving safety techniques, such as CPR, which may become necessary as a result of the imposition of a restraint; failing to teach GHS school staff to call 911 in the event of a medical emergency involving someone involved in a prone restraint.

817.    The negligence of defendant HWC was a substantial factor in causing school staff at defendant, GHS, to use a prone restraint in a deadly and dangerous manner on physically and medically compromised "behaviorally challenged", disabled students, resulting in the death of MAX, and injuries to ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN.

818.    The negligence of defendant HWC was a substantial factor in causing school staff at defendant, GHS, to use the devices provided and sold to GHS by HWC in a dangerous manner on mentally compromised "behaviorally challenged", disabled students, resulting in the death of MAX BENSON and injuries and traumatic conditions to ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN.

819.     As a direct and proximate result of the negligence of the defendants, MAX suffered death and the other minor plaintiffs suffered permanent and continuous physical injuries, and pain and suffering, along with emotional trauma that will continue into the future.  Further, the minor plaintiffs have incurred medical expenses, and will incur other future special damages according to proof.

### EIGHTEENTH CLAIM FOR RELIEF
### STRICT PRODUCT LIABILITY

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN against HWC

820.     Plaintiffs incorporate by reference all preceding paragraphs.

821.     Chapman developed and invented the restraint system applied to the children in this case and holds multiple patents with respect to this product.

822.     Defendant HWC is the assignee of at least some of the restraint system patents held by Chapman and is a closely held corporation operated out of a single-family residence.

823.     At all times herein mentioned, HWC was in the business of designing, developing, marketing, selling, and distributing the restraint system for use on behaviorally challenged, disabled children/students within the United States, specifically within the State of California, and to GHS.

824.     Of the products designed and marketed by HWC, some included mechanical devices that would be used to hold a person in place, immobilized in such a fashion that they could not move extremities or their heads such as a cervical collar and other physical implements to hold a person steady.

825.     They sold and marketed thick mats such as wrestling mats which were used to roll a person in and then sat upon with the subject person contained therein like a sandwich wrap.

826.     Other products included harnesses and straps to hold a person in a sitting position, unable to move feet, hands or arms. Such a device was used to transport S.D. on at least one occasion on May 18, 2018.  On this occasion he was wearing the harness and his hands were bound by zip ties behind his back. He observed other students so restrained on other trips home on which he was transported in the school's van.

827.     D.Z. was also restrained in such a fashion on numerous occasions beginning on or about October 4, 2017 and ending on or about May 18, 2018.  KINSER, on return home from the school, saw her son restrained in the van in a device which she found advertised as marketed by HWC.

- 164 -

828.    At least on one occasion during 2015, J.P. was also restrained in such a fashion because he did not want to go home on the bus.

829.    At some point during the time M.S. was at GHS, he was wrapped up in an exercise mat as described above and sat upon by Linda Stearn. On another occasion, Melanie Stark observed another child tightly restrained as described above in the van when her son, M.S. was delivered home by GHS.

830.    Austin Petersen was transported in a school van by GHS staff repeatedly during his time at GHS. During that time, he repeatedly observed other children who were not cooperating with the staff restrained in a "straight jacket" like device, with wrist restraints and a "cervical type" collar.

831.    On an occasion not long before he was killed by GHS staff, MAX was also threatened with being bound with a "straight jacket" device on his ride home if he did not cooperate.

832.    In all of these occasions where mechanical restraints were used, the children were left with bruising, welts, distinct marks, impressions, upon their bodies where the implement came in contact with their bodies either directly or over their clothing. On occasion, it broke their skin causing bleeding.

833.    At the mortuary, MAX's body bore such marks on his upper, inner arms.

834.    At all times herein mentioned, defendant HWC represented to CDE, LEA's and its employees, GHS and its employees, that the restraint system went through 10 years of field study, development and overview under the supervision of some of the most accomplished and experienced medical minds at Pennsylvania Hospital before the program was offered to the public and that defendant HWC's restraint system had been extensively evaluated by leading forensic experts (forensic pathologists), experts, chief medical examiners, doctors, and nurses.

835.    In developing and marketing the product, HWC knew, or should have known, that the use of a prone restraint carries with it a very well-known risk of injury and death, especially to children; and that other types of physical restraints cause serious injuries to children.

836.    In developing and marketing the product, HWC knew, or should have known, when developing the restraint system, that documented injuries from use of prone restraints include: asphyxiation, choking, strangulation, cerebral and cerebellar oxygen deprivation (hypoxia and anoxia), broken bones, lacerations, abrasions, injury to joints and muscles, contusions or bruising, overheating, dehydration, exhaustion, blunt trauma to the head, broken neck, wrist and leg compression, dislocation of the shoulder and other joints, hyperextension or hyperflexion of the

arms, exacerbation of existing respiratory problems, decreased respiratory efficiency, decrease in circulation to extremities, deep vein thrombosis, pulmonary embolism, cardiac arrest, respiratory arrest, and death.

837.    In developing and marketing the product, HWC knew, or should have known, that the risk of injury or death is increased where the person restrained has neurological, cardiac, respiratory conditions, or is obese.

838.    In developing and marketing the product, CHAPMAN, HWC knew or should have known that children, upon whom the restraint system was intended to be used, have physical limitations and/or other medical conditions that would contraindicate the use of the restraint system upon them.

839.    Chapman and HWC's patented restraint system is intended for use in physically restraining a child, including use of a prone (face down) restraint.  The system includes a method to "take down" the student to the ground, force the student into a face down position, and to immobilize the student while face down on the ground.

840.    In marketing the product, HWC promoted the restraint system as a safe and effective way to gain control over a child who is in a behavioral crisis.

841.    In developing and marketing the product, HWC knew, or should have known, that a disproportionate number of children are injured and/or have died from restraints because children struggle against physical restraints, particularly when the situation or method of restraint is extremely unpleasant or aversive.

842.    In developing and marketing the product, HWC knew, or should have known, that struggling against a hold is a natural and foreseeable response, and that the user of the restraint system may exert pressure, in a variety of forms, on the thoracic cavity of the child upon whom the restraint system is used, and on the child's neck, head, shoulders, ankles, or limbs, which may cause injury.

843.    In developing and marketing the product, HWC knew or should have known that children upon whom the restraint system was intended to be used may have medical or emotional conditions that make it difficult for the child to communicate his/her physical needs or concerns.

844.    At all times herein mentioned, defendant HWC represented to CDE, LEA's and its employees and GHS and its employees that use of defendant HWC's restraint system on "behaviorally challenged" students eliminated injuries during takedown, as well as chest compression and the possibility of positional asphyxiation during a prone hold; and further

represented that their restraint system allowed educational professionals to work in teams and to maintain a safe hold on children, including modifications for orthopedic and physical conditions; and that HWC would customize its deployment system to include a variety of tactical adjustments for an "unprecedented range" of ergonomic considerations.

845.    At all times herein mentioned, HWC knew or should have known that struggling against a restraint is a natural response and cannot be assumed to be oppositional.

846.    At all times herein mentioned, HWC knew, or should have known, that severe injuries, including causing traumatic conditions, and death can occur when adults physically overpower a child or when a child struggles well beyond the point of physical exhaustion.

847.    At all times herein mentioned, HWC knew or should've known that in a crisis situation, a child cannot be expected to fully understand directions and to effectively communicate their personal needs.

848.    At all times herein mentioned, defendants HWC, CDE, LEA's and their employees and GHS and its employees knew or should have known that children may be physically and emotionally injured when someone forces the child from a standing position to the ground and into a prone or other type of restraint.

849.    At all relevant times, HWC knew that HWC's its products would be purchased and used without inspection for defects in that the schools and that school staff relied on Chapman's and HWC's representations about their safety.

850.    The products were defective when they were sold and placed into the stream of commerce by HWC because they caused, at minimum, traumatic conditions, serious injuries and death.

851.    The products at the time of injury were being used in the manner intended by the defendants and further, were used in the manner that was reasonably foreseeable by defendants to include as involving a substantial danger to disabled children that was not readily apparent to the users of the product, and adequate warnings of the danger were not given to the users of the product.

852.    At all times herein mentioned, in marketing the restraint system, HWC made representations that the restraint system was endorsed by the medical profession, when, in fact, the medical profession has not placed its imprimatur on the use of the restraint system, and, in particular, has not indicated any approval of the use of prone restraint on an obese child with a fused neck, such as was MAX's condition was on the date the restraint system caused his death,

and the risks of asphyxiation and aspiration in prone restraints are well known to the medical community.

853.    At all times herein mentioned, HWC knew that the restraint system was defective and knew that the defect was due, in part, on the fact that prone holds should not be used on medically compromised children, on children who were obese, who were taking psychiatric medications, or on autistic children who cannot communicate their needs to an adult, and for whom struggling against a restraint is a natural reaction.

854.    At all times herein mentioned, HWC did not include information to users of the restraint system that would allow the users to determine that the system should not be used on medically compromised or obese children, children who were on psychiatric medication, or autistic children but continued to promote the use of prone restraints as a necessary method of restraining children, especially by promoting fear of behaviorally challenged children among teachers, administrators, and the public at large.

855.    At all times herein mentioned, HWC represented to consumers of the restraint system that it complied with California law.

856.    At all times herein mentioned, HWC knew that the restraint system was defective, and that the defect was due, in part, to the fact that it was prohibited to use the restraint system under California law for behaviors of the person being restrained that do not pose a risk of harm to that person or to others; and for known and predictable behaviors that are addressed in a behavioral intervention plan.  Further, defendants knew or should have known that the restraint system that violated California Education Code sections 56521.1 and 56521.2 which, in pertinent part, prohibits the use of any interventions that: 1) cause physical pain; 2) simultaneously immobile all four extremities,; 3) apply an amount of force that exceeds that which is reasonable and necessary under the circumstances,; or 4)  subjects the individual to verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma.

857.    At all times herein mentioned, HWC also knew that the restraint system was defective, and that the defect was due, in part, to the fact that it failed to limit a child's exposure to the prone hold for a prolonged period of time and failed to inform users of the restraint system of the increased likelihood of injury and death to students if a restraint lasted more than 15 minutes.

858.    At all times herein mentioned, HWC knew the restraint system was defective and that the defect was due, in part, to the fact that the restraint system would be used by inexperienced school staff; that the restraint system failed to take into account the dynamics of a behavioral crisis,

both for the user of the product and for the child upon whom it was intended to be used; and that only one person from the school was trained in the use of the product by HWC, and, like the game of "telephone,", that person would then demonstrate how to use the product to others within the school, with no oversight as to whether use of the product by the next line of teachers was properly performed.

859.    At all times herein mentioned, HWC knew or should have known that of the hazardous and dangerous propensities of the restraint system, in that numerous studies, including those of the U.S. government have established that prone restraints of the type used in HWC's restraint system have resulted in large numbers of deaths and innumerable injuries involving children across the United States.

860.    HWC knew the product would be purchased and used without inspection for defects. The product was defective when it left the control of each defendant. The product at the time of injury was being used in the manner intended by the defendants or used in the manner that was reasonably foreseeable by defendants as involving a substantial danger not readily apparent, and adequate warnings of the danger were not given to the users of the product.

861.    At all times herein mentioned, the restraint system was not reasonably fit, suitable, or safe for its intended purpose, and the foreseeable risks of injury and death exceeded any benefits associated with its design and formulation.

862.    At all times herein mentioned, the restraint system was unreasonably dangerous in that it failed to perform safely when used by ordinary consumers of the restraint system, including staff at GHS, and including when it was used as intended and in a reasonably foreseeable manner.

863.    At all times herein mentioned, the restraint system was expected to reach users of the restraint system without substantial change in the defective and unreasonably dangerous condition in which it was sold, and any misuse of the restraint system was foreseeable in light of the rapidly shifting dynamic under which the restraint system was intended to be used, as demonstrated by the numerous documented incidents of injury and death to students by use of prone restraints such as those which are part of HWC's restraint system.

864.    At all times herein mentioned, the restraint system was unreasonably dangerous and defective in design or formulation for its intended use in that, when it was placed into the stream of commerce by HWC, it posed a serious risk of death and injury that could have been avoided by use of safer alternatives to handling children in behavioral crisis, such as those positive behavioral supports currently promoted by the State of California.

865.    At all times herein mentioned, HWC's restraint system, was insufficiently studied and tested for use on medically compromised or obese children, or children who were taking psychiatric medications, or for use on autistic children in behavioral crisis who cannot convey their needs to an adult, and for children for whom struggling against a restraint is a natural reaction.

866.    and the other minor plaintiffs are within the class of persons that HWC should reasonably have foreseen as being subject to harm caused by the defective restraint system because MAX and the other minor plaintiffs were disabled children within the State of California upon whom the product was intended to be used.

867.     On or about the dates herein alleged, MAX suffered injuries and ultimately death, and the other minor plaintiffs named in this cause of action were injured by said restraint system.

868.    Each of the restraint system defects, as described herein, was a substantial factor in causing MAX to suffer injuries and death, and in causing each of the other minor plaintiffs named herein to suffered permanent and continuous physical injuries, pain and suffering, along with emotional trauma that will continue indefinitely into the future.  Further, the minor plaintiffs have incurred medical expenses, and will incur other future special damages according to proof.  The estate of MAX makes no claim for damages for pain and suffering.

869.    Notwithstanding the foregoing, the other named Defendants knew or should have known that HWC's restraint system was fraudulently misrepresented by HWC and, in fact, posed a dangerous risk of harm, to include even death, to vulnerable students to whom it was to be applied by these Defendants, yet these Defendants nevertheless embraced HWC's false claims and disclaimers of accountability for their own discriminatory and abusive purposes. Given the extensive negative reports filed and distributed by the government agencies described in the preceding paragraphs about the harm that these restraints have inflicted upon children, including death, as well as the visible and otherwise reported actual injuries sustained by the children as a result of the use of these devices purchased from HWC, GHS and the other Defendants knew or had to have known that they were violating all of the California laws set forth herein prohibiting inflicting pain, traumatic conditions and abuse upon these children, especially given the written and verbal complaints made by the parents of the children who suffered the injuries as described herein. Defendants should not have relied on the misrepresentations of HWC and should have immediately discontinued the use of HWC's restraint system when Defendants realized it was not only ineffective but actually inflicted physical and emotional harm upon the children in their care.

**NINETEENTH CLAIM FOR RELIEF**

**PRODUCT LIABILITY NEGLIGENT DESIGN**

ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN Against HWC

870.    Plaintiffs incorporate by reference all preceding paragraphs.

871.    At all times herein mentioned, Defendant HWC (herein after individually and collectively referred to as "HWC") was under a duty not to design, develop, market, and/or sell a restraint system that presented an unreasonable risk of death or harm to children.

872.    the time of the development and sale of the restraint system, Chapman and HWC knew or reasonably should have known that the restraint system presented an unreasonable risk of injury or death to children and should not be used on medically compromised children, on obese children, on children who take psychiatric medications, on autistic children who cannot communicate their needs to adults and who have a natural inclination to struggle against restraint, and/ or for prolonged periods of time.

873.    Defendant HWC breached its duty of reasonable care and was negligent in designing and marketing a restraint system that presented such aid unreasonable risks of injury and death. Defendant HWC further breached its duty of reasonable care and was negligent in designing and marketing a restraint system that violated California Education Code, sections 56521.1 and 56521.2, which, in pertinent part, prohibits the use of any interventions that: 1) cause physical pain; 2) simultaneously immobile all four extremities;, 3) apply an amount of force that exceeds that which is reasonable and necessary under the circumstances;, or 4)  subjects the individual to verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma.

874.    At all times herein mentioned, defendant HWC breached its duty of care to design and market a safe restraint system for use on "behaviorally challenged" students by, but not limited to: failing to instruct GHS school staff on the known dangers of the use of a prone restraint on children; failing to instruct GHS school staff on the types of medical conditions in which use of a prone restraint is contraindicated; failing to instruct GHS school staff that prone restraints should not be used on children who are obese, who have neurological and muscular-skeletal compromise, or who use pain and/or psychiatric medications; teaching GHS school staff to use a prone restraint that constricted the child's ability to breathe; failing to instruct GHS school staff on physical or other signs that would indicate when a child being held in restraint was in physical distress; failing to instruct GHS school staff to identify signs or complaints of distress that must be immediately

addressed, including but not limited to:, urination, vomiting, and agitation; failing to instruct GHS school staff that agitation expressed by a child in a restraint is a natural response to being restrained, and is not necessarily a threat to authority; failing to protect children from foreseeable abuses of its restraint system; failing to instruct GHS school staff that prone restraints should not be used except as a last resort; failing to instruct school staff that restraints should not be used except to control dangerous, unpredictable behavior; failure to instruct GHS staff not to use prone restraints in excess of 15 minutes; failing to instruct GHS school staff that a child must be released from a restraint at the earliest possible moment; failed to instruct GHS school staff not to use multiple staff members applied during a prone restraint; failing to instruct GHS school staff that they must provide for the comfort of a child being held in a prone restraint, including offering a restrained child fluids, bathroom use, exercise, range of motion and periodic release of limbs; failure to instruct GHS school staff that vital signs of the restrained child must be monitored regularly throughout the restraint; failure to instruct GHS school staff that continuous, close supervision of a restraint must be performed by the HWC trainer or another staff member who is not involved in the restraint; failure to instruct GHS school staff that an immediate and accurate report must be provided to all educational professionals after each restraint; failure to instruct GHS school staff that prompt and thorough review of any restraint imposed must it be performed as a means to ensure compliance with laws and policies, to ensure continuing safety of students, and to prevent other incidents of restraint; failure to instruct GHS school staff of primary preventative measures available rather than the use of restraints; failure to instruct GHS school staff of interventions that are less intrusive than restraints; failure to instruct GHS school staff of effective ways to de-escalate situations to avoid the use of restraints; failure to instruct GHS school staff of crisis intervention techniques that utilize alternatives to restraint; teaching use of prone restraints to GHS school staff that create an aversive environment counterproductive to facilitating learning; teaching the use of prone restraints to GHS school staff that cause significant physical harm, serious, foreseeable long term psychological impairment; failure to provide oversight to GHS school staff on the use of restraints to determine whether the intervention was necessary; failure to provide oversight to GHS school staff on whether restraints were being implemented in a manner consistent with staff training; failing to teach GHS school staff basic life-saving safety techniques, such as CPR, which may become necessary as a result of the imposition of a restraint; failing to teach GHS school staff to call 911 in the event of a medical emergency involving someone involved in a prone restraint.

875.    negligence of defendant HWC was a substantial factor in proximately causing school staff at defendant, GHS, to use a prone restraint in a deadly and dangerous manner on physically and medically compromised "behaviorally challenged,", disabled students, resulting in the death of MAX, and injuries to ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN.

876.    The negligence of defendant HWC was a substantial factor in proximately causing school staff at defendant, GHS, to use the devices provided and sold to GHS by HWC in a dangerous manner on mentally compromised "behaviorally challenged,", disabled students, resulting in the death of MAX BENSON and injuries and traumatic conditions to ESTATE OF MAX BENSON, M.S., E.D., D.Z., S.D., J.P., H.K., and AUSTIN.

877.    As a direct and proximate result of the negligence of the defendants, MAX suffered death, and the other minor Plaintiffs suffered permanent and continuous physical injuries, and pain and suffering, along with emotional trauma that will continue into the future.  Further, the minor Plaintiffs have incurred medical expenses, and will incur other future special damages according to proof.

878.    Notwithstanding the foregoing, the other named Defendants knew or should have known that HWC's restraint system was fraudulently misrepresented by HWC and, in fact, posed a dangerous risk of harm, to include even death, to vulnerable students to whom it was to be applied by these Defendants, yet these Defendants nevertheless embraced HWC's false claims and disclaimers of accountability for their own discriminatory and abusive purposes. Given the extensive negative reports filed and distributed by the government agencies described in the preceding paragraphs about the harm that these restraints have inflicted upon children, including death, as well as the visible and otherwise reported actual injuries sustained by the children as a result of the use of these devices purchased from HWC, GHS and the other Defendants knew or had to have known that they were violating all of the California laws set forth herein prohibiting inflicting pain, traumatic conditions and abuse upon these children, especially given the written and verbal complaints made by the parents of the children who suffered the injuries as described herein. Defendants should not have relied on the misrepresentations of HWC and should have immediately discontinued the use of HWC's restraint system when Defendants realized it was not only ineffective but actually inflicted physical and emotional harm upon the children in their care.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court award the following:

1.    For violations of the Americans with Disabilities Act

    a.   Compensatory Damages

    b.   Attorneys' fees and costs

2.    For violations of Section 504 of the Rehabilitation Act of 1973

    a.   Compensatory Damages

    b.   Attorneys' fees and costs

3.    For violations of Section 1983 (Violation of the Fourth Amendment)

    a.   Compensatory Damages

    b.   Punitive Damages

    c.   Attorneys' fees and costs

4.    For violations of Section 1983 (Due Process/Wrongful Death)

    a.   Compensatory Damages

    b.   Punitive Damages

    c.   Attorneys' fees and costs

5.    For violations of Cal. Education Code § 220

    a.   Compensatory damages

    b.   Attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5

6.    For violations of the Unruh Civil Rights Act, Cal. Civ. Code § 51

    a.   Compensatory Damages

    b.   Treble Damages pursuant to § 52(a) (against GHS only)

    c.   Attorneys' fees and costs

7.    For violations of the Ralph Act, Cal. Civ. Code § 51.7

    a.   Compensatory Damages

    b.   Exemplary Damages pursuant to Cal. Civ. Code 52(b)(2) (against GHS only)

    c.   Civil Penalty of $25,000 pursuant to Cal. Civ. Code 52(b)(2) (against GHS only)

    d.   Attorneys' fees and costs

8.    For violations of the Bane Act, Cal. Civ. Code § 52.1

    a.   Compensatory Damages

    b.   Punitive Damages pursuant to Cal. Civ. Code § 3294 (against GHS only)

- 174 -

c. Attorneys' fees and costs

9. For Battery

    a. Compensatory Damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

10. For Assault

    a. Compensatory Damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

11. For False Imprisonment

    a. Compensatory Damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

12. For Intentional Infliction of Emotional Distress

    a. Compensatory Damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

13. For Negligence

    a. Compensatory Damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

14. For Fraud

    a. Compensatory damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

15. For Tortious Breach of the Duty of Good Faith and Fair Dealing

    a. Compensatory damages

    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

16. For Wrongful Death

    a. Compensatory Damages

PLAINTIFFS' THIRD AMENDED COMPLAINT

b.  Plaintiffs reserve their right to seek Punitive Damages pursuant to Cal. Civ. Code § 3294 against Defendants Wohlwend, Meyers, Keller, and GHS pending the outcome of the criminal proceedings against Wohlwend, Meyers and Keller.

17.  For Negligence against HWC

a.  Compensatory damages

b.  Punitive Damages pursuant to Cal. Civ. Code § 3294

18.  For Strict Product Liability against HWC

a.  Compensatory damages

b.  Punitive Damages pursuant to Cal. Civ. Code § 3294

19.  For Product Liability-Negligent Design against HWC

a.  Compensatory damages

b.  Punitive Damages pursuant to Cal. Civ. Code § 3294

20.  On all claims:

a.  Post-judgment interest

b.  Such other and further relief that the Court may deem just and proper.